IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DISTRICT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>　　　　　Plaintiff<br><br>　　vs.<br><br>THOMAS ROMANO<br><br>　　　　　Defendant | Case No. 2:19-cr-202<br><br>Judge Michael H. Watson |

**UNITED STATES' MOTION FOR A CONFLICT OF INTEREST HEARING**

The United States, by and through the undersigned counsel, respectfully requests a hearing to address a potential conflict of interest of defense counsel Samuel Shamansky (Mr. Shamansky) in the concurrent representation of defendants Dr. Thomas Romano (Dr. Romano) and Dr.Troy Balgo (Dr. Balgo). The United States has reason to believe Mr. Shamansky has a potential conflict of interest in the representation of Dr. Romano by virtue of his representation of Dr. Balgo, who is a potential material witness in the case involving Dr. Romano. This potential conflict, which will be outlined below, gives rise to the United States' ethical obligation to disclose to this Honorable Court and seek a hearing.

**I.　　FACTUAL AND PROCEDURAL BACKGROUND**

Defendant Romano is charged with thirty-four counts of unlawfully distributing controlled substances in violation of 21 U.S.C. § 841 and 18 U.S.C. § 2. *See* Dkt. 30. Trial is set for November 2, 2020 before this Court. *See* Dkt. 28.

The United States' allegations in this case relate to Dr. Romano's practice of prescribing controlled substances, including high volumes of opioids and dangerous combinations of

1

controlled substances, to multiple patients outside of the usual course of professional practice and without a legitimate medical purpose. One such patient, J.P., began his relationship with Dr. Romano on or around December 11, 2015. J.P. was approximately 42 years old when he started seeing Dr. Romano. At that time, Dr. Romano immediately began prescribing J.P. two different dosages of oxycodone, at a higher dosage than J.P.'s prior physician had prescribed. Romano increased the total dosage of oxycodone he prescribed to J.P. twice between December 2015 and May 2016, ultimately prescribing J.P. a dosage of oxycodone that was approximately two and a half times stronger than the Centers for Disease Control recommend for safe opioid prescribing. Dr. Romano last prescribed J.P. this dosage of oxycodone on September 16, 2016. On the evening of September 17, 2016, family members found J.P. dead in his Belmont County home.

Local and county officials were dispatched to J.P.'s home when his death was reported. Local fire and police officials responded to the scene, and the responding officer from the fire department wrote a narrative report detailing the investigation. This report notes that J.P. did not have any apparent injuries, and states that the officer "placed a call to coroner and explained what we had, hx (sic) and such. Coroner felt he needed to come to the scene." Dr. Balgo was the Belmont County Coroner at the time of J.P.'s death, having been elected to the position in approximately 2004. The report concludes by noting that "coroner feels that it is from natural causes. But took blood from pts (sic) heart to send out."

Information obtained from the Belmont County Coroner's Office indicates that toxicology testing was performed on blood obtained from J.P. shortly after his death, and that the test was reportedly ordered by Dr. Balgo. The test results indicated that J.P. had 156 micrograms per liter (mcg/L) of oxycodone in his blood. This quantity is nearly four times above the 10 – 40 mcg/L that is the reference range for the test and over one and a half times above the 20 – 99 mcg/L

reference range for chronic pain patients.

After receiving these results, Dr. Balgo issued an official death certificate for J.P. which indicated the sole cause of J.P.'s death was an accidental oxycodone overdose.[1] J.P. only received oxycodone prescriptions from Dr. Romano. The government obtained an expert review of Dr. Romano's prescribing to J.P. from Dr. Timothy Munzing, M.D (Dr. Munzing). Dr. Munzing reviewed J.P.'s patient file from Dr. Romano and Dr. Balgo's assessment of J.P.'s death. Dr. Munzing found that Dr. Romano's prescribing to J.P. fell outside of the usual course of professional practice and was without a legitimate medical purpose. Further, Dr. Munzing determined that Dr. Romano's prescribing constituted a "significant contributing factor" in J.P.'s death. The government has charged Romano for his allegedly unlawful prescribing to J.P., as memorialized by Counts 30, 31, and 32 of the Superseding Indictment. This Superseding Indictment was filed on June 18, 2020, and gives rise to the potential factual conflict of interest discussed below.

The government first addressed the factual basis for this potential conflict of interest with Mr. Shamansky on or around March 3, 2020 when the issue was identified through the ongoing investigation. The government next addressed this issue with Mr. Shamansky on or around June 19, 2020 after the filing of the Superseding Indictment. Mr. Shamansky is in agreement with the government's request to schedule a hearing to address this potential conflict of interest on the record.

