## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

United States of America,

     **v.**                             **Case No. 2:19-cr-202**

Thomas J. Romano,               **Judge Michael H. Watson**

       **Defendant.**

## OPINION AND ORDER

Dr. Thomas J. Romano ("Defendant") renews his motion for judgment of acquittal, ECF No. 103, and alternatively moves for a new trial or mistrial, ECF No. 104. For the following reasons, the motion for a judgment of acquittal is **DENIED**; the motion for a new trial is **GRANTED**.

## I.    BACKGROUND

Defendant was charged with thirty-four counts of unlawfully distributing a controlled substance. *See* Superseding Indictment, ECF No. 30. From August 1 through August 12, 2022, the Court presided over Defendant's trial. *See* ECF Nos. 72, 75, 77, 78–83, & 86. The Jury returned a verdict of acquittal as to ten of the counts and a verdict of guilty as to the other counts. *See* ECF No. 87.

While the jury was deliberating, Defendant moved to dismiss the indictment based on newly disclosed impeachment material on one of the Government's witnesses, Dr. Timothy Munzing ("Dr. Munzing"). *See* ECF Nos. 84 & 85. Specifically, during closing argument, the Government sent Defendant

a 2020 Administrative Law Judge ("ALJ") decision (the "ALJ Decision") ruling on

a 2019 Drug Enforcement Administration ("DEA") hearing (the "DEA Hearing").

*See* ALJ Decision, ECF No. 115-2; Email, ECF No. 115-5.  Dr. Munzing testified

at the DEA Hearing, and the ALJ Decision summarized that testimony.  *See* ALJ

Decision, ECF No. 115-2.  That summary strongly suggested that Dr. Munzing's

DEA Hearing testimony undermined or contradicted some of the central points he

made on the stand in this case.  *See id.* at 11–17.  A subsequent review of the

DEA Hearing Transcript confirmed that, at the DEA Hearing, Dr. Munzing gave

contradictory testimony to the testimony he offered in this trial.  *See* DEA Hr'g

Transcript, ECF No. 110-3.  As outlined in Defendant's motion, much of the

relevant conflicting testimony is as follows:

| Dr. Munzing's DEA Hearing Testimony | Dr. Munzing's *Romano* Testimony |
|---|---|
| **Applicability to Pain Specialists.** | **Applicability to Pain Specialists**. |
| Q.  My question was, did you have a chance to look at the CDC guidelines after we talked, and you did.  Correct?<br><br>A.  I did not look at the whole guidelines but I looked at where it came from.<br><br>Q.  And you saw when you looked yesterday that the CDC guidelines specifically were designed and for primary care settings, correct?<br><br>A.  Yes. | Q.  So let's start with the first part of that sentence.  It says, recommendations for primary care clinicians.  Are these guidelines provided solely for primary care clinicians?<br><br>A.  No.  That was the primary audience. . .<br><br>* * *<br><br>Q.  So based on your understanding, and your understanding of the use of this guideline, is this guideline |

Q.  Do you think you knew in 2016 that these [CDC] guidelines only applied to primary care settings and not to pain specialists?

A.  I think at that point I knew that that specific guideline, you know, applied to primary care.

* * *

Q.  You know that the CDC guidelines apply to primary care physicians, correct?

A.  Yes.

DEA Hr'g Transcript 325:24–326:7, 330:6–12, 339:13–15, ECF No. 110-3.

aimed directly and only at primary care clinicians?

A.  The focus was to primary care.  The guidelines in the document apply to a broader area than just primary care.

* * *

Q.  So [Defendant is] most clearly not a primary care clinician, correct?

A.  He is not a primary care clinician.

Q.  Okay.  So the reality is that by the very nature of this document, upon which you relied quite heavily, it does not apply to Dr. Romano or people of his specialty.  Correct or incorrect?

A.  Incorrect.

Tr. 574:2–6; 579:7–11, ECF No. 125; 845:2–9, ECF No. 126.

**Legacy Patients**

Q.  You know, don't you, that the CDC guidelines do not apply to patients who are already on high dose medications above 90?

A.  They said that they don't specifically apply to people who are on the, the high dosage medicines.

Q.  In fact you're aware the CDC itself knew that many

**Legacy Patients**

Q.  And so then just generally speaking, can you walk us through the bands?  I'm going to get your reaction, your opinion with respect to the amount of opioids that are being prescribed at each level.  So let's start with under 90.  Under the CDC guideline calculation, how many of Dr. Romano's patients, how many of the

physicians were misunderstanding and misapplying the CDC guidelines and in fact were saying you should apply CDC guidelines to patients who came to a practice already above 90.  You're aware of that.

A.  Yes.

Q.  And in fact you were one of those people who were misapplying the guidelines in that regard, weren't you?

A.  That was one of many bullets is an area of concern that it was higher, putting the patient at higher risk.

Q.  My question is, you were misapplying the guidelines yourself, not understanding that those guidelines don't apply to patients who already come into a practice above 90.

A.  I was applying that, yeah. . .

DEA Hr'g Transcript 363:11–364:7, ECF No. 110-3

reviewed patients have prescriptions under that level?

