UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


UNITED STATES OF AMERICA,)
                         )
  PLAINTIFF,             )        CASE NO. 2:19-cr-202
                         )
        vs.              )
                         )
THOMAS J. ROMANO,        )
                         )
  DEFENDANT.             )
_____)


TRANSCRIPT OF CROSS-EXAMINATION AND RECROSS-EXAMINATION
TESTIMONY OF JAMES P. MURPHY, M.D.
BEFORE THE HONORABLE MICHAEL H. WATSON
MONDAY, SEPTEMBER 18, 2023; 11:45 A.M.
COLUMBUS, OHIO

FOR THE PLAINTIFF:
    Kenneth L. Parker
    United States Attorney
    By:  Alexis Gregorian
         Danielle Sakowski
    Assistant United States Attorneys
    1400 New York Avenue, Northwest
    Washington, District of Columbia 20005

    By:  Devon M. Helfmeyer
    Assistant United States Attorney
    1000 Louisiana Avenue, Suite 2300
    Houston, Texas 77002


FOR THE DEFENDANT:
    Samuel H. Shamansky Co., LPA
    By:  Samuel H. Shamansky, Esq.
         Donald L. Regensburger, Esq.
         Ashton C. Gaitanos, Esq.
    523 South 3rd Street
    Columbus, Ohio 43215
                        - - -

    Proceedings recorded by mechanical stenography, transcript
produced by computer.

LAHANA DUFOUR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
85 MARCONI BOULEVARD
COLUMBUS, OHIO 43215
614-719-3286

2

1      Monday Morning Session

2      September 18, 2023

3      - - -

4      CROSS-EXAMINATION

5    BY MR. HELFMEYER:

6    Q.   Good morning, Dr. Murphy.

7    A.   Good morning.

8    Q.   My name is Devon Helfmeyer.  I represent the United

9  States.  We've never met before, have we?

10   A.   I don't think so.

11   Q.   I want to start with something that you said on Friday.

12 You said you're not here to advocate for anybody, right?

13   A.   Correct.

14   Q.   Okay.  I want to stick by that.  Okay?

15   A.   Okay.

16   Q.   And, Dr. Murphy, fair to say that you love opioids,

17 right?

18   A.   No.  That's not a fair statement.

19   Q.   Okay.  Do you remember testifying here in this courtroom

20 in front of Judge Watson in the case against Dr. Eskender

21 Getachew?

22   A.   Yes.

23   Q.   Do you remember saying in that testimony that --

24 regarding opioids, they're God's gift to us, actually?

25   A.   I don't recall exactly what I said.

3

1    Q.    Does that sound like something you would say?

2    A.    I don't know if I said that or if I would say that or

3    not.

4    Q.    Do you disagree with that?

5    A.    Well, a statement like that's pretty broad, and I think

6    that I'd have to look at the circumstances and the context.

7    Q.    Sure.  And if I could --

8         MR. HELFMEYER:  If we could move to this one, and if

9    we can show just for the witness.

10   BY MR. HELFMEYER:

11   Q.    So would looking at your testimony from that case

12   refresh your recollection, Doctor?

13   A.    It might.

14        MR. HELFMEYER:  Are we on the government's computer or

15   the --

16        THE DEPUTY CLERK:  Government.

17        MR. HELFMEYER:  Can we move to the podium?

18        THE DEPUTY CLERK:  It should be -- it's not on.  I

19   don't see anything.

20        MR. HELFMEYER:  Is there any way to do it on the

21   podium?

22        THE DEPUTY CLERK:  It should be.  There's nothing

23   coming up at all.

24        MR. HELFMEYER:  Okay.  Could we switch to the Elmo?

25        THE DEPUTY CLERK:  Yes.

4

1          MR. HELFMEYER:  Okay.  I can do it like this.

2     BY MR. HELFMEYER:

3     Q.   All right.  Can you see that, Dr. Murphy?

4     A.   Yes.

5     Q.   Let me know if you want me to scroll up.

6          Have you had a chance to refresh your recollection,

7     Doctor?

8     A.   Yes.

9     Q.   Okay.  Now would you agree that you testified previously

10    that opioids are God's gift to us?

11    A.   It says here, what's been yellowed:  Most people get

12    tremendous relief from opioids.  They're -- I say it twice.

13    They're -- they're God's gift to us, actually.

14    Q.   Okay.  So you did say that?

15    A.   It's written there so I -- I know it's written there.

16    It sounds like -- I mean, it makes sense.

17    Q.   Okay.  So you stand by that statement?

18    A.   I don't know if I exactly said that.  But, I mean,

19    that's actually a pretty good -- a pretty good statement.

20    Q.   When I asked you whether you and I had met before, you

21    took a second to answer that question, right?  Just a few

22    minutes ago.

23    A.   I don't know how long I took.

24    Q.   Okay.  Because you've testified in a number of occasions

25    in federal court against the United States.  Is that fair?

5

1    A.    Well, I've testified.  I don't testify against the

2  United States.  I testify as a fact witness.

3    Q.    And in -- as a fact witness, Dr. Murphy, or as an

4  opinion witness?

5    A.    Again, I guess maybe I don't know what that means.  I'm

6  here to give facts.  I give some opinions.  But my

7  understanding is that what I say, the jury is allowed to take

8  as factual evidence or as evidence.  So it's opinion, but I'm

9  also -- I'm able to -- my opinion can be perceived as actual

10  evidence they can consider.  That's what I've been told.

11    Q.    Dr. Murphy, I know you were, excuse me, an English

12  major, but you're not a lawyer, right?

13    A.    Correct.

14    Q.    So there's a difference between a fact witness and an

15  opinion witness.  You would agree with that?

16    A.    I don't know.

17    Q.    Okay.  I am a lawyer.  Would you take my word for it if

18  I told you that?

19    A.    Yes.

20    Q.    All right.  And so you're here today offering opinions.

21  You didn't -- you weren't the doctor examining these nine

22  patients back from 2014 to 2019, right?

23    A.    Correct.

24    Q.    Okay.  So you're offering your opinions about your

25  review of the medical records?

6

1    A.   And the other -- the records and the other records that

2  I reviewed as well --

3    Q.   Got you.

4    A.   -- the list of things.

5    Q.   Okay.  And so my question was about your prior

6  testimonies offering opinions on behalf of doctors who had been

7  accused of unlawfully prescribing opioids.  You've done that a

8  number of times, have you not?

9    A.   I have done that a number of times as an expert witness

10  for -- asked to do that by the defense.

11    Q.   Each time for the defense; is that correct?

12    A.   Each time in federal court has been for the defense.

13    Q.   Gotcha.

14        MR. HELFMEYER:  If we could project the screen, I want

15  to ask Dr. Murphy some questions and write them down.  If we

16  could have the Elmo projected?

17        THE DEPUTY CLERK:  For everyone?

18        MR. HELFMEYER:  Yes.  Thank you, ma'am.

19  BY MR. HELFMEYER:

20    Q.   Dr. Murphy, I want to talk about just the last couple

21  years each time you've testified as an expert witness, as an

22  opinion witness on behalf of those doctors, you've been paid,

23  have you not?

24    A.   Yes.

25    Q.   Do you know how much you've been paid over the last,

7

1    say, four years?

2        A.   No.

3        Q.   So it's September right now, right?

4        A.   Yes.

5        Q.   All right.  In August of this year, did you testify on

6    behalf of a Dr. Robert Taylor?

7        A.   No.

8        Q.   Did you testify in the case regarding Dr. Taylor?

9        A.   No.

10       Q.   You weren't called in that case in the Eastern District

11   of Kentucky?

12       A.   I don't think there was a case that he was involved in.

13       Q.   Did you testify in federal court in August of '23?

14       A.   Yes.

15       Q.   Where'd you testify?

16       A.   Frankfort, Kentucky, I believe.

17       Q.   And who was the doctor who called you as a witness?

18       A.   Dr. Herrell.

19       Q.   Herrell.  How do you spell that?

20       A.   I believe it's H-A-R-R-E-L-L.  It may be H-E-R-R-E-L-L.

21       Q.   All right.  And how much were you paid in that case?

22       A.   I don't recall completely.  I think it was somewhere

23   around twenty-five, twenty-six thousand dollars.

24       Q.   Let's say 25 to be safe, Dr. Murphy.  Is that fair?

25       A.   Yes.  Again, I'm going, you know, by memory.

8

1     Q.    Gotcha.

2         And so that was August of '23.  In July of '23, did you

3  testify on behalf of a Dr. Kousa?

4     A.   I did for Dr. Kousa and his case.  I don't know the

5  exact date.

6     Q.   And were you paid in that case?

7     A.   Yes.

8     Q.   And was that $27,000?

9     A.   It was either -- between 25 to 27, I think.  I don't

10  know for sure.

11     Q.   Would taking a look at the transcript help refresh your

12  recollection?

13     A.   Well, the transcript will be what I said, and it's

14  probably accurate.  Yeah, from that case.

15     Q.   Yeah, but you know what you said, 25 to 27, Doctor.  I

16  don't want to spend a whole lot of time.  25 to be safe?

17     A.   That was -- I think it was -- I think it was at least

18  25.

19     Q.   And that was July.  In June of 2023, we just talked a

20  minute ago, Dr. Getachew.  Do you remember testifying for

21  Dr. Getachew?

22     A.   I do.  I don't know which date it was, though.

23     Q.   And that was before Judge Watson, right, the court we're

24  in right now?

25     A.   I believe so.

9

1    Q.   Hard to keep track?

2    A.   Well, no, it's not, actually.  But I want to be -- I

3    want to be as accurate as I can.  I know there are records that

4    we can look at.

5    Q.   And for Dr. Getachew, were you paid about $25,000 as

6    well?

7    A.   I believe so.

8    Q.   That was June.  In April of '23, did you testify for a

9    Dr. Stanton?

10   A.   I testified -- I was asked on behalf of his defense to

11   offer my testimony, yes.

12   Q.   And did you get paid about $12,000 for Dr. Stanton?

13   A.   I believe that is correct.

14   Q.   And March was a busy month for you, wasn't it?

15   A.   I'm sorry?

16   Q.   In March of '23, did you testify for a Dr. Ghearing?

17   A.   I don't know the exact date, but I did testify -- I did

18   testify on behalf of Dr. Ghearing.

19   Q.   All right.  And were you paid in that case $18,000?

20   A.   I don't recall.  That sounds accurate.

21   Q.   Still in March of '23, did you testify for a

22   Dr. Siefert?

23   A.   I did for Dr. Siefert.  I don't know what the date was,

24   though.

25   Q.   Okay.  Did you get paid $26,000 to testify for

10

1   Dr. Siefert?

2       A.    Yeah.   I want to say I'm answering this question, did I

3   testify for them?   And the correct answer would be I served as

4   their expert, the expert for their attorney, for that total

5   amount.

6           What I charge is for all of my expert services,

7   including all of the reviews, all of the time I spent, all of

8   the hours I go into it, the travel, the taking off my job, all

9   the things I do, and I try to give them one lump sum.   So it's

10  not to appear in court.   It's not to testify necessarily, that

11  these represent the full amounts that I got for all of the

12  effort, all of the time I put into it.

13      Q.    I understand that.

14          Also in March of 2023, did you testify in New York state

15  court for a Dr. Deshmukh?

16      A.    I did for Dr. Deshmukh.   I, again, don't know the exact

17  date.

18      Q.    Okay.   Gotcha.

19          Do you know how much you were paid for your expert

20  services in Dr. Deshmukh's case?

21      A.    I think it was probably the 25 or 26.

22      Q.    We'll be conservative and say 25.   So that's March.

23  Let's go to February of this year.   Did you testify on behalf

24  of a Dr. Kistler?