**II.     LEGAL AUTHORITY AND ARGUMENT**

The United States has an ethical and legal obligation to disclose potential conflicts of

---

[1] This finding was apparently solely based on the toxicology report, as Balgo noted on the death certificate that he did not perform an autopsy on J.P.

interest to the trial court for review. In an opinion that has been cited by multiple Circuit appellate courts[2] as well as trial courts in the Sixth Circuit,[3] the Fifth Circuit held in *In re Gopman* that when a prosecutor "discovers a possible ethical violation concerning a matter before a court, he is not only authorized but is in fact obligated to bring the problem to the court's attention." *In re Gopman*, 531 F.2d 262, 265 (5th Cir. 1976) (internal citation omitted).

Attorneys who practice before the United States District Court for the Southern District of Ohio are bound by local rule to maintain standards of ethical practice pursuant to the Ohio Disciplinary Rules of Professional Conduct. United States District Court for the Southern District of Ohio Model Federal Rules of Disciplinary Enforcement, Rule IV(B). Ohio Rule of Professional Conduct 1.7, entitled Conflict of Interest: Current Clients, states in part:

> (a) A lawyer's acceptance or continuation of representation of a client creates a conflict of interest if either of the following applies:
>
> (1) The representation of that client will be directly adverse to another current client;
>
> (2) There is a *substantial* risk that the lawyer's ability to consider, recommend, or carry out an appropriate course of action for that client will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by the lawyer's own personal interests.

In the Comment to Rule 1.7, the Ohio Supreme Court explained that conflicts of interest can arise during the course of representation: "Just as conflicts can emerge in the course of a representation, the nature of a known conflict of interest can change in the course of a representation….A lawyer must be alert to the possibility that newly acquired information requires

---

[2] See *Ramos Colon v. U.S. Atty for Dist. of Puerto Rico*, 576 F.2d 1, 8-9 (1st Cir. 1978); *In re Taylor*, 567 F.2d 1183, 1186-1187 (2nd Cir. 1977); *U.S. v. Clarkson*, 567 F.2d 270, 271-2 (4th Cir. 1977); *Sealed Appellee v. Sealed Appellant*, 900 F.3d 663, 672 (5th Cir. 2018).
[3] *Matter of Grand Jury Proceedings*, 428 F.Supp. 273, 276-277 (USDC EDMI 1976); *United States v. Beasley*, 27 F.Supp.3d 793, 805 (USDC EDMI 2014).

reevaluating a conflict of interest, and taking different steps to resolve it." Ohio Rule of Professional Conduct 1.7, Comment [6].

Based on the factual information outlined above, the government hereby raises a concern that the newly-filed Superseding Indictment presents a potential conflict of interest for Mr. Shamansky in the dual representation of Drs. Romano and Balgo. Specifically, the government respectfully avers that Dr. Balgo's involvement with the investigation into the cause and circumstances of J.P.'s death makes him a potential witness for one or both parties in the criminal case against Dr. Romano. The government seeks a hearing to determine two things: 1) the scope and gravity of the conflict of interest, and 2) whether the interests of Drs. Romano and Balgo would be materially adverse (or that there is a substantial risk thereof) such to trigger the ethical obligation that Mr. Shamansky withdraw from either or both cases as a result of the newly-identified conflict of interest. Such a hearing would ensure that all proceedings are managed and resolved in a transparent and appropriate manner, to the benefit of all parties and to meet the ends of justice.

### III. CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court grant the motion and set a hearing to address issues of Mr. Shamansky's potential conflict of interest in simultaneously representing defendants Drs. Romano and Balgo, whether they are waivable, and whether or not Mr. Shamansky should be disqualified from representation of either of both defendants as a result.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney

By:   *s/Christopher Jason*
       Christopher Jason
       Trial Attorney
       U.S. Department of Justice
       PA State Bar No. 312373
       303 Marconi Boulevard, # 200
       Columbus, OH 43215
       Phone: 202-262-6438
       E-mail: christopher.jason@usdoj.gov

Dated: July 20, 2020

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 20th day of July, 2020, I electronically filed the foregoing with the Clerk of the Court using the ECF system and sent the filing to the Court and defense counsel via electronic mail.

By: *s/Christopher Jason*
Christopher Jason
Trial Attorney
U.S. Department of Justice
PA State Bar No. 312373
303 Marconi Boulevard, # 200
Columbus, OH 43215
Phone: 202-262-6438
E-mail: christopher.jason@usdoj.gov