A.  Of the prescriptions, 13.4 percent.

Q.  And is that a lot or a little when it comes to prescribing morphine milligram equivalents?

A.  Well, that would tell me that 86.6 percent are over 90, and that's a very large number.

* * *

Q.  So four out of every five prescriptions to these patients, opioid prescriptions to these patients, are over double the CDC guideline?

A.  That's correct.

* * *

Q.  For a number of these patients, were they receiving prescriptions prior to seeing the defendant?

A.  Yes.

Q.  Were they receiving, in some cases, high doses or dangerous combinations of prescriptions prior to seeing the defendant?

A.  Yes.

Q.  And were they receiving those prescriptions for an extended period of time, in

| | some instances, prior to seeing the defendant? |
|---|---|
| | A. Some of them, yes. |
| | Tr. 644:12–23; 645:4–7, ECF No. 125; 781:23–782:8, ECF No. 126. |
| **Application to Pain Specialists and Doctors with Legacy Patients**<br><br>Q. And what I said is correct, that in fact the CDC guidelines for two separate reasons do not apply to Dr. Rosenblum in these patients.<br><br>A. Strictly the CDC guidelines, that's correct.<br><br>DEA Hr'g Transcript 366:5–8, ECF No. 110-3 | |

Defendant's motion to dismiss—and the Court's concerns about the alleged nondisclosure of the impeachment evidence—led to additional briefing, an evidentiary hearing, the pending motions, and this Opinion and Order.

## II. JUDGMENT OF ACQUITTAL

Defendant renews his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. ECF No. 103. The Court denies the motion.

### A. Standard of Review

A motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29 challenges the sufficiency of the evidence. *See United States v. Donnell*, No. 21-3957, 2022 WL 10219848, at *2 (6th Cir. Oct. 18, 2022). On

such a motion, the "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  When considering the motion, the Court does not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury." *United States v. Essex*, No. 21-6137, 2022 WL 17078717, at *3 (6th Cir. Nov. 18, 2022) (quotation marks and citations omitted).  The Rule 29 standard is "demanding" and "imposes a very heavy burden on defendants." *United States v. Martin*, No. 22-5172, 2022 WL 17456337, at *2 (6th Cir. Dec. 6, 2022) (cleaned up).

## B.   Analysis

During the trial, the Court denied Defendant's Rule 29 motion, citing to the following evidence:

> You've stipulated to the defendant writing prescriptions and you got the experts, the various publications, notices, letters, and other evidence from which a rational jury could infer he was knowingly or intentionally prescribing without a legitimate medical purpose outside the usual course of professional practice.

Tr. 1806:19–24, ECF No. 131.  As none of the evidence has changed, the Court likewise does not change its view of the Rule 29 motion.

Further, even taking Dr. Munzing's DEA Hearing testimony into account, the Court denies the Rule 29 motion.  To whatever extent Defendant may want the Court to consider the DEA Hearing testimony when considering the value of

Dr. Munzing's testimony in this trial, the Court may not make credibility determinations on a Rule 29 motion. *See Essex*, 2022 WL 17078717, at *3.

If, instead, Defendant argues that the Court should effectively strike the entirety of Dr. Munzing's testimony and consider the evidence without the same, the Court disagrees. A prior inconsistent statement is generally not a basis to exclude opinion testimony under the *Daubert* framework. *See In re: Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2019 WL 4508920, at *2 (S.D. Ohio Sept. 19, 2019) ("[A]ny inconsistent testimony or statements [the proposed expert] has offered previously are best addressed on cross examination." (internal quotation marks and citations omitted)). Thus, even if the Court had known about the DEA testimony prior to trial, it likely would not have excluded Dr. Munzing's testimony. Instead, the DEA testimony would have merely provided fodder for cross examination.

Finally, to the extent Defendant argues that the Court should disregard Dr. Munzing's testimony as a sanction for the Government's failure to disclose the ALJ Decision, that argument also fails. For the reasons discussed below, the Court concludes that a new trial, not a judgment of acquittal, is the proper remedy for the Government's failure to disclose.

Accordingly, the Rule 29 motion is **DENIED**.

### III.    NEW TRIAL

Defendant moves for a new trial under Federal Rule of Civil Procedure 33 or, in the alternative, for the Court to declare a mistrial. Because the jury has

returned a verdict, the Court considers only the motion for a new trial. *See United States v. Koubriti*, 435 F. Supp. 2d 666, 673 (E.D. Mich. 2006), *aff'd*, 509 F.3d 746 (6th Cir. 2007) (explaining that a certain doctrine "applies only in cases of motions for mistrial, not to post-verdict motions for new trial."); *Sanders v. Ford*, No. 3:16-CV-02763, 2017 WL 3888492, at *8 (M.D. Tenn. Sept. 6, 2017) ("A mistrial is granted in a case in which the jury is discharged without a verdict; a motion for new trial is made after a judgment has been rendered" (quoting and collecting state law)).