25      A.    Yes.

11

1    Q.    And were you paid about $26,000 for that case?

2    A.    Again, I don't know.  25 to 26, probably.

3    Q.    We'll be conservative again, Doctor.

4          In January of this year, did you testify for a

5    Dr. Flynn?

6    A.    I'm not sure what month it was, but, yeah, I testified

7    for Dr. Flynn.

8    Q.    And that was here in Columbus; is that right?

9    A.    Yes.

10   Q.    For Dr. Flynn -- for your work on Dr. Flynn's case, did

11   you get around $26,000 as well?

12   A.    Again, same usual amount, 25 to 26.

13   Q.    We'll keep staying conservative.

14         Back to October of last year, did you testify for a

15   Dr. Keller?

16   A.    I'm not sure exactly what you would call this.  I was

17   called as, I think, a rebuttal witness.  I'm not sure.  But it

18   was by his defense.

19   Q.    So you testified on behalf or you were called by the

20   attorneys for Dr. Keller?

21   A.    Yes.

22   Q.    And in that case, were you paid $26,000?

23   A.    No.  I think that was -- that was five or six thousand

24   dollars.  I'm not sure.

25   Q.    Okay.  We'll call it six.

12

1      And then since we're in September, let's go to September

2  of last year.  Did you testify on behalf of Dr. Suetholz?

3  A.   Yes.  I'm not --

4      THE COURT:  Did you mean October of '23?

5      MR. HELFMEYER:  We are -- we are in October of '22.

6  And I'm going to ask about September and then stop, Your Honor.

7  BY MR. HELFMEYER:

8  Q.   In September of '22, you testified for Dr. Suetholz,

9  Dr. Murphy?

10  A.   I did Dr. Suetholz.  I don't know the exact date,

11  though.

12  Q.   And were you paid $26,000 for that case as well?

13  A.   Again, I think it's 25 to 26 like the other ones.

14  Q.   Okay.  So this is the last year; is that right,

15  Dr. Murphy?

16  A.   I -- I would -- it looks like it.  I provided a listing

17  of all of my testimony.  So you should have that.

18  Q.   I do.  And what number is reflected on the calculator --

19  I've been doing math as we've been going through -- for the

20  past year of your expert services?

21  A.   The calculator says 237,000.

22  Q.   So that's $237,000 over the last year.  Does that seem

23  right?

24  A.   Yeah.  I think that's probably reasonable.

25  Q.   And I believe you've testified also for -- you know

13

1    what?  I'll move on.

2       A.   I'm sorry?  What?

3       Q.   I'll ask one last question.  When you get off the stand

4    here today, are you going to head back to Kentucky to federal

5    court down there?

6       A.   Yes.

7       Q.   To do what?

8       A.   I'm testifying in Pikeville.

9       Q.   And in Pikeville, you're being called by a doctor

10   accused of unlawfully prescribing opioids; is that right?

11      A.   Yes.

12      Q.   On direct examination, Dr. Murphy, you were asked about

13   your work for Purdue Pharma.  Do you remember those questions?

14      A.   Yes.

15      Q.   Okay.  And you testified earlier that you were a fact

16   witness for Purdue.  But that's not quite right, right?  You

17   were offering opinions for Purdue?

18      A.   Well, I gave an affidavit, so it was a paper that I

19   wrote out and signed it.  But it was -- I don't think -- I

20   don't know if that was opinion, but I was giving factual

21   information.

22      Q.   And the information that you included in your affidavit

23   was about your training and experience as a pain physician, was

24   it not?

25      A.   I'm not sure all that I put in there.

14

1   Q.   Would taking a look at it refresh your recollection?

2   A.   Yes.

3        MR. HELFMEYER:  If we could, ma'am, just for the

4   witness.  Thank you.

5   BY MR. HELFMEYER:

6   Q.   So the State of Kentucky, which is where you live and

7   have for a while, right, Dr. Murphy?

8   A.   Yes.

9   Q.   The State of Kentucky was suing Purdue Pharma.  Is that

10  fair?

11  A.   Yes.

12  Q.   All right.  And so you're contacted by Purdue or their

13  lawyers, and they asked you to write an affidavit?

14  A.   Yes.

15  Q.   In their defense?

16  A.   Well, they're defending Purdue so they wanted an

17  affidavit.  So I assume it's for their defense.

18  Q.   Gotcha.

19       And you got paid for this affidavit, did you not?

20  A.   Yes.

21  Q.   And you understand that fact witnesses don't get paid

22  for their testimony?

23  A.   I don't know.

24  Q.   Let's take a look.  I just have a couple of things

25  highlighted.

15

1    Among -- do you see the paragraph 8 that I've

2  highlighted?

3    A.    Yes.

4    Q.    And that's an expression of what you've learned based on

5  your training and experience, your opinion as a pain physician?

6    A.    Yes.

7    Q.    And then just one more.  The second one that I've

8  highlighted, paragraph 16, again, an expression of your

9  training and experience as a pain physician, you're offering

10  your opinion?

11    A.    Yes.

12    Q.    So you were hired to give an expert opinion by Purdue

13  Pharma?

14    A.    I was -- they asked me my thoughts on the medication and

15  about the drug reps, how I interacted with them, and I gave

16  them factual information.

17    Q.    And the drug they were talking about was OxyContin,

18  right?

19    A.    Yes.

20    Q.    And that's one of the drugs that is -- that Dr. Romano

21  prescribed to a number of the patients in this case?

22    A.    Yes.

23    Q.    All right.  Now, Dr. Murphy, you would agree with me

24  that you consider yourself a passionate activist on behalf of

25  pain patients and their providers; is that right?

16

1    A.   I am supportive of patients getting proper care, and I'm

2   supportive of physicians being allowed to provide that care for

3   patients.

4    Q.   I understand that.  But you would consider yourself a

5   passionate activist in that respect?

6    A.   Well, passionate is a very subjective term.  I believe

7   that patients should get access to appropriate care and that

8   physicians should --

9    Q.   Doctor, do you remember testifying in the

10  *United States v. Siefert*?

11    A.   I'm sorry.  I wasn't finished with my sentence.

12    Q.   I understand, but you were answering a different

13  question than I asked.

14    A.   I don't think I was, but we'll go on.

15    Q.   All right.  Do you remember testifying in the case of

16  the United States against Dr. Siefert?

17    A.   Yes.

18    Q.   All right.  And did you testify in that case that you

19  were a passionate activist on behalf of pain patients and their

20  providers?

21    A.   You're showing me something that I don't know what this

22  is.

23    Q.   We're taking a look at your testimony from

24  *United States v. Siefert*.  Refresh your recollection?

25    A.   Yes.

17

1    Q.    All right.  Do you see that's what I'm showing you?

2    A.    Yes.

3    Q.    All right.  And did you indicate in that case when you

4    were asked about your passionate activism that you said yes?

5    A.    Yeah.  There's a question there.  The question, you are

6    a passionate activist on behalf of pain patients and their

7    providers, correct?  And the A says yes.  So that's what's

8    written there.

9    Q.    Okay.  Are you disputing what you said in United States

10   versus Dr. Siefert, I believe?

11   A.    Not really.  I mean, I probably said that.

12   Q.    Are you not a passionate activist, Dr. Murphy?

13   A.    I -- as I said, as I'm saying today, passionate is a

14   subjective term, and I explained to you factually what I am.

15   Q.    And that subjective term, "activism," you're passionate,

16   activism is a theory or practice based on militant action, is

17   it not?

18   A.    Not necessarily.

19   Q.    Would taking a look at the dictionary definition of

20   activism help refresh your recollection?

21   A.    I know what activism is.

22   Q.    Do you disagree that the dictionary definition includes

23   a reference to militant action?

24   A.    I have no idea what the dictionary definition says.

25   Q.    Okay.  You're proud of the fact that you're an English

18

1    major, though, right, Dr. Murphy?

2        A.    Proud of it?  No.  It's -- again, I'm factually an

3    English major.  I understand language and English.

4        Q.    Okay.  Would taking a look at the definition help you?

5        A.    I know what activism is.

6        Q.    Okay.  Me too.

7              I think you testified about this a little bit,

8    Dr. Murphy, on direct examination.  But when you're practicing

9    medicine, you only prescribe opioids when the benefits of the

10   drug outweigh the risks; is that right?

11       A.    When, in my judgment, in my clinical judgment, the

12   benefits outweigh the risk, yes.

13       Q.    And only under those circumstances is it within the

14   practice of medicine to be prescribing opioids or any other

15   drugs.  Is that fair?

16       A.    That is the decision-making process that you use.

17   Sometimes we do give medicines that end up causing more harm

18   than good.  So the intent, the intent in practicing medicine,

19   the ethic of beneficence is that you are attempting to benefit

20   the patient.  That means providing more benefit than harm.

21       Q.    And you would agree that the drugs that we've been

22   talking about in this case -- the opioids, the benzos, the

23   Soma -- all carry significant risks.  Is that fair?

24       A.    Yes.

25       Q.    And they carry significant risks or serious risks of

19

1  addiction and overdose. Is that fair?

2  A.  Some of them do.

3  Q.  Okay. And that's especially the case with prolonged use

4  of those drugs. Is that true?

5  A.  Not necessarily.

6  Q.  When you have patients at your clinic, Dr. Murphy, you

7  have them fill out a new patient intake form, or you have a new

8  patient intake form available for them on your website, do you

9  not?

10  A.  Yes.

11  Q.  And one of the things you have on that new patient

12  intake form is a pamphlet from the CDC; is that right?

13  A.  I believe so, yes.

14  Q.  And in that CDC pamphlet, it says that prescription

15  opioids carry a serious risk of addiction and overdose,

16  especially with prolonged use, does it not?

17  A.  I'm not sure exactly what it says.

18  Q.  Would you disagree with that statement?

19  A.  I'm not sure if that statement is entirely accurate.

20  Q.  What's not accurate about it?

21  A.  Well, like anything else, the risk is going to depend

22  upon the circumstances of the patient. And for some patients,

23  that first dose or the initial or the acute use of the

24  medication is much more dangerous than the chronic use.

25       Somebody on chronic opioids, as I said earlier, becomes

20

1    tolerant to the medications.  The reason people die from opioid

2    overdose is they quit breathing.  And one of the first things

3    you become tolerant to is the respiratory depressant effect.

4    So, actually, long-term use of opioids at stable can be safer

5    than somebody who's acutely taking them who's not used to them.

6         So then again, as is always the case, it depends on the

7    uniqueness of the patient, your clinical knowledge and the

8    science behind it, and your clinical judgment in that

9    situation.

10   Q.   Dr. Murphy, do you disagree with the form that you have

11   posted on your website for new patients?

12   A.   I think it's informative and helpful, but I'm not sure

13   that the CDC always gets it exactly right in the language they

14   choose.  But I have it on the website because, again, I

15   generally like what the CDC puts out, and I want patients to

16   have access and be able to read that.

17   Q.   Because it's important that patients understand the

18   potential risks associated with the drug therapy they might

19   receive?

20   A.   Yes.

21   Q.   And something else that you have on your new patient

22   forms.  As many as one in four people, Dr. Murphy, receiving

23   prescription opioids long term in a primary care setting

24   struggle with addiction; is that right?