## A. Standard of Review

Federal Rule of Criminal Procedure 33 provides that, upon a defendant's timely motion, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Although Rule 33 does not define the "interests of justice," it is "widely agreed" that the standard "allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (citing cases).

## B. Analysis

The Court views two categories of problems that warrant a new trial: the *Brady/Giglio* violation and prosecutorial misconduct. The Court addresses each, in turn.

### 1. *Brady/Giglio* Violation

Defendant alleges that the Government's failure to disclose the ALJ Decision and/or the DEA Hearing testimony (collectively, "the Evidence") before

the parties rested violates Defendant's rights under *Brady v. Maryland*, 373 U.S. 83 (1963).

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. This disclosure obligation includes evidence "that could be used to impeach the credibility of a witness." *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999) (citing *Giglio v. United States*, 405 U.S. 150, 154–55 (1972)). To be a *Brady/Giglio* violation, the at-issue impeachment evidence must be material, and the government must have suppressed it. *United States v. Tavera*, 719 F.3d 705, 710 (6th Cir. 2013).

### a. Was the Evidence material?

"Evidence qualifies as material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Giglio*, 405 U.S. at 154). If the allegedly suppressed evidence is "merely cumulative to evidence presented at trial, then it is immaterial under *Brady*." *United States v. Bailey*, No. 19-2280, 2022 WL 2444930, at *11 (6th Cir. July 5, 2022) (internal quotation marks and citations omitted). However, "if the impeachment evidence would seriously undermine the testimony of a key witness on an essential issue . . . the withheld evidence has been found to be material." *Eakes v. Sexton*, 592 F. App'x 422, 428 (6th Cir. 2014) (internal quotation marks and citations omitted).

Here, the Evidence is material. First, it includes prior inconsistent testimony of a key witness for the Government who was involved in "making the case" against Defendant. *See Kyles v. Whitley*, 514 U.S. 419, 445 (1995) (concluding suppressed evidence was material in part because it could be used to impeach a witness who was "essential" to the government's investigation and, "indeed, 'made the case'" against the defendant). Further, the Evidence includes prior inconsistent statements about an essential issue: the applicability of the CDC guidelines to Defendant and his prescribing practices. Although the applicability of the CDC guidelines to Defendants may not have been the only basis for Dr. Munzing's opinions, it certainly was one of the major bases of those opinions. Thus, if Defendant had successfully impeached Dr. Munzing on his understanding of the guidelines, something that would have been significantly more probable with the Evidence, such an impeachment would have substantially undermined all of Dr. Munzing's opinions and, as a result, the Government's case. *See Eakes*, 592 F. App'x at 428.

In addition, the Evidence is not "merely cumulative." True, "if the undisclosed evidence just provides an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence *may* be cumulative, and hence not material." *Bailey*, 2022 WL 2444930, at *11 (internal quotation marks and citation omitted) (emphasis added). Here, Dr. Munzing was the Government's main witness. His

testimony—and, therefore, his credibility—were essential.  Defense counsel cross-examined Dr. Munzing about the CDC guidelines and what the guidelines said or did not say about their applicability to pain management specialists like Defendant or to doctors treating legacy patients.  But, due to the nondisclosure, defense counsel could not cross-examine Dr. Munzing with his own prior inconsistent statements about the CDC guidelines' applicability.  In other words, defense counsel could not show the jury that Dr. Munzing's *belief* as to the CDC guidelines applicability to doctors like Defendant had apparently changed from the DEA Heaing to this one.  Dr. Munzing's own prior statements undermining his testimony would have had significantly more impeachment value.  Thus, the Evidence is material.

### b.    Did the Government suppress the evidence?

The parties agree that DOJ Attorneys Barras and Jason personally did not receive the ALJ Decision until the middle of closing arguments and that they turned it over to the defense almost immediately upon receipt.  *See* Hr'g Transcript 68:18–69:5, ECF No. 118.  There is also no question that the DOJ and DEA at large—and particularly the Office of the Chief Counsel of the DEA— possessed the ALJ Decision by February 25, 2020.  *See* ALJ Decision 162, ECF No. 115-4.  Specifically, the ALJ Decision was served on the Office of Chief Counsel of the DEA via the email address dea.registration.litigation@usdoj.gov.  *Id.*

The question, then, is who counts as "the Government" for purposes of *Brady/Giglio*.

### i.    Who is "the Government"?

The Supreme Court has explained that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," and that a failure to meet that obligation can be a *Brady* violation if that failure results in the non-disclosure of material favorable evidence.  *Kyles*, 514 U.S. at 437–38.  Following *Kyles*, the Sixth Circuit has explained that "others acting on the government's behalf" means only those specific individuals involved in the investigation or prosecution. *See Sutton v. Carpenter*, 617 F. App'x 434, 440–41 (6th Cir. 2015); *see also Goff v. Bagley*, 601 F.3d 445, 476 (6th Cir. 2010)  ("*Brady* clearly does not impose an affirmative duty upon the government to take action to discover information which it does not possess." (internal quotation marks and citation omitted)).