25   A.   I don't know if that's on there or not.

21

```
 1      Q.   All right.  Would taking a look at it refresh your

 2   recollection?

 3      A.   Yes.

 4      Q.   All right.  If you could take a look at your screen.

 5      A.   Yes.

 6      Q.   All right.

 7           THE COURT:  Mr. Helfmeyer, would now be a good time to

 8   break for lunch?

 9           MR. HELFMEYER:  If I could ask one thing of Dr. Murphy

10   and then I would.

11   BY MR. HELFMEYER:

12      Q.   Dr. Murphy, during the break earlier, did I give you an

13   article?

14      A.   Yes.

15      Q.   Okay.  Could you take a look at it over the break?

16      A.   Yes.

17      Q.   All right.  Thank you.

18           MR. HELFMEYER:  Good time.

19           THE COURT:  All right.  Ladies and gentlemen, close

20   your books.  Place them on the chair.  We'll return at 1:30.

21   Don't discuss the case.

22        (Jury out at 12:10 p.m.)

23                            - - -

24                         Monday Afternoon Session

25                         September 18, 2023.
```

                                                                    22
1                              - - -

2          (Jury in at 1:30 p.m.)

3              THE COURT:  Mr. Helfmeyer, you may continue your

4    cross-examination.

5              MR. HELFMEYER:  Thank you, Your Honor.

6      BY MR. HELFMEYER:

7      Q.   Are you good, Dr. Murphy?

8      A.   Yes.  Thank you.

9      Q.   Great.

10          Before the lunch break, we were talking about some of

11   the risks associated with the use of opioids.  Do you remember

12   that testimony?

13     A.   Yes.

14     Q.   Okay.  And you've reviewed the Indictment in this case,

15   right?

16     A.   Yes.

17     Q.   The time period that we're talking about is 2014 to

18   2019.  Does that sound right to you?

19     A.   Yes.

20     Q.   Okay.  During that time, in your practice, Dr. Murphy,

21   you warned your patients about the dangers associated with

22   taking prescription opioids, did you not?

23     A.   Yes.

24     Q.   And you had a form on your website that new patients

25   were supposed to download before they came to your office,

23

1  right?

2    A.   Yes.

3    Q.   You're familiar with that form?

4    A.   Yes.

5    Q.   And you authored much of that form, right?

6    A.   Yes.

7    Q.   You wanted, among other things, your patients to

8  recognize the risks associated with using opioids?

9    A.   Yes.

10    Q.   And you wanted them to understand and acknowledge that

11  they understand that the use of high-dose opioids for chronic

12  opioid therapy is controversial and is not recommended without

13  a demonstrated need and a plan for appropriate monitoring.  You

14  wanted them to acknowledge that, right?

15    A.   Yes.

16    Q.   You wanted them to say that they understand that many

17  respected clinicians do not believe that long-term use of these

18  medications is beneficial for chronic pain.  You wanted them to

19  understand that?

20    A.   Yes.

21    Q.   You wanted them to understand that the need for

22  progressively higher opioid dosages may be the result of either

23  progression of the underlying condition, the development of

24  tolerance, a psychiatric condition, or may indicate substance

25  use disorder or unlawful diversion?

24

1   A.   Yes.

2   Q.   And you also wanted them to understand that if their

3   prescribing clinician elects to provide or continue providing

4   opioid therapy at a morphine-equivalent dose of more than

5   60 MME, that there are risks associated with opioid therapy,

6   including the risk of dying, and that those risks are

7   substantially increased?

8   A.   Yeah.  I believe that's written in my documents.

9   Q.   All right.  And so you're acknowledging and you want

10  your patients to understand that the risks associated with

11  dying are substantially increased above 60 MME?

12  A.   Yes.

13       MR. HELFMEYER:  If we could go to the Elmo.

14  BY MR. HELFMEYER:

15  Q.   I want to do a little bit of -- and if we could project

16  to the jury.

17       I'm showing what's been entered into evidence as 301.

18  Can you see it, Dr. Murphy?

19  A.   Yes.

20  Q.   Can you read the numbers on there?  You don't need to

21  read them out loud right now.  But can you read the numbers?

22  A.   Yes.

23  Q.   So you're risking -- you're telling your patients about

24  the substantial increase in risk over 60 daily MME; is that

25  right?

25

1    A.    Yes.

2    Q.    All right.  And what we have here are the prescriptions

3    that are in this Indictment and the MME associated with each

4    daily dose of those prescriptions.  Okay?

5         When you're calculating the daily MME, you're adding up

6    the MME associated with each of the opioids that have been

7    prescribed; is that right?

8    A.    That's --

9    Q.    That's just a general question, Dr. Murphy, not specific

10   to a page yet.

11   A.    I think that's the way most people do it.

12   Q.    Okay.  All right.  Because your MME is just for opioids,

13   right?

14   A.    Correct.

15   Q.    They're similar to morphine?

16   A.    Correct.

17   Q.    And it's a way to compare apples to apples.  So you're

18   comparing all opioids to morphine?

19   A.    The way you worded your question is not correct.  It's

20   not apples to apples.

21   Q.    It's the best that clinicians use to do so?

22   A.    No.

23   Q.    So you disagree with the use of MMEs?

24   A.    I think that the MMEs are misunderstood and they can be

25   used to harm patients.

26

1    Q.    Okay.  All right.  I want to do just a little bit of

2    math, Dr. Murphy.  So for January 19th associated with Count 6,

3    we have 120 plus 68.  So that would be 188; is that right?

4    A.    Yes.

5    Q.    And I've got a handy-dandy calculator here.  And if we

6    do 188 divided by 60, what number is reflected on the

7    calculator?

8    A.    3.13333.

9    Q.    So you'd agree that that's more than three times greater

10   than what you're warning your patients against for this one

11   count; is that right?

12   A.    Yes.

13   Q.    For Count 7, you'd agree with me that 90 plus 120 is

14   210, right?

15   A.    Yes.

16   Q.    And if we do 210 divided by 60, that's 3.5, is it not?

17   A.    Yes.

18   Q.    Okay.  And so that's 3.5 times what you're warning your

19   patients against increases their risk of death?

20   A.    Yes.

21   Q.    For Count 8, 210 again.  I won't do the math again.

22   It's the same answer, right?

23   A.    Yes.

24   Q.    Down to Count 9 with Donald Neilan.  I don't want to do

25   that math on the fly.  495 plus 480, that equals 975?

27

1 A. Yes.

2 Q. And then if we divide that by 60, what's reflected on

3 the calculator?

4 A. 16.25.

5 Q. Down to the next one.  501 plus 480, you'd agree with me

6 that that's 981?

7 A. That's what's on your calculator.

8 Q. And if we divide that number by 60, what do we get?

9 A. 16.35 is on the calculator.

10 Q. So it's 16.35 times 60, right?

11 A. Yes.

12 Q. 405 plus 485, that's 885, right?

13 A. Yes.

14 Q. And if we divide that number by 60, we get -- what

15 number is that?

16 A. 14.75.

17 Q. Down to Mr. Saker, we've got 270 plus 360, right?

18 A. Yes.

19 Q. And that's 630 daily MMEs.  If we divide that by 60,

20 what do we get?  Can you see it?  I'm sorry.

21 A. Oh, 10.5.

22 Q. All right.  And then the other ones for Mr. Saker.  225

23 plus 480 equals 705, right?

24 A. Yes.

25 Q. Divide that by 60.  11.75?

28

1    A.    Yes.

2    Q.    And then the final Count 14 for Mr. Saker, 270 plus 480.

3    750?

4    A.    Yes.

5    Q.    Divided by 60 equals what?

6    A.    12.5.

7    Q.    Rather than going through each of these, Dr. Murphy, how

8    about I do one for each patient.  Okay?

9    A.    Whatever is great.  Fine with me.

10    Q.    All right.  Thank you.

11          Let's do Count 5 with Patient John Tittle.  We have 180

12    plus 90 plus 240 for a total of 510 MMEs; is that right?

13    A.    Yes.

14    Q.    All right.  And if we divide that one by 60, we get

15    what?

16    A.    8.5.

17    Q.    And Mr. Tittle's mom, Patricia Tittle, you testified a

18    little bit about earlier.  If we add up hers, she was on the

19    same MME count as her son, right?

20    A.    I would have to look.  I don't know.

21    Q.    Here and here.

22    A.    Oh, yes.

23    Q.    So we know that's eight-and-a-half times greater than 60

24    when you start warning your patients.

25          Down to Mr. Crigger.  You'd agree with me that 180 plus

29

1    180 is 360?

2    A.    Yes.

3    Q.    Divided by 60 is 6, right?

4    A.    Yes.

5    Q.    So that's six times.

6          Mr. Robinson, let's do Count 25.  188, is that the daily

7    MME for that prescription?

8    A.    Yes.

9    Q.    All right.  And if we divide that by 60, what's that

10   number?

11   A.    3.13333.

12   Q.    Mr. Webb, let's do count 26.  585 plus 360 equals what?

13   A.    945.

14   Q.    And if we divide that number by 60, we get what?

15   A.    15.75.

16   Q.    And then finally, Ms. Butler, we have 90.  And that's

17   1.5, is it not?  Don't take my word for it.

18   A.    Yes.

19   Q.    So if these were your patients, Dr. Murphy, you'd agree

20   it would be very important to warn them about the increased

21   risks of death associated with the high-dose opioid treatment?

22   A.    I would warn them with the risks.  And there's several

23   risks, one of which would be the high risk of death.

24   Q.    Sticking with your new patient intake form that you have

25   on your website, you have a policy with respect to pill counts,

30

1    do you not?

2        A.    Yes.

3        Q.    And because of that policy -- and that -- you've come up

4    with that policy because you feel that it's in the best

5    interests of your patients, right?

6        A.    Yes.

7        Q.    Making sure that they're taking the medication as

8    prescribed?

9        A.    It helps, I think.

10       Q.    Gotcha.

11             And you testified a little bit about that on direct.

12             But because of that policy, you require, and it's

13   explicit, that patients live within 100 miles of your practice?

14       A.    That's on the website.  I don't require that anymore.

15       Q.    But at the time that this case -- that the Indictment is

16   covering from 2014 to 2019, that was on your website, was it

17   not?

18       A.    Yeah, but I didn't -- I didn't enforce it.

19       Q.    So you just put it up there for no reason?

20       A.    No, because I wanted people to -- if I wanted to do a

21   random pill count, I felt within 100 miles, you could make it

22   in, you know, not too far away.  And as people over -- you

23   know, just moved away and moved further away and whatnot, I

24   really didn't enforce that.

25       Q.    I want to talk a little bit about Xanax, Dr. Murphy.

31

1    Xanax is a benzodiazepine, is it not?

2    A.   Yes.

3    Q.   And it has abuse potential just as any other controlled

4    substance does, right?

5    A.   Well, it has abuse potential.  It's not like any other

6    controlled substance.  It has its own abuse potential.

7    Q.   Gotcha.  No.  I got you.

8         You use Xanax occasionally in your practice, do you not?

9    A.   Personally I don't know of any that I prescribe Xanax

10   for.  I have patients that take Xanax, though.

11   Q.   And you've testified previously that the highest daily

12   dose of Xanax you've prescribed to a patient is probably a

13   milligram a day.  Is that fair?

14   A.   I -- probably in that range.  I don't prescribe much

15   Xanax.  So a range would be difficult to say, but I don't

16   recall anybody over a milligram.

17   Q.   Do you remember testifying for Dr. Siefert in March of

18   this year?

19   A.   Yes.

20   Q.   Do you remember being asked about the maximum dosage

21   that you prescribed for a patient for Xanax?  Oh.  I'm sorry.

22   Not Dr. -- Dr. Houdersheldt, a different one.  Do you remember

23   testifying for Dr. Houdersheldt at the end of 2020?

24   A.   Yes.

25   Q.   Okay.  And you were asked that question about the

32

1   maximum daily dose that you prescribe for the drug Xanax?

2       A.    I don't recall that question.

3       Q.    Do you remember whether you said for yourself it would

4   be probably a milligram a day?