Applying that rule here—the rule that only the *individuals* helping with the prosecution or investigation (that is, not the agencies) may be fairly considered "the Government"— such an individual *did* know of the Evidence in this case: Dr. Munzing.  True, witnesses are generally not considered part of the investigation or prosecution team.  *See Sutton*, 617 F. App'x at 440–41 (explaining that "evidence possessed only by a cooperating witness" is not attributable to the Government for purposes of a *Brady* analysis (citation omitted)).  However, Dr. Munzing was not *just* an expert witness; Dr. Munzing also helped with the

investigation into and prosecution of Defendant because Dr. Munzing reviewed all the files to help the Government decide to and prepare to indict Defendant. Tr. 1935:7–21, ECF No. 131.  Dr. Munzing certainly would have known what he said at the DEA hearing and that a transcript was made of the same. Accordingly, because Dr. Munzing knew about the Evidence from the time he testified at the DEA Hearing, "the Government" possessed the Evidence well ahead of the day the Government disclosed it to Defendant.

### ii.　Was the Evidence suppressed?

Having determined that the Evidence is material and that the Government possessed the same, the Government's nondisclosure of the Evidence was an impermissible suppression.  *See, e.g.*, *Kyles*, 514 U.S. at 433 (citing cases). This is true even if, as here, the nondisclosure was a good faith mistake.

The Government disputes this position by arguing that the ALJ Decision was publicly available via an internet search and that, had Defendant exercised due diligence, he would have discovered the decision on his own.[1]  This theory is sometimes called the "due diligence rule." *Tavera*, 719 F.3d at 711–12 (6th Cir. 2013).  The Sixth Circuit has rejected that rule and so, therefore, does this Court. *See id*. ("In sum, we follow the Supreme Court in *Brady*, *Strickler*, and the recent *Banks* case, and decline to adopt the due diligence rule that the government proposes based on earlier, erroneous cases.").

---

[1] This argument, of course, invites the question of why the Government did not discover the ALJ Decision involving their primary medical opinion witness.

### c.  Conclusion

For these reasons, the Evidence is material, and the Government suppressed it.  Accordingly, the Court concludes that the failure to disclose the Evidence was a *Brady/Giglio* violation.  The "remedy for a *Brady* violation is a new trial." *United States v. Paulus*, No. 20-6017, 2021 WL 3620445, at \*4 (6th Cir. Aug. 16, 2021) (citing cases).  Thus, a new trial is required here.

### 2.    Prosecutorial Misconduct

In the alternative, even if the Court had concluded that no *Brady/Giglio* violation had occurred, the Court would still order a new trial under the cumulative error doctrine.  Under the cumulative error doctrine, when a defendant shows that the "combined effect of individually harmless errors was so prejudicial as to render his trial fundamentally unfair," he must receive a new trial. *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004) (citation omitted).  Errors that "might not be so prejudicial as to amount to a deprivation of due process when considered alone . . . may cumulatively produce a trial setting that is fundamentally unfair."  *United States v. Daniels*, 699 F. App'x 469, 475 (6th Cir. 2017) (internal quotation marks and citations omitted).  Here, the Government repeatedly violated Court orders and engaged in improper argument throughout Defendant's trial.  These actions of prosecutorial misconduct, both individually and certainly in combination, so prejudiced Defendant that a new trial is necessary.

### a.  Standard of Review

When considering whether conduct by the Government rises to the level of prosecutorial misconduct or requires a new trial, the Court first determines whether the conduct was improper.  *United States v. Trujillo*, 376 F.3d 593, 613 (6th Cir. 2004) (internal quotation marks and citation omitted).  Next, the Court considers whether the conduct was "flagrant."  *Id.* (internal quotation marks and citation omitted).  In determining whether the conduct was flagrant, the Court considers the following factors:

> 1) whether the statements tended to mislead the jury or prejudice the defendant; 2) whether the statements were isolated or among a series of improper statements; 3) whether the statements were deliberately or accidentally before the jury; and 4) the total strength of the evidence against the accused.

*United States v. Francis*, 170 F.3d 546, 549–50 (6th Cir. 1999) (citing cases).  If conduct is both improper and flagrant, a new trial is warranted.  *See Trujillo*, 376 F. 3d at 613 (citation omitted).  In rare cases, conduct that is improper but not flagrant may also warrant a new trial.  *Id*. (citation omitted).

When a defendant fails to object to the Government's conduct at trial, the conduct is subject to a more rigorous review than when a defendant does object.  *See United States v. Henry*, 545 F.3d 367, 376 (6th Cir. 2008); *see also United States v. Washam*, No. 1:03CR-43-M, 2007 WL 2253161, at *12 (W.D. Ky. Aug. 1, 2007) (explaining, when considering whether alleged prosecutorial misconduct warrants a new trial that because "defense counsel did not object to the statement, the Court reviews this claim for plain error." (citation omitted)).  In the

absence of a defense objection, the Court must not only determine whether the prosecutor's conduct was improper and flagrant but also consider whether an obvious or clear error occurred, whether such error affected the defendant's substantial rights, and whether the "adverse impact seriously affected the fairness, integrity, or public reputation of the judicial proceedings." *Id.* at 376–77 (internal quotation marks and citations omitted).