5       A.    I don't recall what my answer was.

6       Q.    Would taking a look at that transcript help refresh your

7   recollection?

8       A.    Well, I could tell you what's on the transcript.  I

9   don't remember the question, but I can read what's on the

10  transcript.

11      Q.    Well, I'm interested in what it is that the maximum that

12  you prescribe of the drug Xanax and whether it's a milligram a

13  day.

14      A.    I prescribe what I think the patient needs.  I don't

15  know what the dose it would be right now.

16          MR. HELFMEYER:  If we could go just for the witness,

17  ma'am, to the podium and -- thank you.

18  BY MR. HELFMEYER:

19      Q.    Can you see the screen, Doctor?

20      A.    Yes.

21      Q.    All right.  Take a look at the highlighted portion, and

22  let me know when you're done.

23      A.    Yes.

24      Q.    Okay.  Do you remember testifying now that the maximum

25  that you prescribe of Xanax for a day is a milligram?

33

1    A.   No.

2    Q.   You don't remember saying that?

3    A.   I don't -- I mean, that was 2022. It's -- I can read

4  it, but I don't remember all the questions.

5    Q.   And I think you testified earlier that that's probably

6  about right, though. Is that fair?

7    A.   Yeah. I would answer the question the same way today

8  probably.

9    Q.   Oh, good. All right. Well, that's what I was trying to

10  get at.

11       The other drug that I want to talk about quickly is

12  diazepam. That's Valium, right?

13    A.   Yes.

14    Q.   That's also a benzo?

15    A.   Yes.

16    Q.   Do you use Valium much in your practice?

17    A.   I have at least one patient on Valium that I prescribe

18  for.

19    Q.   All right. And for Valium, would you agree that the max

20  that you prescribe is roughly 10 milligrams a day?

21    A.   I think the one patient that I prescribe Valium for is

22  on less than that per day.

23    Q.   Gotcha.

24       MR. HELFMEYER: All right. If we could go back to the

25  Elmo, and we'll stick with this Exhibit 301.

34

1    BY MR. HELFMEYER:

2    Q.    There were a number of patients that you reviewed that

3    are in the Indictment that are on those two drugs, Xanax and

4    Valium, right?  Not them together.  I'm sorry.

5          There are patients on Xanax, and there are patients on

6    Valium?

7    A.    There are patients on Xanax.  I don't know if there were

8    very many on Valium.  I think it -- I remember only one on

9    Valium.

10   Q.    Okay.  And that's diazepam, right?

11   A.    Correct.

12   Q.    Okay.  So I want to go through the same exhibit and mark

13   instances where we see those two drugs present.  Okay?

14   A.    Okay.

15   Q.    All right.  We see Mr. Neilan here associated with

16   Count 10.  Can you see that?

17   A.    Yes.

18   Q.    All right.  And we have clonazepam there.  That -- oh,

19   I'm sorry.  Alprazolam.  I'm sorry.

20         Alprazolam for Mr. Neilan.  Can you see my pen?

21   A.    Yes.

22   Q.    All right.  And this is a 30-day supply.  How many per

23   day of Xanax did Dr. Romano prescribe?

24   A.    Well, if number 60 is the amount he prescribed for

25   30 days, that would be two pills a day.

35

1    Q.    Okay.  The next for Mr. Neilan, same thing, right?

2    A.    Yeah.  The thing is, though, I don't know how that's

3    prescribed because that's 60.  You'd have to look at what the

4    prescription says because it could be up to three a day, and

5    then he gives him 60 for the whole month.  So, you know, it's

6    not necessarily one twice a day.  It's -- it could be -- it

7    could vary.

8    Q.    Okay.  So it could be two; it could be three.  You're

9    not sure exactly.  But if we're assuming a 30-day supply, that

10   would be two a day?

11   A.    That would be, on the average, two a day.

12   Q.    Gotcha.

13         Going to the second page of 301, we have Ms. Tittle.

14   Can you see that?

15   A.    Yes.

16   Q.    All right.  And she's prescribed 10-milligram of

17   diazepam?

18   A.    Yes.

19   Q.    And how many of that 10-milligram?

20   A.    Sixty.

21   Q.    And so that's 20 milligrams a day of the diazepam,

22   assuming a 30-day supply?

23   A.    That would be, on the average, 20 milligrams a day.

24   Q.    Again, for Ms. Tittle, same thing for Count 20?

25   A.    Yes.

36

1    Q.    And then Ms. Butler down at the bottom for Count 34.    We

2    have Xanax 1 milligram twice a day.    Fair?    So that's

3    2 milligrams?

4    A.    It would be, average, two pills per day.

5    Q.    Okay.    And that's 2 milligrams?

6    A.    Yes.

7    Q.    So that's twice the max of what you prescribed in your

8    practice?

9    A.    I'm not sure I have any patients that I prescribe

10   alprazolam for right now.

11   Q.    Gotcha.    I appreciate your honesty.

12        When -- that leads to my next question, Dr. Murphy.

13   When you receive a patient, when a patient comes in and they're

14   receiving a benzodiazepine, generally your practice is to taper

15   them off that benzo, right?

16   A.    No, not necessarily.

17   Q.    Do you remember testifying for Dr. Suetholz?

18   A.    Yes.

19   Q.    Do you remember being asked that same question?

20   A.    No.

21   Q.    Would taking a look at your transcript refresh your

22   memory?

23   A.    Probably.

24        MR. HELFMEYER:    If just for the witness we could

25   switch to the podium.    Thank you.    Wrong one.    You know what?

1    I'll move on.

2        I want to talk -- we can take that down, and we can

3    switch to the government's projector to Ms. Balde's computer.

4    BY MR. HELFMEYER:

5    Q.    You talked about Ms. Arrieal Butler on direct

6    examination.  Do you remember that?

7    A.    Yes.

8    Q.    And you testified that she was a pretty straightforward

9    patient?

10   A.    I believe so, yeah.

11       MR. HELFMEYER:  Okay.  If we could go to

12   Government's -- or sorry, Joint Exhibit 154 at page 36,

13   Ms. Balde.

14   BY MR. HELFMEYER:

15   Q.    You see that, Dr. Murphy?

16   A.    Yes.

17   Q.    And so at the top, it has a date.  We have February 3rd

18   sorry, February 13th of 2017.  Do you see that?

19   A.    Yes.

20       MR. HELFMEYER:  If we could zoom back out.

21   BY MR. HELFMEYER:

22   Q.    Do you remember seeing that Dr. Romano indicated for

23   Ms. Butler that he was going to temporarily increase the pain

24   meds for Ms. Butler?

25   A.    It looks like at number 16 it says that.

38

1    Q.    Thank you.  Yeah.  There we go.  Appreciate that.

2          He indicated that he would temporarily increase the pain

3    meds for Ms. Butler?

4    A.    That's what that would imply to me, yes.

5    Q.    Okay.  And he did that, right?  He did increase the meds

6    for Ms. Butler.  If we could go to --

7          And so when she started, the initial MME count, I

8    believe, was around 50 MME per day.  Does that sound about

9    right for Ms. Butler?

10         MR. HELFMEYER:  And while Dr. Murphy is looking, if we

11   could go to 154 at page 183, Ms. Balde.

12         THE WITNESS:  So I'm sorry.  What was your question

13   about the MME?

14   BY MR. HELFMEYER:

15   Q.    The initial -- the initial prescription for -- Well, she

16   came in on tramadol, right?

17   A.    I -- she had been taking oxycodone in the past, and I

18   think she was taking tramadol when she came in.

19   Q.    Right.  So she came in on tramadol.  And that's a lower

20   dose of opioid, right, a lower-strength opioid?  I think you

21   testified about that on direct examination.

22   A.    Yes.  It's considered a milder opioid.

23   Q.    Okay.  And then Dr. Romano changes her to oxycodone,

24   does he not?

25   A.    Yes.

39

1    Q.   Okay.  And here we have -- in February we have that he's

2    increasing the strength of -- the number to 90; is that right?

3    Oh, you know what?  Okay.  So here we are.  And I'm sorry.  I'm

4    not reading my notes right.

5         This is from January, right?

6    A.   Yes.

7    Q.   Okay.  Up at the top, January 16th of 2017.  And it's

8    oxycodone 10 milligrams, 90 pills for this prescription?

9    A.   Yes.

10   Q.   All right.

11        MR. HELFMEYER:  If we could go to page 187 of this

12   exhibit, Ms. Balde.

13   BY MR. HELFMEYER:

14   Q.   Now we're in February.  And we go from 90 at

15   10 milligrams to 120 at 15 milligrams, right?

16   A.   Yes.

17   Q.   And so that's the increase that Dr. Romano is talking

18   about in the progress note?

19   A.   I would have to see that progress note again.

20   Q.   Sure.  No problem.

21        MR. HELFMEYER:  Let's go back to page 36 of this

22   exhibit.  And then zoom back down so the doctor can see number

23   16.

24        THE WITNESS:  That would appear to be the increase

25   he's talking about.

40

1    BY MR. HELFMEYER:

2    Q.   All right.  And he indicates that it's going to be a

3    temporary increase, does he not?

4    A.   That's what it says, yes.

5         MR. HELFMEYER:  If we could go to 154 at 316,

6    Ms. Balde.  And zoom in to the oxycodone prescription.

7    BY MR. HELFMEYER:

8    Q.   So two years later, it's the same exact prescription, is

9    it not?

10   A.   I think it is.

11   Q.   I think you would agree that two years is not a

12   temporary increase?

13   A.   I would not call that a temporary increase.

14   Q.   And --

15   A.   Can I say I don't know what happened in those whole two

16   years?  It may have gone down and come back up.

17   Q.   Sure.

18   A.   But that's the same as it was when we saw that initial

19   increase.

20   Q.   Gotcha.

21        And that wouldn't be appropriate if it wasn't working,

22   right?  There's a double negative in there, but let me ask it a

23   different way.

24        You testified earlier that you have to weigh the risks

25   and the benefit in prescribing opioids, right?

41

1    A.    Yes.

2    Q.    And there are risks associated with these drugs?

3    A.    Yes.

4    Q.    Including oxycodone that we're looking at here?

5    A.    Yes.

6    Q.    Okay.  And so you're only prescribing, you, as a

7    physician practicing medicine, if it's benefiting the patient?

8    A.    I'm prescribing if I -- if in my clinical judgment I

9    believe that that prescription will have more benefits than

10   harm to the patient.  That's my decision-making process.

11   Q.    And if it doesn't have any benefit, then it obviously

12   can't have more benefits than harm, right?

13   A.    If it has no benefit at all, then -- if there's no harm,

14   then there's -- it's even.  They're zero.

15   Q.    Gotcha.

16   A.    So --

17   Q.    But part of that risk-benefit analysis is you're

18   weighing the possible harm for a patient taking these drugs.

19   And that's nonzero?

20   A.    Well, it's also with a possible benefit.  I mean, I

21   have -- I mean, every prescription I give, I don't know for

22   sure what the result's going to be.  But in my clinical

23   judgment, my decision is based on what I believe is going to be

24   in the best interest of the patient.

25   Q.    But after two and a half years, you probably got a good

42

1   idea, right?

2   A.   Well, everyone changes, and it depends on the person,

3   the place, and the time.

4   Q.   And you reviewed the entirety of Ms. Butler's patient

5   file for your testimony today?

6   A.   I reviewed everything that was given to me.  I focused

7   mostly on the visits that were around the Indictment dates.

8   Q.   Gotcha.

9        And did your review include the progress notes sent by

10  Dr. Belcik that has been referred to as a book?  Did you review

11  those notes?