With these standards in mind, the Court first analyzes whether the Government's conduct during different phases of the trial was improper. If it was, the Court next analyzes whether the improper conduct was flagrant.

### b.    Violation of Court Orders

To begin, the Court addresses the Government's repeated violation of the Court's evidentiary rulings. Relevant to this Order are the Court's rulings on so-called "death evidence," uncharged prescription data, and opinion testimony. Defendant objected to the violations of the Court's Orders. *E.g.*, Tr. 456:8–23, ECF No. 124 (Death Evidence); 287:22–288:9, ECF No. 123 (Uncharged Prescription Data);1168:9–25 (Opinion Testimony), ECF No. 128.

### i.    Death Evidence

Before trial, the Government moved *in limine* for permission to admit two types of evidence. ECF Nos. 48 & 54.[2] First, the Government sought to admit evidence of the overdose deaths of two of the patients listed in the Superseding

---

[2] On the Court's order, the Government filed an amended motion in limine. *See* ECF Nos. 52 & 54. For readability, the Court will cite to only the amended motion.

Indictment, J.P. and E.W. ("Death Evidence").  Mot. 1–10, ECF No. 54.  The Court denied the request based on Federal Rule of Evidence 403.  Order 1–4, ECF No. 69.  Specifically, the Court determined there was minimal, if any, probative value to the Death Evidence and that the risk of unfair prejudice was high.  *Id*.

This Order was not followed.  The Death Evidence as to E.W. came out through E.W.'s widow: during her re-direct examination, she testified in passing that E.W. had "passed away."  Tr. 456:9–11, ECF No. 124.  Defendant objected. *Id.* 456:12–18.  The Court immediately ended questioning of the witness and adjourned for lunch.  *Id.* at 456:19–21.  When the jury returned after lunch, the Court gave a limiting instruction about the Death Evidence.  *Id.* at 469:1–4.

The reference to the Death Evidence was improper because the Court had excluded the evidence.  *See Trujillo*, 376 F.3d at 613–14 (explaining, under the rubric for prosecutorial misconduct, that a witness's reference to marijuana was improper because it violated the district court's order).  Thus, the statement about the Death Evidence was improper.

Turning to flagrancy, the mention of the Death Evidence was prejudicial for the reasons outlined in the Order on the motion in limine; however, the statement was isolated and an accidental "slip of the tongue" from the witness.  Finally, although the Government's evidence was sufficient, *see* Part II, *supra*, it was little more than that.  Especially as to Defendant's knowledge or intent, the

Government's evidence was weak, highly circumstantial, and required the jury to make substantial inferences.

On the whole, then, the mention of the Death Evidence was not flagrant, nor was it the type of non-flagrant conduct that could require new trial because the Court immediately admonished the jury not to consider that evidence.  As such, a new trial is not warranted solely because of the reference to the Death Evidence.  Nonetheless, the improper reference to the Death Evidence adds to the reason why Defendant's trial was fundamentally unfair.

### ii.        Uncharged Prescription Data

In the motion *in limine*, the Government also sought to admit data on Defendant's prescribing practices across all patients, including patients whose prescriptions were not listed in the Superseding Indictment ("Uncharged Prescription Data").  Mot. 10–17, ECF No. 54.  The Court reserved ruling on whether that evidence was admissible until it saw what other evidence was presented at trial.  Order  4–8, ECF No. 69.  When the Court revisited the issue during trial, it ruled that the Government could present prescription data on only the indicted *prescriptions*.  Tr. 293:6–9, ECF No. 123.  In other words, the Court excluded prescription data for any patients not included in the indictment, *and* it excluded prescription data for patients in the indictment beyond those prescriptions that formed the basis of an indicted charge.

The Government nonetheless presented the Uncharged Prescription Data. Although the Court expressly ordered that the Government could present

evidence of *only* the indicted prescriptions, the Government proceeded to question one of its witnesses, Paul Short, about all the prescriptions Defendant wrote for the indicted patients. *See, e.g.*, Tr. 301:20–302:1; 314:20–315:13, ECF No. 123; Gov't Ex. 301. Even more troubling, the Government presented documentary evidence of Defendant's prescribing history for patients not listed in the superseding indictment, totaling over 7,000 different prescriptions. *See* Gov't Ex. 301.

The Government's presentation of the Uncharged Prescription Data was improper. Again, the presentation was improper because it was in violation of a Court Order. *See Trujillo*, 376 F.3d at 613–14.