12  A.   I don't recall them offhand.

13  Q.   All right.  Well, let's take a look, and you tell me.

14       MR. HELFMEYER:  If we can go to 154 at page 281,

15  Ms. Balde, and if we could zoom in to the top half, including

16  the header.  Sorry.  If you could -- yeah.

17  BY MR. HELFMEYER:

18  Q.   So, Dr. Murphy, you see that this is a fax sent from

19  Boardman Specialty Physicians from Dr. Belcik.

20       MR. HELFMEYER:  And you know what?  Let's zoom out,

21  and let's go back to page 280 so Dr. Murphy can see -- there we

22  go.

23  BY MR. HELFMEYER:

24  Q.   Do you see that these are the progress notes associated

25  with Dr. Belcik?

43

1    A.    Yes.

2    Q.    All right.  And these are a part of Dr. Romano's patient

3    file?

4    A.    I don't recall seeing this exact note.

5    Q.    Okay.  So you didn't look at this note?

6    A.    I may have.  I just don't remember it.

7    Q.    Okay.  Gotcha.

8          And you see up here at the top that the day that it was

9    sent is July 31st of 2019, which is also the same date as the

10   date of the note itself?

11   A.    Okay.  At the top, looks like it's a fax notation.

12   Q.    Yep.

13   A.    It says, July 31st, 2019, which is the same day as the

14   visit.

15   Q.    Okay.  And you said you were looking at the records that

16   are around the date of the Indictment.  That was your

17   testimony.

18   A.    I was looking at Dr. Romano's records around the date of

19   the Indictment.

20   Q.    Gotcha.

21         And this was in his patient file.  And one of the counts

22   associated with Ms. Butler, you'd agree, was from August 30th,

23   roughly a month after this note of 2019, Count 34.

24   A.    Yes.

25   Q.    Okay.  Great.

44

1      MR. HELFMEYER:  If we could go to the next page and

2  zoom in to the top half, Ms. Balde.

3   BY MR. HELFMEYER:

4   Q.   So we're on the second page of Dr. Belcik's note.

5  Dr. Murphy, do you see next to my arrow what it says?  What

6  does Ms. -- according to Dr. Belcik, Ms. Butler reporting the

7  severity of her pain?

8   A.   8 to 10 out of 10.

9   Q.   And then what does she indicate, according to

10  Dr. Belcik, is alleviating the pain?

11   A.   Says, "Pain alleviated by nothing."

12   Q.   You'd agree that nothing is different from oxycodone,

13  right?  Those two words are different?

14   A.   They are different.

15   Q.   Gotcha.  Wasn't trying to trick you.

16      MR. HELFMEYER:  If we could zoom back out.

17   BY MR. HELFMEYER:

18   Q.   I want to talk a little bit about informed consent.

19  We've talked about the form that you use for patients and you

20  want to make sure that they understand the possible risks

21  associated with the drugs that you might prescribe them; is

22  that right?

23   A.   Yes.

24   Q.   You want to make sure that they understand that some of

25  the drugs they might take together have dangerous side effects

45

1   or there are significantly increased risks there, right?

2   A.   Yes.

3   Q.   And the medical literature recognizes that the risks

4   associated with taking opioids starts somewhere, right?  Not a

5   specific number but they start somewhere.  There are risks

6   associated.  We talked about that a bunch.

7   A.   Yes.

8   Q.   And those risks go up when you add a benzodiazepine; is

9   that right?

10   A.   Not necessarily.

11   Q.   That's what the medical literature says, though?

12   A.   No, it does not.

13   Q.   You would agree that the CDC's recommendation, their

14   guidelines, because of those risks recommends against that

15   combination?

16   A.   The recommendation in the CDC guideline is more of an

17   advice, and it's based on poor quality evidence.  And the

18   advice they give there is not substantiated by the evidence,

19   and the CDC says that.

20   Q.   Okay.  And --

21   A.   Basically, they leave it to the doctor's decision based

22   on the individual patient.

23   Q.   Gotcha.

24        And so you felt it was important to identify for the

25   jury the quality of the evidence that the CDC relied on, right?

46

1    A.    I think it's the CDC; they want us to know the quality

2    of the evidence.  Any proper guideline is transparent about the

3    quality of the data that goes into creating the guideline.  And

4    they will tell you, therefore, this is only a recommendation,

5    and it's based upon certain quality of evidence.

6        So the outcome may not be what the recommendation says.

7    And the CDC very candidly says that in their guideline.

8    Q.    You'd agree that it's important --

9        THE COURT:  Are you talking about the black box

10   warning here?

11       MR. HELFMEYER:  No, Your Honor.  The guidelines issued

12   in March of 2016.

13       THE COURT:  All right.  Go ahead.

14       MR. HELFMEYER:  But the black box warning is another

15   instance there, and I'll ask about that in a second.

16   BY MR. HELFMEYER:

17   Q.    You talked about the importance of transparency in a

18   guideline.  It's important for an expert witness to be

19   transparent about the quality of the evidence that they rely

20   on, too, right?

21   A.    I would say that's a proper statement, yes.

22   Q.    And we'll come back to that in a second.  You testified

23   on direct examination about the FDA's black box warning, right?

24   A.    Yes.

25   Q.    Mr. Shamansky asked you some questions about it.  You

47

1    described it, that the FDA has sent out so that doctors know

2    that it's top -- at the top of the page when they're

3    considering combining what two drugs?

4    A.    It's on the label.  Doctors don't always read the

5    labels.  Doctors read their journals.  They read the medical

6    literature.  They -- that's the label that comes with the

7    medicine.

8    Q.    Gotcha.  And what two drugs is the FDA warning about

9    combining?

10   A.    Combining, in that regard, the opioids with the

11   benzodiazepines or other sedative medicines as well.

12   Q.    Gotcha.  Other sedative medicines like Soma?

13   A.    Yes.

14   Q.    So it's important that patients understand that there's

15   risks associated with that combination of drugs?

16   A.    Yes.

17   Q.    Gotcha.  Thank you.

18        I want to go back to Ms. Butler's patient file, what

19   Dr. Belcik sent to Dr. Romano.

20         MR. HELFMEYER:  If we could go to page 280, 154 at

21   280, Ms. Balde.  And if we can zoom into just the very bottom

22   paragraph.

23   BY MR. HELFMEYER:

24   Q.    Do you see where it says, "The patient was not," is how

25   that sentence ends?

48

1    A.    Yes.

2    Q.    Okay.

3          MR. HELFMEYER:  And if we could zoom back out and go

4    to the next page, and then zoom in to the top.

5    BY MR. HELFMEYER:

6    Q.    So the patient was not aware what?  After "aware," the

7    patient was not aware what?

8    A.    Okay.  The arrow is in the way.  I think the patient was

9    not aware how dangerous the combination of opioids and benzos

10   are.

11   Q.    You can keep reading.

12   A.    She was quite surprised when I told her this.

13   Q.    You would agree that Ms. Butler, according to

14   Dr. Belcik, is reporting to him that she didn't know of any

15   risks associated with combining opioids and benzodiazepines,

16   right, Dr. Murphy?

17   A.    Not necessarily.

18   Q.    That's not what she's reporting?

19   A.    I don't know what -- I mean, I have no idea who wrote

20   this or how it came about or where this came from, whether he

21   wrote it down or she wrote something out.  A lot of times,

22   there are forms.  You showed me something earlier with this

23   8-out-of-10 thing with her pain score.  Who knows where that

24   came from.

25          So I don't really know how this got generated, what this

49

1   means.

2   Q.   Gotcha.

3        You would agree, Dr. Murphy, that informed consent is

4   more than a piece of paper, right?

5   A.   Yes.

6   Q.   There's got to be a -- there's got to be an interaction

7   between the physician and the patient?

8   A.   Not necessarily.

9   Q.   There's got to be an interaction between somebody and

10  the patient to make sure they understand what it is they're

11  receiving?

12  A.   Not necessarily.

13  Q.   So informed consent is just a piece of paper?

14  A.   No.

15  Q.   It's more than that?

16  A.   Yes.

17  Q.   Gotcha.

18       I want to switch gears and talk about some of the other

19  patients and addiction.  Would you agree that many of the

20  patients whose files you reviewed were more prone to addiction

21  given some of their other health conditions?

22  A.   No.

23  Q.   You would not agree with that?

24  A.   Not necessarily.

25  Q.   Would you agree, Dr. Murphy, that people that have

50

1   psychological issues, like anxiety and depression or PTSD, can

2   be more prone to addiction?

3      A.   Yes.

4      Q.   That they lose their job or they wreck their cars, would

5   you agree that that's the case for people suffering from

6   addiction?

7      A.   Not necessarily.

8      Q.   Do you remember testifying on behalf of Dr. La, L-A?

9      A.   Yes.

10     Q.   Do you remember talking about addiction and talking

11  about some of the conditions that make people more prone or

12  that you see make people more prone to addiction?

13     A.   I don't remember the details of my testimony.

14     Q.   Would taking a look at the transcript help refresh your

15  recollection?

16     A.   Probably.

17          MR. HELFMEYER:  If we could go back here just for the

18  witness.

19          THE DEPUTY CLERK:  To Cady or --

20          MR. HELFMEYER:  To me.  I'm sorry.

21          THE DEPUTY CLERK:  That's okay.

22          MR. HELFMEYER:  And just for the witness.  Thank you.

23  BY MR. HELFMEYER:

24     Q.   Let me know when -- can you see it, Dr. Murphy?

25     A.   Yes.

51

1    Q.   I want to go to -- all right.  Do you see what I have

2   highlighted?  There's a whole paragraph there.

3    A.   Yes.

4    Q.   So you'd agree that some of the things that people who

5   are addicted do is they wreck their cars, they overdose, they

6   lose their jobs?

7    A.   I'm not sure what you're asking me.  Would you -- can

8   you ask it to me again?

9    Q.   Yes.  So people who are prone to addiction or people who

10  suffer from addiction often wreck their cars, lose their jobs,

11  or their relationships suffer?

12   A.   Well, not necessarily.

13   Q.   But that was your testimony previously, was it not?

14   A.   I don't -- where was it?

15   Q.   Let me know when your recollection is refreshed.

16   A.   Oh, okay.  I see what I said there.

17   Q.   Would you agree with that, Dr. Murphy?

18   A.   I agree with what I said.

19   Q.   And what is it that you said?

20   A.   Some people are genetically predisposed to it, so it

21  tends to run in families sometimes.  People that have

22  psychological issues, like anxiety and depression or PTSD, for

23  example, sometimes they can be more prone to it.

24   Q.   Gotcha.  That's all I was asking you.

25   A.   Okay.

52

1    Q.    All right.   In your review of the patient files in this

2    case, you saw people that suffered from depression or anxiety,

3    right?

4    A.    Yes.

5    Q.    And I want to go through a couple of those.   You'll have

6    to forgive my handwriting.   Can you see this?

7    A.    Yes.

8    Q.    Okay.

9         MR. HELFMEYER:   If we can switch back to Ms. Balde's

10   computer.   If we can go to Joint Exhibit 111 at page 158.

11   BY MR. HELFMEYER:

12   Q.    I want to ask you about Mr. Miller.

13        MR. HELFMEYER:   Do you want me to run it?

14        MS. BALDE:   Yeah.

15        MR. HELFMEYER:   Okay.   If we can go back to my

16   computer, Ms. Balde is having some computer difficulties.

17        MS. BALDE:   Okay.   I got it.

18        MR. HELFMEYER:   You got it?

19        MS. BALDE:   Yeah.

20        MR. HELFMEYER:   Okay.   Actually, don't change it back

21   to me.   Sorry.

22        Yes, 111 at page 158.   And we can zoom in --

23   BY MR. HELFMEYER:

24   Q.    Or can you read here what it says next to -- before

25   unspecified?