Further, the violation was flagrant. First, the evidence was prejudicial and had a risk of misleading the jury. True, such evidence may be admissible in some circumstances, for example as res gestae evidence. *See* Order 6–8, ECF No. 69 (explaining the res gestae doctrine) (citing cases). However, on the facts of *this* case, unindicted prescriptions too far removed from those in the indictment or written to patients not mentioned in the Superseding Indictment have a low probative value of a defendant's guilt or innocence as to the indicted prescriptions, and the presentation of so many prescriptions unfairly prejudices the defendant by implying that he is a significant supplier of unlawful drugs. *See* Fed. R. Evid. 403. Underscoring that prejudice is that Paul Short testified that substantial percentages of *all* of Defendant's prescriptions for the patients listed in the Superseding Indictment—including those prescriptions not included in the

Superseding Indictment—were well outside the guidelines established by the CDC or other organizations. *See, e.g.*, Tr. 314:20–315:23, ECF No. 123. Taken together, the Uncharged Prescription Data was prejudicial and had a risk of misleading the jury by implying that Defendant engaged in significant, uncharged, criminal activity.

The other factors also weigh in favor of flagrancy. For the second factor, the Government repeatedly brought up large portions of Defendant's prescribing history for patients in the Superseding Indictment.

The conduct was not accidental because the Court gave the Order excluding the evidence minutes before the Government presented the Uncharged Prescription Data. *See id.* 293:6–9. Moreover, any argument that the Government misunderstood the Court's order as limiting the Uncharged Prescription Data to prescriptions written to indicted *patients* (rather than indicted *prescriptions*) is unavailing because the Government presented evidence of both unindicted prescriptions *and* unindicted patients. *See, e.g.*, Gov't Ex. 301.

Finally, the Government's case was weak.

Accordingly, the presentation of the Uncharged Prescription Data was improper and flagrant and, therefore, warrants a new trial.

### iii. Opinion Testimony

The Government introduced opinion testimony through several witnesses billed as fact witnesses, including Drs. Le and Belcik. Of these witnesses, Dr. Le testified first; her testimony was "almost entirely expert testimony," even though

the Government represented her as a fact witness. Tr. 222:8–9, ECF No. 123. Following Dr. Le's testimony, the Court ordered that the Government could elicit opinion testimony from Dr. Belcik only as it specifically related to Dr. Belcik's treatment of A.B., a patient listed in the Superseding Indictment. *See* Order, ECF No. 76.

The Government failed to follow this Order and repeatedly elicited opinion testimony from Dr. Belcik regarding other matters. For example, Dr. Belcik offered opinion testimony about, *inter alia*, the comparative effects and risks of different medications, Tr. 1168:9–14, ECF No. 128; "red flags" in the prescribing of opioids, *id*. at 1180:3–18; and at least some of the potential dangers of combining different controlled substances, *id*. at 1213:24–1214:6.

The eliciting of these opinions from Dr. Belcik was improper because they were offered in violation of the Court's Order. *See Trujillo*, 376 F.3d at 613–14.

The Government's eliciting of these opinions was also flagrant. Dr. Belcik's opinion testimony was prejudicial because "jurors are likely to give special weight to expert testimony." *United States v. Deuman*, 892 F. Supp. 2d 881, 885 (W.D. Mich. 2012) (citation omitted). Thus, when the Government calls multiple medical professionals to opine on the "dangers" of Defendant's prescribing practices, there is a substantial risk that the jury will place too much importance on those opinions.[3] Indeed, it was this concern that underlay the

_____

[3] That is not to say, of course, that there is any *per se* rule against presenting opinion testimony from multiple witnesses in one case, or even for multiple witnesses to opine

Court's decision to limit Dr. Belcik's opinion testimony.  *See* Order 10–13, ECF No. 76.

The Government repeatedly elicited expert testimony and, therefore, this conduct was not isolated.

The conduct was not accidental because the Court gave multiple Orders on the topic, and the Government persisted in asking these questions.

Finally, as stated above, the overall strength of the case against the Defendant was weak.

Therefore, the Government's repeated use of opinion testimony from purported fact witnesses was improper and flagrant and warrants a new trial.

### c.  **Improper argument**

The Government's closing argument was far from a paradigm of proper argument.  Throughout closing, the Government made comments that, although not strictly improper, came close to constituting improper vouching, *see* Tr. 1823:9–12; 1828:20–1829:2; 1898:16–21, ECF No. 131; or invoking the "community protection" argument, *see id.* 1827:24–1828:6; 1859:1–7; 1896:11–17.

---

on the same topic.  In some circumstances, such a line-up of opinion witnesses might be appropriate.  Here, however, the risks of unfair prejudice, undue delay, and needlessly presenting cumulative evidence substantially outweighed the probative value of the duplicative testimony.  *See* Fed. R. Evid. 403.

However, the Government also repeatedly referenced other bad acts evidence and uncharged, allegedly criminal conduct (the "Statements").  For the following reasons, the Statements were both improper and flagrant.

In the following discussion, the Court is mindful that prosecutors are afforded "wide latitude" during closing arguments.  *Henry*, 545 F.3d at 377 (citing cases).  Any potentially improper comments must be considered in the "context of the trial as a whole" because "inappropriate comments alone do not justify reversal where the proceedings were otherwise fair."  *Id.* at 377 (internal quotation marks and citations omitted).  However, prosecuting attorneys have as much a duty "to refrain from improper methods calculated to produce a wrongful conviction" as they do "to use every legitimate means to bring about a just one."  *Berger v. United States*, 295 U.S. 78, 88–89 (1935).  When the Government makes improper statements in closing arguments (as opposed to elsewhere in the trial), there is even greater concern because "the jury heard the [improper] comments shortly before deliberations."  *Simpson v. Warren*, 475 F. App'x 51, 63 (6th Cir. 2012).