53

1      MR. HELFMEYER:  And we can zoom in, Ms. Balde.  Down

2   at the bottom.

3     BY MR. HELFMEYER:

4     Q.   Okay.  Right here next to the arrow.

5     A.   Yeah.  It says, "Bipolar disorder, unspecified."

6          MR. HELFMEYER:  And zoom back out.

7     BY MR. HELFMEYER:

8     Q.   We're talking about Mr. Miller?

9     A.   Yes.

10    Q.   Okay.

11         MR. HELFMEYER:  We could go to page -- Joint

12   Exhibit 111 at page 165.  If we could zoom in to the bottom

13   down here.  Thank you, Ms. Balde.

14    BY MR. HELFMEYER:

15    Q.   What's indicated here in this chart?

16    A.   At the arrow, it says, "Depression with anxiety."

17    Q.   I want to switch to a different patient.

18         MR. HELFMEYER:  If we could go to 140, joint exhibit,

19   at 749.  All right.  If we could zoom in to the discharge

20   diagnosis in the middle of the screen, Ms. Balde.  Thank you.

21    BY MR. HELFMEYER:

22    Q.   What is next to 8 and 9, the discharge diagnosis for

23   Mr. Mark Robinson?

24    A.   It says -- 8 says opioid -- opiate dependence.  9 says

25   anxiety.

54

1    Q.    Anxiety.  All right.

2          MR. HELFMEYER:  If we could zoom back out and go to

3    the same exhibit, 140 at page 689, and zoom in to the top half.

4    BY MR. HELFMEYER:

5    Q.    What active problem is reflected next to the arrow?

6    A.    Depression.

7    Q.    And I wrote MVA here.  That's motor vehicle accident,

8    right --

9    A.    I'll --

10   Q.    MVA?

11   A.    I'll accept that, yes.

12   Q.    And that's often shorthand how it's referred to in

13   medical records.  Is that fair?

14   A.    Yes.

15   Q.    Okay.  Cool.

16         If we could go to Ms. Butler.  And I don't think we need

17   to go to her patient chart because I think in your report,

18   Dr. Murphy, you noted that she suffered from anxiety; is that

19   right?

20   A.    Yes.

21   Q.    If we could go to 154 at 82 for Ms. Butler, not about

22   anxiety, but I wanted to ask you about -- and if we could zoom

23   in to the portion.

24         She became a patient of Dr. Romano's in March of 2016,

25   is that right, according to his letter here at the very top?

55

1    A.    Yes.

2    Q.    Okay.  Cool.

3          And then what does Dr. Romano say that happened to

4    Ms. Butler in July of 2016?

5    A.    Says, "To complicate matters, this patient was in a

6    motor vehicle accident on July 21st, 2016."

7    Q.    Okay.

8          MR. HELFMEYER:  If we could zoom back out and go to

9    page -- sorry, Exhibit 154 at page 48.

10   BY MR. HELFMEYER:

11   Q.    Do you remember whether she had a second -- another

12   motor vehicle accident?

13   A.    I don't know for sure.  It says on --

14         MR. HELFMEYER:  If we could zoom in to the top half,

15   Ms. Balde.

16         THE WITNESS:  Yes.  Hit head -- hit head-on -- hit

17   head-on by driver fleeing the scene.  The date says 9/29/17.

18         MR. HELFMEYER:  Thank you, Ms. Balde.  We can zoom

19   back out.

20   BY MR. HELFMEYER:

21   Q.    Let's go to Mr. Neilan.  In your report, you noted,

22   Dr. Murphy, that Mr. Neilan suffers from anxiety and panic

23   attacks, does he not?  I believe it's at page --

24   A.    Yes.

25   Q.    -- 25 of your report?

56

1    A.    Yes.

2    Q.    John Saker, Dr. Murphy, you'd agree that he suffered

3    from generalized anxiety?

4    A.    I'd have to refer to my notes.

5    Q.    Yeah, sure.  To speed it up, you can go to page 51 of

6    your report.

7    A.    Yes.  Anxiety is listed.

8    Q.    Great.

9          Moving on to Mr. Webb, Eric Webb, you testified about

10   earlier.

11         MR. HELFMEYER:  Ms. Balde, if we could go to Joint

12   Exhibit 145 at page 5.  And this is one of the forms.  We could

13   zoom in to the middle portion, Ms. Balde.

14   BY MR. HELFMEYER:

15   Q.    Dr. Murphy, this is one of the forms that you talked

16   about on direct examination that Dr. Romano had fill out -- had

17   patients fill out.  Sorry.  Is that right?

18   A.    Yes.

19   Q.    Okay.  Do you see here, what does Mr. Webb report to

20   Dr. Romano next to the red check mark?

21   A.    Yes, depression-feeling blue.

22         MR. HELFMEYER:  You could zoom back out.

23   BY MR. HELFMEYER:

24   Q.    Do you remember, Dr. Murphy, whether Eric Webb reported

25   being in car accidents?

57

1    A.    It was definitely documented in his record.

2    Q.    Do you remember how many?

3    A.    Multiple, I believe.  I don't know the exact number.

4         MR. HELFMEYER:  If we could go to page 7, 145 at

5    page 7.  And zoom in to the top third.  Yeah, there we go.

6    Okay.

7    BY MR. HELFMEYER:

8    Q.    So here we have MVA, motor vehicle accident.  What does

9    Mr. Webb report to Dr. Romano?

10    A.    Oh, I quit -- it says, "Describe what started the pain,

11    the event."  He says, "I quit counting after 16 MVA."

12    Q.    That's a lot of car accidents, right?

13    A.    I would say that's a lot of car accidents.

14    Q.    And part of the concern that you have and the

15    association with addiction and car accidents is that people who

16    are addicted engage in risky behavior.  That's one of the

17    problems, right?

18    A.    Not always.

19    Q.    And I didn't say always.

20         That could be one of the things that they do.  Is that

21    fair?

22    A.    It could be, yes.

23    Q.    Okay.  Or, in addition to that, they could be impaired

24    by what they're addicted to?

25    A.    Yes.

58

1    Q.    Okay.  And so that could be part of what causes car

2    accidents?

3    A.    Yes.

4    Q.    So that's why you, as a practitioner, as a clinician,

5    are concerned when you're looking to see whether a patient

6    suffers from addiction whether they have a long history of car

7    accidents?

8    A.    That's an important consideration.  It is.

9    Q.    I want to change to Mr. Tittle.

10        MR. HELFMEYER:  If we could go to Joint Exhibit 125 at

11   page 12.  And then zoom in to the top third.  Perfect.  Thank

12   you.

13   BY MR. HELFMEYER:

14   Q.    Most of the time I feel.  What does Mr. Tittle check for

15   most of the time how he feels?

16   A.    He's checked worried, depressed, and he's checked sad.

17        MR. HELFMEYER:  If we could go to this Exhibit 125 at

18   page 534.

19   BY MR. HELFMEYER:

20   Q.    This is a record from a hospital.  Is that fair?

21   A.    It looks like it's an emergency room visit.

22   Q.    Right.

23        MR. HELFMEYER:  If we could zoom in to the top half.

24   BY MR. HELFMEYER:

25   Q.    The date is December of 2010, right?

59

1    A.    Yes.

2    Q.    That's after he became a patient of Dr. Romano's, right?

3    A.    Yes.

4    Q.    And what is reflected halfway down on what you're

5    looking at here as the chief complaint?

6    A.    Motor vehicle crash.

7    Q.    Next we have Mr. Kent Crigger.  I think you noted in

8    your report at page 67, if you want to refer to it, that

9    Mr. Crigger suffered from depressive disorder, right?

10         Do you see in your notes -- I'll save you some time --

11   on page 67 a note from Dr. Cofer from July 10th of 2014?

12   A.    Yes.

13   Q.    What is the top listed reviewed problems from Dr. Cofer?

14   A.    On Dr. Cofer, the top one says, "Depressive disorder."

15   Q.    And that's referring to Patient Kent Crigger, right?

16   A.    Yes.

17   Q.    Finally, we have Ms. Patricia Tittle.

18         MR. HELFMEYER:  And, Ms. Balde, if we could go to

19   Joint Exhibit 129 at page 101.  And the third line -- zoom in

20   to the top third.

21   BY MR. HELFMEYER:

22   Q.    This is for Ms. Tittle, right?

23   A.    Yes.

24   Q.    All right.  And Dr. Romano indicates, On lorazepam for

25   anxiety/depression, right?

60

1    A.    Yes.

2    Q.    Great.  Thank you, Dr. Murphy.

3         MR. HELFMEYER:  We can take that down, Ms. Balde.

4    BY MR. HELFMEYER:

5    Q.    You would agree, Dr. Murphy, that some evidence suggests

6    that patients with depression, regardless of pain condition, do

7    not respond as well to opioid therapy as nondepressed patients?

8    A.    Correct.

9    Q.    And you would agree that there's substantial evidence

10   that benzodiazepines and other -- the co-administration of

11   other CNS depressants are major contributors to the deaths

12   associated with opioids?

13   A.    I do not agree with that statement.

14   Q.    Dr. Murphy, do you remember signing on to a letter from

15   an organization called Professionals for Rational Opioid

16   Monitoring & Pharmaco-Therapy?

17   A.    Probably.  I think I did.

18   Q.    You sign on to a lot of letters?

19   A.    No, but that was a while back.  And I think I remember

20   there was a letter, a group of specialists, and I think I may

21   have signed on to a letter from that organization.  But I don't

22   remember exactly what it said at this point.

23   Q.    Okay.  And on that letter -- and I'm happy to show it to

24   you if you want -- that was a letter to the Food and Drug

25   Administration, right?

61

```
 1    A.   I don't recall exactly who it was to at this point.  I'd
 2   be happy to look at it.
 3    Q.   Sure.
 4    A.   I recall it being a good letter, and I wouldn't have
 5   signed on to it if I didn't feel like it was -- that I agreed
 6   with it at least in large part so...
 7         If you could show it to me, I'd appreciate it.
 8          MR. HELFMEYER:  If we could switch -- Jen, if we could
 9   switch to the podium and my computer.  And just for the
10   witness.  Yeah.  Sorry.
11   BY MR. HELFMEYER:
12    Q.   Do you recognize -- let me zoom up to the top,
13   Dr. Murphy.  Do you recognize this prompt?
14    A.   Yes.
15    Q.   Okay.  As a -- and I'll go to the next page.  You see
16   your name there?  It's highlighted.
17    A.   Yes.
18    Q.   And that's your signature, right?
19    A.   It is.
20    Q.   Okay.  And part of what you guys were doing is you were
21   fully supporting a document submitted by the American Academy
22   of Pain Medicine, right?
23    A.   Yes.
24    Q.   And so I want to point -- this is a specific question
25   about the co-prescribing of opioids and benzodiazepines.
```

62

1   That's how we got here, Dr. Murphy.  And I'll point you to

2   where -- here we go.

3        You see what's highlighted?

4   A.   Yes.

5   Q.   Did you agree in 2012 that there is substantial evidence

6   that benzodiazepines and perhaps the co-administration of other

7   CNS depressants are major contributors to deaths associated

8   with opioids?

9   A.   That's what it says.

10  Q.   And you agreed with it, right?

11  A.   I signed on to that letter, so at the time, I agreed to

12  that.

13  Q.   Right.  Dr. Murphy, you would agree with this, that all

14  of the patients who you reviewed for this case were

15  co-prescribed opioids and benzodiazepines?

16  A.   I believe, yes.

17  Q.   Switching gears slightly.  You're familiar, Dr. Murphy,

18  with opioid-induced hyperalgesia, right?