As a general rule, it is improper for a prosecutor to discuss uncharged conduct or "other bad acts" during closing argument.  *See, e.g.*, *Cristini v. McKee*, 526 F.3d 888, 899–900 (6th Cir. 2008) ("When a prosecutor dwells on a defendant's bad character to prove that he or she committed the crime charged, we may find prosecutorial misconduct."); *United States v. Foreman*, 199 F. App'x 515, 517 (6th Cir. 2006) (discussing favorably another circuit's rule that "the

prosecutor's engaging in a discussion of uncharged crimes [is] wholly inappropriate" (internal quotation marks and citation omitted)). Said another way, "the government may not rely on prejudicial facts not in evidence when making its closing arguments." *United States v. Roach*, 502 F.3d 425, 434 (6th Cir. 2007) (citation omitted). The risk of prejudice to a defendant from discussions of uncharged conduct is highest when the charged and uncharged conduct are "of the same nature." *United States v. Snyder*, 789 F. App'x 501, 508 (6th Cir. 2019).

Here, the Government made the following statements during closing argument (collectively, "the Statements"):

> You heard from Dr. Munzing that, in fact, these prescriptions are indicative, that is important to keep in mind the number of prescriptions and the quantity of these prescriptions as that's just one indication, one very basic outline of the scope of how many pills and what kind of prescribing this defendant was conducting over the course of, in some instances, five or more years with these patients.

Tr. 1818:8–14, ECF No. 131.

> You've seen this chart. We've explained this chart. Just to give you a quick summary of it. 80 percent of every opioid prescription to this patient group was over double. And 30 percent was over five times the daily amount or six times even. As we discussed, I'm not great at math. But, most importantly, what we know, six times the daily MME suggestion of the CDC that, again, is not a hard-and-fast rule but is a guideline for patient safety. Yet the defendant blew straight past it.

*Id*. at 1820:19–1821:2.

> And this is the slide specifically what we're talking about when we're talking about the concurrent prescribing or the polypharmacy or multimodal prescribing the defendant was conducting with 11 of the 13 patients that are the subject of the Indictment.

He not only personally prescribed high daily MME, as much as over 450 at a time to these patients.  He then also prescribed benzodiazepines often for extended periods of time.  And then to five of these patients he even prescribed the trinity including, as we heard, unfortunately, was the situation with [E.W.] where he had over almost 1,000 daily MME and benzodiazepines and carisoprodol.  All the while having all the other issues that we'll discuss in a moment.

One example of this.  So as I just discussed in a summary form, we have 11 of the 13 patients who were prescribed opioids and benzos, 5 of the 13 were prescribed trinity, and 7 of those were prescribed at least 450 daily MME at one point with the defendant.

*Id.* at 1822:9–1823:1.

Remember, the defendant was concerned with making sure that the patients knew how many drugs they were taking.  That's why he gave them Narcan.  You heard from Dr. Munzing, methadone is the type of drug that it's really easy to forget or to lose track of the kind of dosing you're on because it's slow acting.  You're not going to immediately feel it.  And yet [T.M.] was on an exceptionally high daily MME and the trinity throughout the course of prescribing by the defendant.

*Id.* at 1836:25–1837:7.

But what you heard is that [D.N.] had almost 1,000 daily MME and that he had it continually over seven to eight or even nine or ten times the CDC guideline of MME consistently over the period of five years.  He also had benzodiazepines and he also traveled a fairly significant distance, about the same as [M.M.].  A couple of hours each way every single month each direction just to get the drugs.

*Id.* at 1837:18–24.

So [J.T.], Counts 15, and 16.  A lot of scripts over two, three PowerPoint slides.  We've heard about [J.T.].  I don't need to belabor this.

These are versions of the trinity prescribing that the defendant issued to [J.T.] over the course of many years.  These are two of the many examples of that.

*Id.* at 1840:19–24.

So now we've heard of [P.T.], counts 17, 18, 19 and 20. [P.T.] we've already spoke about as well. These are examples of the trinity prescriptions from 2016 through 2019 that [P.T.] was on over the course of many years.

*Id.* at 1841:24–1842:2.

And yet the defendant, without any consideration, placed [M.R.] back on them and then within two months he put him back on the holy -- or put him back on the trinity of drugs. Again eschewing the danger, again eschewing the risks. Because that's what he decided was the best thing.

Then this is an example of the trinity prescribing that continued over the course of years to [M.R.]. The type of prescribing that, as you heard, [M.R.] cannot get from any other doctor. That's not an accident, ladies and gentlemen.

*Id.* at 1847:12–21.