19  A.   Yes.

20  Q.   And from a lay perspective, that's when a patient

21  suffers pain caused in part by the use of opioids.  Is that

22  fair?

23  A.   That's a theory.  That has not been proven, but that is

24  a theory that there's been some neurologic changes because of

25  the chronic exposure to opioids such that there is a perhaps --

63

1    they don't know exactly why, but the theory is there's an NMDA

2    receptor activity damage that can actually cause a sort of

3    neuropathic response to getting opioids.

4         So while the opioids can be beneficial to pain, they can

5    also contribute to a neuropathic pain as well so...

6    Q.    Okay.

7    A.    And when --

8    Q.    When you say "neuropathic pain," the pain -- the patient

9    feels pain, right?

10   A.    It's a nerve-damage kind of pain.  It's neuropathic pain

11   versus what's called nociceptive pain, which is normal pain.

12   Q.    And from the patient's perspective, it hurts?

13   A.    It can also be an uneasiness.  So it may be hurt; it may

14   be just an uneasiness.  It's an uncomfortable feeling.  It's a

15   theory that has not been proven.

16   Q.    But it's a theory that is cited to in the literature, is

17   it not?

18   A.    I think it's cited in -- it's cited as theory.  It's not

19   cited as an actual thing.

20   Q.    Prior to the break, I asked you about the article that I

21   gave you.

22   A.    Yes.

23   Q.    Did you have a chance to review it?

24   A.    Sorry.  I did not.

25   Q.    Gotcha.

64

1          I'm going to ask you some questions, and maybe we can

2    get there in the end, Dr. Murphy.

3          Are you familiar with fibromyalgia?

4    A.    Yes.

5    Q.    Do you treat patients with fibromyalgia?

6    A.    Yes.

7    Q.    You understand, Dr. Murphy, that the medical literature

8    cautions against the use of opioids for patients with

9    fibromyalgia?

10   A.    Yes.

11   Q.    And in part, that's because those patients with

12   fibromyalgia have been found to have poorer outcomes when they

13   receive opioids than patients that don't receive opioids; is

14   that right?

15   A.    Not necessarily.

16   Q.    Is that what the medical literature reflects, though?

17   A.    Not necessarily.

18   Q.    You're talking about the Mayo Clinic, right?

19   A.    I'm sorry.  What?

20   Q.    On direct examination, the Mayo Clinic?

21   A.    I don't understand your question.

22   Q.    The Mayo Clinic, you work there or did work there,

23   right?

24   A.    Yes.

25   Q.    And you went to school there?  You taught there?

65

1     A.   Yes.

2     Q.   It's a reliable authority, is it not, the Mayo Clinic?

3     A.   I very much like the Mayo Clinic.  I think they are a

4  reliable source.

5     Q.   Great.  And they issue publications, right?

6     A.   Yes.

7     Q.   And so their publications are also reliable sources?

8     A.   I would consider their publications to be reliable

9  sources.

10    Q.   Does that include the *Mayo Clinic Proceedings*?

11    A.   Yes.

12    Q.   And that's the publisher of the article I gave you,

13  right?

14    A.   Yes.

15    Q.   Great.  And you would agree that the *Mayo Clinic*

16  *Proceedings*, the article published there, indicated that

17  observational studies have found that patients with

18  fibromyalgia -- and I'm reading from page 1 of the abstract --

19  patients with fibromyalgia receiving opioids have poorer

20  outcomes than patients receiving nonopioids, and fibromyalgia

21  guidelines recommend against the use of opioid analgesics?

22       Is that what the *Mayo Clinic Proceedings* says?

23    A.   Let me see.  Where are you reading that again?

24    Q.   Sure.  From the abstract.

25      MR. HELFMEYER:  And if -- you know what?  If we can

66

1    project to the witness.

2      BY MR. HELFMEYER:

3      Q.    You can look on the screen with me.  You see that?

4      A.    Oh, yes.  Thank you.

5      Q.    Observational studies have found that patients with

6    fibromyalgia receiving opioids have poorer outcomes than

7    patients receiving nonopioids; is that right?

8      A.    Yes.

9      Q.    And the fibromyalgia guidelines recommend against the

10   use of opioid analgesics?

11     A.    That's what it says, yes.

12     Q.    And analgesics means painkiller, right?

13     A.    Yes.

14     Q.    And there are a whole host of medical associations whose

15   guidelines recommend against the use of long-term opioids in

16   fibromyalgia; is that right?

17     A.    Yes.

18     Q.    And that includes the American Pain Society, right?

19     A.    Yes.

20     Q.    The American Association of Pain Medicine, right?

21     A.    It's the American Academy of Pain.

22     Q.    Oh, I'm sorry.  The American Academy.  Thank you,

23   Dr. Murphy.

24           American Academy of Neurology, right?

25     A.    Yes.

67

1    Q.    The European League Against Rheumatism?

2    A.    Yes.

3    Q.    The Canadian Pain Society?

4    A.    Yes.

5    Q.    The Canadian Rheumatology Association?

6    A.    Yes.

7    Q.    And the British Pain Society?

8    A.    Yes.

9    Q.    So their guidelines all recommend against the use of

10   long-term opioids in fibromyalgia?

11   A.    Yes.

12   Q.    And so the second one that I listed there, the American

13   Academy of Pain Medicine, that's different from a similarly

14   named organization, the American Academy of Pain Management, is

15   it not?

16   A.    Yes.

17   Q.    Those are two different things?

18   A.    They are.

19   Q.    And the American Academy of Pain Management is the one

20   that Dr. Romano is a member of.  Do you recall that?

21   A.    He was.

22   Q.    And they had to change their name, right?  The other

23   one -- the other AAPM sued them to change the name?

24   A.    I don't know why they changed their name.

25   Q.    But that entity, the one that Dr. Romano was a member

68

1  of, the Academy of Pain Management, that was the one funded by

2  your old client, Purdue, right?

3      A.   I don't know who funded them.

4      Q.   But then they went bankrupt after the funding dried up?

5      A.   I don't know the reason why they no longer exist.

6      Q.   I want to go back to fibromyalgia, Dr. Murphy.  The *Mayo*

7  *Clinic Proceedings* suggests that the pain associated with

8  fibromyalgia may actually be caused by the chronic opioid

9  therapy.  Would you agree that it says that?

10     A.   No.  That's a very technical statement, and I'll be glad

11  to explain it to you.  But the way you characterize it is

12  inaccurate.

13     Q.   So let's talk about what the Mayo Clinic suggests.  The

14  Mayo Clinic suggests, and correct me if I'm wrong, that

15  opioid-induced hyperalgesia may be an iatrogenic phenomenon,

16  right?  And I -- is that right, Dr. Murphy?

17     A.   Yes.

18          I want to make sure that we understand that when you say

19  the Mayo Clinic is saying this, these -- this was published by

20  one, two, three, four authors.  This is four authors.  They

21  submitted a paper to this journal, and it got published.  This

22  is not necessarily the Mayo Clinic's stance on this.  This is

23  an article they felt they needed to publish in the journal for

24  us to read.

25     Q.   Gotcha.

69

1          My question was about iatrogenic.  That means it's an

2     illness caused by medication, right?

3     A.    Not necessarily.

4     Q.    That's not what iatrogenic means?

5     A.    No.

6     Q.    What does it mean?

7     A.    It means it's caused by the treatment.  So not just

8     medications.  It could be caused by surgery.  It could be

9     caused by psychotherapy.  It could be caused by lack of

10    treatment.  It's just injury that occurs as a result of

11    treatment.

12    Q.    Okay.  And so what the *Mayo Clinic Proceedings*, this

13    article, is suggesting is that opioid-induced hyperalgesia may

14    be caused by medications -- by treatment.  Sorry, Dr. Murphy.

15    By treatment.

16    A.    Yes.  Opioid-induced hyperalgesia may be an iatrogenic

17    phenomenon.  I don't know if it means caused by it.  It just --

18    it says, "a phenomenon."  So --

19    Q.    And I --

20    A.    -- it means -- that means it just exists.

21    Q.    All right.  For --

22    A.    I mean, I'm sorry, but it -- when you read clinical

23    medical journals, you have to understand what they're saying.

24    You can't just, you know, imply things.  And when I'm telling

25    you what it means, I'm not trying to be cagey with you.

70

1          That's the issue with a lot of medical journals.  You

2    have to understand the strength of the evidence and what

3    they're actually saying and also what they're not saying

4    because there's a lot of uncertainty in medicine, and we

5    understand that.

6          Medicine is a lot of theory.  And a lot of times, these

7    authors, they give us their best idea, but they always qualify

8    it with:  More studies need to be done.  Maybe there's an

9    association, not a cause.

10         So you have to actually read the article to understand

11   this and not just pick out sentences to make them look like

12   there's an -- there's an association.

13         That kind of thing is called misapplying the guidelines.

14   That actually harms people.  That's what doctors did and policy

15   makers did with the CDC guidelines.  And the CDC in 2022

16   said --

17   Q.   Dr. Murphy --

18   A.   -- said stop doing that.

19   Q.   All right.

20   A.   It harms patients.

21   Q.   Thank you for that.

22         I want to switch gears and talk about something that you

23   just said about how important it is to have the entire context

24   of a statement.  We talked a little bit earlier about the

25   strength of evidence that an expert relies on, right?

71

1    A.   Yes.

2    Q.   Okay.  And in your -- in developing your opinion in this

3    case and in presenting your expert report, you relied on a

4    study from the Cochrane Library, did you not?

5    A.   I think I mentioned that, yes.

6    Q.   All right.  And you mentioned that to talk about how

7    there's support for the idea that patients can receive a

8    benefit from long-term opioid use, right?

9    A.   Yes.

10   Q.   In your report, Dr. Murphy, did you talk about what kind

11   of evidence supports that conclusion?

12   A.   No.  It was a summary statement, but I'll be glad to

13   talk about it now.

14   Q.   Me too.

15        You said that it was a summary statement, right?  But

16   that's not quite true.  You quoted from the Cochrane Review,

17   did you not?

18   A.   I quoted their summary statement.

19   Q.   Gotcha.  Okay.  But it wasn't a full quote, right?

20   A.   No.  I didn't quote the entire article.  I quoted what I

21   felt was necessary to get the point across.

22   Q.   Not necessarily to advocate, right, because you're not

23   an advocate?

24   A.   I'm presenting facts from what is considered the gold

25   standard of organizations that review studies.

72

1    Q.    Okay.  And in presenting the gold standard, you didn't

2  present here and you haven't presented to this jury what the

3  strength of the evidence is that supports that summary, right?

4    A.    I can tell you what it is.

5    Q.    It's weak evidence, right?

6    A.    It's exactly the same evidence strength that would go

7  against opioids.  The point being --

8    Q.    Dr. Murphy --

9    A.    The point --

10   Q.    -- it's weak evidence, right?  That's the full quote

11 that you left out, is it not?

12   A.    I'm not sure exactly what you're talking about.  I know

13 that the evidence that -- in support of opioids is not strong.

14 I know the evidence against opioids is also not strong.  So

15 they're -- the point being is that everyone's talking about how

16 opioids are so horrible and --

17   Q.    Dr. Murphy --

18   A.    -- they harm people.

19         What?

20   Q.    -- there's no question pending.  Please wait for me to

21 ask you a question.

22   A.    I thought you did.

23   Q.    You know what?  I'll move on.

24         I want to talk about Patient John Tittle.  You testified

25 on direct examination about Dr. Romano's termination of John

73

1    Tittle.  Do you remember that testimony?

2        A.    Yes.

3        Q.    And I think your testimony was that it was a very

4    well-written letter terminating Mr. Tittle, right?