So Count 33 relates to a prescription prior to that date that's exemplifying the type of prescribing he was issuing to [A.B.]. And Count 34 is the opioid and two benzodiazepines that he issued the month after without -- despite what the defendant tells you he completely ignored the red flag of Dr. Belcik's note that was provided to him the month prior.

*Id.* at 1853:14–19.

Ladies and gentlemen, as an overview, none of these patients are on nearly what, if anything, what they were previously prescribed because no doctors will do it. Some of the patients as you heard from are happier now. And that while all the patients had legitimate medical issues, none of them had the legitimate medical need for the types, dosages, combinations of drugs the defendant prescribed to them, oftentimes for many years.

*Id.* at 1853:20–1854:2.

The Statements were certainly improper. Each one expressly or impliedly argues that Defendant was prescribing controlled substances without a legitimate medical purpose outside the usual course of professional practice for "years."

This reference to Defendant's prescribing practices for "years" invites the jury to consider not only the prescriptions in the Superseding Indictment but also the overall course of (uncharged) prescribing practices. It thus uses Defendant's alleged guilt on *uncharged* conduct as an argument to find Defendant guilty for the *charged* conduct. Although many of the comments are vague—*e.g.*, that Defendant "continued" to prescribe certain drugs—they impart a message that the Government views large portions of Defendant's prescribing history as unlawful. Further, this is not a case where a prosecutor's closing argument references to other bad acts are firmly grounded in properly admitted evidence. *United States v. Davidson*, 452 F. App'x 659, 666 (6th Cir. 2011) (explaining that the prosecutor's reference to the defendant's other bad acts "was not improper in that the prosecutor was simply referring to evidence that was properly admitted during trial"). To the contrary, this is the same type of other bad acts evidence the Court expressly excluded earlier in the trial. *See* Part III.2.b.ii, *supra*. Accordingly, the Statements were improper.

In addition, the Statements were flagrant. The Statements were unquestionably prejudicial to Defendant, especially because the uncharged conduct discussed was exactly the same conduct for which Defendant was on trial: unlawfully prescribing controlled substances. *See Snyder*, 789 F. App'x at 508.

Next, the Statements were far from isolated: as demonstrated above, the Government repeatedly argued propensity evidence to the jury throughout its closing.

Third, the statements were deliberate, not accidental. Indeed, because the Court had already excluded this type of other acts evidence, it is "hard to believe that the prosecution was unaware" that referencing "character evidence during closing argument was inappropriate."[4] *United States v. Silvestri*, 968 F.2d 1217 (Table), 968 F.2d 1217, at *6 (6th Cir. 1992) (Keith, J., concurring).

Finally, the overall strength of the evidence against Defendant was weak.

Although Defendant did not object to the Statements, they are nonetheless grounds for a new trial. First, for the reasons explained above, the Statements were an obvious error. Second, the Statements are so prejudicial that they affected Defendant's substantial rights and "seriously affected the fairness, integrity, or public reputation of the judicial proceedings," especially considering the non-overwhelming evidence against Defendant. *Henry*, 545 F.3d at 376–77. As the Sixth Circuit has said, when reviewing for plain error, "even one unfairly prejudicial remark may warrant reversal where the evidence of guilt is not very

---

[4] Again, the Court notes that there are likely some permissible uses of other acts evidence in these sorts of cases. However, even assuming there was such a permissible use for this evidence in this case, the Government went far beyond that permitted use with its comments in closing. *See Washington v. Hofbauer*, 228 F.3d 689, 699 (6th Cir. 2000) ("[W]hile the evidence as to [the defendant's] character was admissible for certain limited purposes, the prosecutor went far beyond the bounds of permitted conduct when presenting that evidence to the jury.").

strong . . ." *United States v. Acosta*, 924 F.3d 288, 308 (6th Cir. 2019).  Here, we have not one, but numerous prejudicial remarks from the Government in the face of properly admitted evidence that was, at best, highly circumstantial and weak as to Defendant's knowledge of wrongdoing.

Accordingly, the Statements were improper and flagrant, and they are grounds for a new trial under the plain error standard.

## IV.    CONCLUSION

In sum, the Court concludes that the Government violated its *Brady/Giglio* obligations, and, therefore, a new trial is required.  In the alternative, the Government's conduct throughout trial was both improper and flagrant.  This misconduct so permeated the trial that it rendered the trial fundamentally unfair.  As such, a new trial is also warranted based on that misconduct.

For these reasons, the motion for a judgment of acquittal is **DENIED**; the motion for a new trial is **GRANTED**.  The new trial will be on only the counts on which the jury found Defendant guilty, as Double Jeopardy bars retrial on the acquitted counts.  *See Benton v. Maryland*, 395 U.S. 784, 796 (1969) (holding that the Double Jeopardy Clause barred retrial on acquitted count after the jury returned a split guilty/not guilty verdict); *cf. Tibbs v. Florida*, 457 U.S. 31, 41 (1982) ("A verdict of not guilty, whether rendered by the jury or directed by the trial judge, absolutely shields the defendant from retrial.").

**IT IS SO ORDERED.**

**MICHAEL H. WATSON, JUDGE**
**UNITED STATES DISTRICT COURT**