5        A.    You know, I don't think I used the word "terminating."

6    He was severing the doctor/patient relationship there.

7        Q.    Gotcha.  Okay.

8              But you'd agree that terminating a patient for missing a

9    pill count could potentially harm that patient, could it not?

10       A.    You're saying that -- you're asking me if terminating a

11   patient for missing a pill count could possibly harm the

12   patient?  The answer is yes.

13             He did not mention that in the letter.  It was about

14   trust.  It wasn't about the pill count.

15       Q.    Not in the letter.

16       A.    Well, if you look at the whole chart, you see there's a

17   lot of trust issues throughout that relationship.  It wasn't

18   just that one visit.  It had been going on for a long time.

19       Q.    You're reading a lot into that, though, right?

20       A.    I'm reading exactly what it says.

21       Q.    I want to stick with Mr. Tittle.  You testified on

22   direct examination about an EMG for Mr. Tittle.  Where in the

23   patient file did you see reference to an EMG?

24       A.    I can show you that.  And I thought this is interesting

25   that you would bring this up because I think it illustrates

74

1    another good point.  Let's see here.  Mr. Tittle, on 7/18/16,

2    which is the day of the -- of one of the counts against

3    Dr. Romano, the patient was prescribed the medications, and

4    then the patient was also given a prescription for an EMG and

5    nerve conduction study because he possibly had carpal tunnel

6    syndrome.

7         So Dr. Romano was also sending him for additional

8    evaluations.  That was on -- dated 7/18/16.

9    Q.   So I can refer to it, what page of your report are you

10   talking about?

11   A.   63.

12   Q.   Thank you.  Appreciate that.

13        You testified on direct examination about injections.

14   Do you remember that testimony?

15   A.   Yes.

16   Q.   And I believe your testimony was that you wouldn't want

17   to give injections to a patient every week.  Is that fair?

18   That's what you said?

19   A.   Well, if they needed it, if I felt like the benefit

20   outweighed the risk, yeah.  But generally speaking, I don't

21   want to overload the patient with steroid if steroid is

22   involved.  But some injections would involve perhaps local

23   anesthetic and not steroids.  There could be situations where,

24   yes, you would give it to them once a week for a while.

25   Q.   So now it's okay when I'm asking you questions?

75

1    A.    I'm sorry?  What?

2          MR. SHAMANSKY:  Object.

3          THE WITNESS:  Is that a question?  I'm sorry.

4    BY MR. HELFMEYER:

5    Q.    It was a question.

6    A.    Would you ask me again, please?

7    Q.    Sure.

8          Now it's okay to give an injection every week to a

9    patient now that I'm the one asking you questions?

10   A.    What I -- what I said was always that -- I think what I

11   was talking about was steroid injections.  And you want to

12   minimize those.  Like the injection we talked about was a hip

13   injection, which includes steroids.  You do not want to give

14   people steroids all the time.

15         But there are injections, like trigger point injections,

16   which Dr. Romano gave a lot of those, that involve just local

17   anesthetics.  There's even a thing called dry needling that

18   physical therapists do.  They don't involve any medicine at

19   all.  And, yes, you can have those on an ongoing basis.

20         So it -- this -- the overriding thought that you can't

21   have any type of therapy based upon some time factor is wrong.

22   It's based upon the circumstances of the patient and whether

23   they need it or not and the clinical judgment of the

24   practitioner.

25   Q.    I was just repeating your words.  I'm sorry, Dr. Murphy.

76

1    You would agree, Dr. Murphy, that you believe that

2    heroin is absolutely medicine, do you not?

3    A.   Well, it depends on what you're saying.  Heroin, capital

4    H, is a trade name for diacetylmorphine.  Diacetylmorphine was

5    created by the Bayer Company; it makes Bayer Aspirin.  They're

6    a German company.  It was actually an over-the-counter

7    medicine, and they used Heroin.  And they called it Heroin

8    because the -- back in the time it came out around 1900, 1910

9    or so, opium was very popular, and it was overused in this

10   country.  And there's a lot of opium addicts and issues like

11   that.

12   So they thought that Heroin was a heroic drug because

13   people that took Heroin over the counter or whatever from a

14   pharmacy, they didn't crave the opium.  Well, you know, that's

15   very similar to Suboxone now or to methadone.  They were

16   replacing one opiate for the other but not in a therapeutic

17   way.

18   So in 1914, the Harrison Narcotics Act kind of made that

19   Heroin could no longer be over the counter; it had to be

20   written by a prescription.  But, yes, it was a -- it was a

21   medicine until ten years later, which I think 1924, where the

22   Heroin Act then outlawed Heroin.  And what happened after

23   that --

24   Q.   Okay, Dr. Murphy.

25   A.   Well, I -- I -- you asked me if it was --

77

1   Q.   I asked you a question about whether you believe that

2   heroin is absolutely medicine.

3   A.   It depends.  You have to understand the historical

4   context.

5   Q.   Okay.  And the word that I use -- and as an English

6   major, you'll recognize this -- was:  Is.  Heroin is medicine.

7   Your belief is that it is medicine?

8   A.   But I can't --

9   Q.   It's not 1900.

10  A.   I can't answer the question unless we clarify what you

11  mean by "heroin."  Low H heroin, the, you know, lower case came

12  about after 1924 when it went on the black market because it

13  was no longer a prescription drug.  And that's coal tar heroin.

14  That's the heroin that's made in labs and whatever.  That's the

15  more dangerous heroin that was on the streets.  And that is not

16  a medicine.  That's a medical -- that's a chemical that is not

17  a medicine.

18       So the question, the verbal question, of whether heroin

19  is a medicine or not, you have to define what you mean by

20  "heroin."

21       And by the way, diacetylmorphine is still used in other

22  countries.  It's used as a medicine in Europe for certain

23  things.  It's got medical properties.  It just happens to be

24  not legal in this country.  It's a Schedule I drug, by the way,

25  like marijuana is a Schedule I drug.

78

1    Q.   Dr. Murphy, you've been asked that same question a

2    number of times, have you not?

3    A.   You know, this comes up a lot because I think people try

4    to confuse the two and --

5    Q.   And, Dr. Murphy, is it not true that on a number of

6    previous occasions, your answer to the question of whether you

7    believe that heroin is absolutely medicine, your answer has

8    been yes?

9    A.   My answer, I think, consistently has been what I just

10   told you.  The heroin -- the diacetylmorphine is a medicine.

11   It still is in certain countries.  But lower case heroin, the

12   vernacular, the, you know, street name for heroin, horse,

13   whatever they want to call it, that is not medicine.

14        And to characterize my testimony as saying that that is

15   medicine is, is -- that's -- that's dishonest, and I will not

16   stand for that.

17   Q.   Gotcha.

18   A.   I will tell you that Heroin, diacetylmorphine, I'm

19   telling you this as a Mayo Clinic doctor --

20        THE COURT:  Please ask him a question.

21   A.   -- is a medicine.

22        MR. HELFMEYER:  Yes.  Sure.

23        If we could show just the witness.

24   BY MR. HELFMEYER:

25   Q.   Dr. Murphy, do you remember testifying on behalf of

79

1    Dr. Suetholz?

2      A.   Yes.

3      Q.   All right.  When asked the question, Do you think that

4    the drug heroin is a medicine, what was your one-line response?

5      A.   I'm sure that I --

6      Q.   Dr. Murphy, please answer the question.

7      A.   I don't know.  I don't remember.

8      Q.   All right.  Can you see what I've highlighted here?  The

9    question is the same as I just asked you, was it not?

10     A.   Yes.

11     Q.   What was your one-line response?

12     A.   I'm going to spell it for you.  Capital H-E-R-O-I-N is

13   absolutely a medicine, and that is the truth.  I stand by that.

14   And just to mischaracterize that --

15          MR. HELFMEYER:  No further questions.

16          THE COURT:  Thank you.

17     A.   -- is just unconscionable.

18                              - - -

19                          *  *  *  *  *

20                              - - -

21          MR. HELFMEYER:  Recross, Your Honor.  I just have one

22   line that I wanted to go through.

23                              - - -

24

25

80

RECROSS-EXAMINATION

1

2      BY MR. HELFMEYER:

3      Q.    On redirect, Dr. Murphy, you testified about Arrieal

4  Butler.  Okay.  We talked about the increase that Dr. Romano

5  called was temporary was on February 13th of 2017, right?

6      A.    Well, you're showing me the prescription there for

7  February 13, 2017.  And --

8      Q.    And that was the date reflected in the note that he

9  indicated was going to be a temp -- he was going to temporarily

10  increase the strength -- the pain meds.  Would you believe me

11  if I said that?

12      A.    Yes.

13      Q.    Okay.  Thank you.

14          All right.  So that's on 187.  On 188, we have March of

15  2017, right?

16      A.    Yes.

17      Q.    Same strength, same number?

18      A.    Yes.

19      Q.    Going to 196, we're now in April of 2017.  Same

20  strength, same number?

21      A.    Yes.

22      Q.    197, same strength, same number?

23      A.    Yes.

24      Q.    198, same strength, same number?

25      A.    Yes.

81

1    Q.    And now we're in June of 2017?

2    A.    Yes.

3    Q.    Okay.  July of 2017, same strength, same number,

4  page 199?

5    A.    That's still June.  June 30th.  That's almost July.

6    Q.    Okay.  Sorry.

7          Let's go to 228.

8          MR. HELFMEYER:  Oh, I'm sorry.  Could we publish this

9  to the jury?  This is in evidence.

10          MR. SHAMANSKY:  No objection.

11          MR. HELFMEYER:  I should have made that clear.

12  BY MR. HELFMEYER:

13    Q.    All right.  Doctor, now we're in July of 2017 or the end

14  of July of 2017.  Same dose, same number?

15    A.    Yes.

16    Q.    And that's page 228.

17          The next page for -- at the end of August of '17, same

18  dose, same number?

19    A.    Yes.

20    Q.    Next month, the end of September or middle of September,

21  same dose, same number?

22    A.    Yes.

23    Q.    Page 233, same dose, same number?

24    A.    Yes.

25    Q.    234, same?

82

1    A.    Yes.

2    Q.    235, same in December?

3    A.    Yes.

4    Q.    Now in January of '18, same dose, same number?

5    A.    Yes.

6    Q.    And that's page 236.

7          Now we're in February of 2018.  Same dose, same number?

8    A.    Yes.

9    Q.    Page 255.

10         Now March, page 256, still on this temporary increase,

11   right?

12   A.    I'm sorry.  What?

13   Q.    We're in March of 2018.  We're still in the temporary

14   increase?

15   A.    Oh, no.  We're -- he's got her on a stable dose for

16   months of this dose.  I mean, it became not temporary very soon

17   after he gave her the first --

18         MR. HELFMEYER:  That was all.

19   A.    -- dose.

20         MR. HELFMEYER:  Thank you.

21         THE COURT:  Thank you, Doctor.  I believe we're

22   finished.  You may step down.

23                        - - -

24

25

                                                                    83

1                          – – –

2                     WITNESS INDEX

3                          – – –

4    WITNESSES          DIRECT CROSS REDIRECT RECROSS

5    DEFENDANT'S:

6    James Murphy              2           80

84

1          C E R T I F I C A T E

2

3          I, Lahana DuFour, do hereby certify that the foregoing

4     is a true and correct transcript of the proceedings before the

5     Honorable Michael H. Watson, Judge, in the United States

6     District Court, Southern District of Ohio, Eastern Division, on

7     the date indicated, reported by me in shorthand and transcribed

8     by me or under my supervision.

9

10

11                    s/Lahana DuFour
                       Lahana DuFour, RMR, CRR
12                     Official Federal Court Reporter
                       December 21, 2023
13

14

15

16

17

18

19

20

21

22

23

24

25