UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


UNITED STATES OF AMERICA,)
                   )
  PLAINTIFF,       )     CASE NO. 2:19-cr-202
                   )
      vs.       )
                   )
THOMAS J. ROMANO,    )
                   )
  DEFENDANT.      )
_____)


TRANSCRIPT OF GOVERNMENT CLOSING ARGUMENTS
BEFORE THE HONORABLE MICHAEL H. WATSON
TUESDAY, SEPTEMBER 19, 2023; 9:00 A.M.
COLUMBUS, OHIO

FOR THE PLAINTIFF:
    Kenneth L. Parker
    United States Attorney
    By:  Alexis Gregorian
        Danielle Sakowski
    Assistant United States Attorneys
    1400 New York Avenue, Northwest
    Washington, District of Columbia 20005

    By:  Devon M. Helfmeyer
    Assistant United States Attorney
    1000 Louisiana Avenue, Suite 2300
    Houston, Texas 77002


FOR THE DEFENDANT:
    Samuel H. Shamansky Co., LPA
    By:  Samuel H. Shamansky, Esq.
        Donald L. Regensburger, Esq.
        Ashton C. Gaitanos, Esq.
    523 South 3rd Street
    Columbus, Ohio 43215

- - -

   Proceedings recorded by mechanical stenography, transcript produced by computer.

LAHANA DUFOUR, RMR, CRR
FEDERAL OFFICIAL COURT REPORTER
85 MARCONI BOULEVARD
COLUMBUS, OHIO 43215
614-719-3286

2

Tuesday Morning Session

September 19, 2023

– – –

1

2

3

4      THE COURT:  Mr. Helfmeyer, you may begin your closing

5  argument, sir.

6      MR. HELFMEYER:  Thank you, Your Honor.

7      He way overprescribed medications to me.  If I had to

8  say something, legal drug dealer.  That's how John Tittle

9  described the care he received from Dr. Thomas Romano.

10      These type of drugs control you, your mind.  You feel

11  like you're going to die without them.  And in your mind, you

12  have to have them.  You feel like you'll do whatever you can to

13  get them.  That's the way Ms. Patricia Tittle described the

14  drugs that Dr. Romano gave her.

15      Over the last week you've heard some of the stories of

16  how these drugs destroyed lives and families.  You've heard

17  that, for some, there can be light at the end of the tunnel.

18  Light that represents freedom from the prescribing and the

19  control of Dr. Romano's cocktail of high-dose opioids,

20  benzodiazepines, and Soma.

21      You've heard that these high-dose opioids are dangerous

22  all by themselves; that the CDC and the medical literature warn

23  against prescribing more than 90 daily morphine milligram

24  equivalents because the risks get higher as the dose gets

25  higher; that before prescribing these high-dose opioids,

3

1    doctors need to make sure that they're working, that they're

2    decreasing pain and increasing function, that they're doing

3    more than turning patients into zombies.

4          You saw the lie in Dr. Romano's pain contract about the,

5    quote, low risk of psychological dependence as an outcome.

6          And, Jen, could we have the -- and if we could project

7    it to the whole courtroom.  Thank you.

8          The, quote, low risk of psychological dependence as an

9    outcome.  Dr. King was vehement in saying that was false.  And

10   that's just the opioids by themselves.

11         The oxycodone, the OxyContin whose manufacturer Purdue

12   paid for the defendant's expert -- paid the defendant's expert

13   witness and for his professional association.

14         The oxymorphone, the hydromorphone, morphine, and

15   methadone, all dangerous on their own.

16         By adding a benzodiazepine into the mix, he increased

17   the danger, increased his patients' stupor.

18         The Xanax, Klonopin, and Valium, drugs his own witness

19   Dr. Murphy said he rarely prescribes or only prescribes in low

20   dosages.

21         And for many of the patients before you, he added the

22   third drug, the tranquilizer Soma.  A tranquilizer that makes

23   the complete Romano cocktail.

24         Soma, a drug that Dr. King never prescribes, that Dr. Le

25   told you she never prescribes.  You heard that it turned John

4

1    Tittle into even more of a zombie.  Increasing sedation without

2    any benefit.

3           That prescribing is why we're here.  Prescribing that

4    Dr. King meticulously reviewed, analyzed and ultimately

5    concluded was without a legitimate medical purpose and outside

6    the usual course of professional practice.

7           Those terms "outside the usual course of professional

8    practice" and "not for a legitimate medical purpose" have been

9    used a lot in the last week.  And that's because those terms

10   are central to your job in this case in deciding the 24 counts

11   of the Indictment.

12          The 24 counts in the Indictment each relate to

13   prescriptions the defendant wrote for the nine patients you've

14   been hearing about.  Each count charges the unlawful

15   distribution of a controlled substance.  Judge Watson will give

16   you the instructions at the close of closing arguments but I

17   want to give you a little bit of a preview.

18          Each count has four elements, four of the same elements.

19   The first two elements are not in dispute.  The first element:

20   That the defendant knowingly or intentionally distributed a

21   controlled substance.  He did that by signing prescriptions.

22   The second element also not in dispute is that he knew the

23   drugs that he was prescribing were controlled substances.

24          Now, the second two are in dispute.  Third:  He

25   prescribed in a manner that fell outside the objective usual

1    course of professional practice without a legitimate medical

2    purpose.  And I'll give you some of the evidence that supports

3    that element in a moment.

4         Finally, the fourth element:  That when he was

5    prescribing controlled substances, he knew that he was

6    prescribing without a legitimate medical purpose outside the

7    usual course of professional practice.

8         And you'll hear that you can infer knowledge if you find

9    that the defendant deliberately ignored the obvious.  In this

10   case, Dr. Romano either knew or deliberately ignored the red

11   flags that his patients didn't need the drugs he was

12   prescribing or that he either knew or deliberately ignored that

13   his patients were addicted.

14        Generally speaking, the, quote, usual course of

15   professional practice means acting in accordance with a

16   standard of medical practice generally accepted in the

17   defendant's field.  You've heard evidence about guidelines,

18   regulations, and best practices.  You'll hear that you can use

19   those as you consider what is the usual course of professional

20   practice and as you determine that the defendant's

21   prescriptions were outside that.

22        But how do we know that those prescriptions were outside

23   the usual course of professional practice?  Three credible

24   doctors testified in this trial about how opioids can be used

25   for a legitimate medical purpose and how based on their

6

1    training, experience and, in two cases, real-time examination

2    of Dr. Romano's patients, that his prescribing was outside the

3    usual course of professional practice.

4          Some of the patients themselves testified that the drugs

5    Dr. Romano gave them hurt more than they helped; other patients

6    testified that Dr. Romano helped them.  But remember what it is

7    that they said helped them.  Either the HGH or the physical

8    therapy that they received, not the high-dose opioid, benzo,

9    Soma cocktail.

10         You heard from a bunch of medical professionals in this

11   case who educated you about opioids.  Generally, they're an

12   effective painkiller for acute, short-term pain.  And they can

13   be appropriate as a last option when a patient is suffering

14   from chronic pain.

15         They're appropriate in that last instance only when they

16   work, when they both reduce pain and improve function, and only

17   if the risks are outweighed by the benefit.

18         You've learned what some of those risks are throughout

19   this trial.  First, sedation and impairment.  Like Mr. Crigger

20   and Ms. Tittle falling asleep at work.  Like Eric Webb

21   repeatedly crashing his car.  And Arrieal Butler crashing her

22   car maybe causing her transportation problems.

23         Another risk is increased pain as described in the

24   medical literature that Dr. Murphy didn't bother to read and

25   didn't want to discuss with you.  Other more serious risks

7

1   include addiction, overdose, and death.

2        By adding a benzodiazepine into the mix, that risk

3   greatly increased.  When asked about the dangers associated

4   with mixing opioids and benzodiazepines, Dr. Le answered

5   curtly, you stop breathing and you die.

6        And then Soma, which you've learned is really a

7   tranquilizer, only increased those risks.

8        The evidence you've heard over the last week is that

9   Dr. Romano's cocktail didn't help patients, it harmed them.  It

10  sent them down, spiraling them down the path of addiction and

11  further isolating them from their families.

12       How do we know that he knew that his prescriptions were

13  outside the usual course of professional practice?  The

14  defendant's own patient files as you've seen are littered with

15  red flags the drugs weren't working; that the patients weren't

16  candidates for these dangerous drugs; and that in some cases

17  that the patients were addicted.

18       The defendant was repeatedly warned by fellow doctors,

19  pharmacists, and insurance companies.  The Dear Patient letter

20  in each of the patient files in which the defendant

21  acknowledges that he doesn't work with other doctors, that he

22  is different, outside the usual course of professional

23  practice.

24       His receptionist, Carol Vargo, told you about the

25  disdain Dr. Romano held for anyone who questioned his practice.

8

1    He knew he practiced differently, outside the usual course of

2    professional practice.

3          And Dr. Romano himself told you on Friday repeatedly, I

4    know the risks.  I know the dangers.

5          He acknowledged that he knows how dangerous it is to

6    prescribe opioids and benzodiazepines together.  And

7    accidentally, he acknowledged the CDC guidelines that warn

8    against going above 90 daily MME.  Guidance that clinicians

9    should avoid altogether combining opioids with benzodiazepines.

10         He didn't want to acknowledge the CDC guidelines on

11   Friday because he knows he didn't follow them.  That's just one

12   of the ways the defendant put on a show on that stand.

13         The Dr. Thomas Romano he showed you is not the same man

14   who ran his client -- his clinic as a giant among men, who

15   scoffed at calls from pharmacists, disregarded warnings from

16   his colleagues, and was above concerns from insurance

17   providers.  He wanted you to think that he was open to

18   suggestion, respectful of others' opinions.  But you saw

19   through that mask.  He didn't fool you.

20         He didn't want to draw your attention to the CDC

21   guidelines because their recommendations are so far from the

22   way he ran his practice.  And those guidelines are at Joint

23   Exhibit 501 if you want to look at them.

24         In terms of the strengths of the drugs that Dr. Romano

25   prescribed, this summary in Government's Exhibit 321 shows that

1    roughly a third of Dr. Romano's prescribing to these nine

2    patients was greater than 360 morphine milligram equivalents.

3    That's four times what the CDC warns against going over.

4         Almost 45 percent of Dr. Romano's prescriptions to these

5    patients was for between 180 and 359 daily MME.  More than

6    twice what the CDC warns against.

7         Combining the information in Exhibit 321, more than

8    75 percent of the time, Romano prescribed greater than 180 MME

9    per day.  All more than double what the CDC warns against

10   exceeding.

11        And you saw that the FDA issued its strongest black box

12   warning for combining opioids and benzodiazepines because the

13   serious risks and death.  But that's basically all Dr. Romano

14   prescribed these patients.

15        This summary, Government's Exhibit 328, shows just how

16   long Dr. Romano had these patients on cocktails during the

17   Indictment period from 2014 to 2019.

18        Over on the right, Romano had Terry Miller and Mark

19   Robinson on almost all three for four years; he had Ms. Tittle

20   on all three pretty much the whole time that she was his

21   patient; Eric Webb, four the whole time that he was

22   Dr. Romano's patient.

23        On the left, those are the number of days that

24   Dr. Romano had these patients on the two-drug combination of an

25   opioid and a benzo.  What the FDA and the CDC recommend

10

1    strongly against.

2         Now I want to get into some of the evidence of the

3    individual counts that you're to consider.  I want to start

4    where Ms. Sakowski started a week ago with Arrieal Butler.

5         Ms. Butler's prescriptions are Counts 33 and 34 for your

6    consideration.

7         When Ms. Butler came to the defendant, she was on a very

8    low-dose opioid called tramadol and the benzo Xanax.  But

9    according to her initial screening at Dr. Romano's practice,

10   those two drugs, quote, neither of these medications helped

11   very much.  So Dr. Romano takes what wasn't working and

12   increases it.  He gives her oxycodone.

13        Then on February 3rd, he increases the strength of her

14   opioids taking her up to 90 MME.  Dr. Romano writes in the note

15   that it's a temporary increase.  But we know that's a lie.  Two

16   years later when she stumbles into Dr. Belcik's exam room,

17   she's still on that same high dose of opioids and Xanax.

18        Count 33 is that next month, the continuation of that

19   fake temporary increase.  Increase on the drug that wasn't

20   working.

21        And Dr. King told you based on his 50 years of training

22   and experience that this prescription was outside the usual

23   course of professional practice and not for a legitimate

24   medical purpose.  And that's Count 33.

25        Fast-forward more than two years of Dr. Romano's fake

11

1    temporary increase to July 31st of 2019.  That's when

2    Ms. Butler met Dr. Belcik.  Ms. Butler was acting strangely,

3    pain catastrophizing, and appeared sedated.

4         When Dr. Belcik learned what drugs Dr. Romano was giving

5    her, he was immediately alarmed.  When Dr. Belcik learned that

6    Dr. Romano never warned Ms. Butler about the dangers associated

7    with those drugs, he was even more alarmed.  So alarmed that he

8    filed a complaint with the State Board of Pharmacy and faxed a

9    copy of his progress notes to Dr. Romano.

10        Alarmed not just by the combination of drugs, something

11   someone right out of residency would immediately notice,

12   something he told you even a medical student would immediately

13   notice and be concerned by.  But even more alarmed by the fact

14   that Ms. Butler had no idea how dangerous those drugs were.

15        A patient cannot consent to treatment unless she knows

16   the dangers, the side effects, and the risks associated with

17   those drugs.  But Dr. Romano never warned her.  He just

18   prescribed.

19        A couple of the -- of things about the suggestions made

20   on cross-examination of Dr. Belcik and some of the suggestions

21   Dr. Romano made to you while he was testifying.  First, it's

22   true that someone sedated like Ms. Butler was shouldn't be

23   driving.  But you learned that she wasn't driving, that

24   transportation was an issue.

25        Next, the sunglasses.  Dr. Belcik did a thorough

12

1  examination and documented it in detail.  Even the defendant

2  acknowledged that.  He referred to it as a, quote, book.

3      The defendant wants you to believe that Ms. Butler

4  wasn't sedated by his cocktail.  Instead, that she was

5  suffering from migraines.  But at no point in the thorough

6  examination and documentation that Dr. Belcik did, did he ever

7  mention that she complained of migraines.  He documents her

8  complaints and that's not in there.  It's not in there because

9  she wasn't having one.

10      Her slurred speech was based on sedation from the drugs

11  Dr. Romano was giving her for which she had no idea of the

12  risks.

13      And Dr. Belcik sent that information, that book, to

14  Dr. Romano.  What else was in it?

15      He sent repeated warnings that the drugs were not

16  working for Ms. Butler; that she reported pain of 8 to 10 out

17  of 10; that the pain was alleviated by nothing.

18      How does Dr. Romano respond to this?  He responds by

19  giving her another month of the same dangerous drugs that

20  aren't working.  They hadn't been working three years earlier

21  when she started at his practice.  They weren't working when

22  she met with Dr. Belcik.  And they weren't working on

23  August 30th of 2019, when he gave her these prescriptions

24  charged in Count 34.

25      We can be absolutely sure these drugs didn't work, that

13

1   they were harming, not helping, because a few months later

2   after Ms. Butler was gone from Dr. Romano's practice, she went

3   back to Mercy Hospital to see Dr. Belcik. Dr. Belcik told you

4   she was a changed woman. She was more alert, in less pain,

5   doing better all around. And that's no coincidence. The fog

6   had been lifted and she could live again.

7        Next, Eric Webb. Counts 26 and 27 of the Indictment.

8        Eric Webb was deep in the throes of addiction. You

9   heard from Krishna Wright who agonizingly conveyed to you her

10  and Eric's heroin and opioid addiction. When asked about her

11  home, Ms. Wright told you: A disaster, like both of us.

12       She was able to get out of it. Eric went to Dr. Romano.

13  Ms. Wright told you that Eric had been desperately looking for

14  someone to supply his pills after his father was no longer able

15  to. Desperately looking until he found Thomas Romano.

16       Dr. Romano either recognized the signs of Eric's

17  addiction and didn't care or was deliberately ignorant and

18  missed what was staring him in the face. Something hard to

19  believe for someone of such eminent qualifications.

20       Dr. Romano broke his own rule for Eric, not requesting

21  his prior medical records. Again, he knew that there would be

22  something bad that he didn't want to see or he didn't care.

23  Either way, the prescriptions issued to Eric were unlawful.

24       But what was in Dr. Romano's patient file for Mr. Webb?

25  Eric's statement that he had been in more car accidents than he

1    could count and a dirty urine test.

2         On his first visit, Eric tests dirty for marijuana.

3    Acceptable.  And the defendant never tests him again.  Never

4    follows up, an aberrant drug screen to start.  No follow-up

5    with any other urine drug screen.  No more pill counts at any

6    point during the 14 months that Dr. Romano prescribed to Eric.

7    All while Dr. Romano is fielding calls from Eric's pharmacist

8    about how potent and dangerous these pills were.

9         Count 26 charges Dr. Romano with the full cocktail and

10   an astronomically high dosage of opioids.  364 pills of

11   oxycodone, that's 13 per day; plus 84 pills of oxymorphone,

12   three more per day; and to top those off, 120 Soma and

13   Klonopin.  This to a person who suffered repeated head injuries

14   and has short-term memory loss.

15        That combination, the opioid, benzo, and Soma, John

16   Tittle told you was comparable to heroin.  No surprise, that's

17   what Dr. Romano prescribed to Eric Webb, the heroin addict.

18        Then ensued the repeated warnings from Pharmacist

19   Jeffrey McCloud that Eric needed to be weaned off this

20   dangerous combination because Mr. McCloud had actually listened

21   to the warnings and advice of the state regulators.  He

22   implored Dr. Romano, but Dr. Romano dismisses pharmacists.  He

23   believes they're folks who couldn't hack it in medical school.

24        Now, when he testifies, Dr. Romano doesn't want you to

25   believe that these calls with Mr. McCloud didn't happen because

15

1    Dr. Romano knows how bad it looks that he ignored those

2    warnings.  He kept prescribing the prescription equivalent of

3    heroin to a heroin addict.

4         And so he wants you to believe what?  That Jeffrey

5    McCloud who had never met him somehow knew that Romano would be

6    dismissive?  That McCloud somehow knew that Romano believes

7    himself to be a giant among men, above lowly pharmacists?

8         Use your common sense.  Mr. McCloud's account makes

9    sense and it fits what you know about the defendant.

10        Just like he told the inspector from the medical board.

11   I don't want to throw roses at myself but I know what I'm

12   doing.  I'm very well accomplished.  I write book chapters.

13   I'm nationally, internationally known.  I know what I'm doing.

14        Fast-forward a year and Dr. Romano still has Eric Webb

15   on an incredibly high MME of opioids plus the other ingredients

16   of his cocktail.  That's Count 27.

17        Krishna Wright told you even her grandmother knew that

18   Eric was an addict.  How could her grandmother know more than a

19   self-proclaimed expert?  She couldn't.  He knew.

20        And you don't need Dr. King to tell you that providing

21   the prescription equivalent to heroin to a heroin addict is

22   outside the usual course of professional practice and without a

23   legitimate medical purpose.

24        Next is Terry Miller whose prescriptions make up Counts

25   6, 7 and 8.

16

1       Mr. Miller shows up at the defendant's clinic with a

2   host of medical conditions that made opioids incredibly

3   dangerous.  He had COPD which is a severe lung disease and for

4   which he was taking supplemental oxygen.  He had congestive

5   heart failure, anxiety, bipolar disorder, depression, and

6   short-term memory loss.

7       Here in Count 6, the defendant prescribed him a cocktail

8   of drugs that would sedate him and could further suppress his

9   already troubled breathing, potentially fatal.

10      Despite all the drugs the defendant was giving

11  Mr. Miller, he was in more pain, more pain.  Clearly, the drugs

12  weren't working.

13      Here in Count 7 it's oxycodone, methadone, Klonopin, and

14  Soma.

15      Almost a year later in Count 8, the defendant does more

16  of the same giving Terry Miller the same dangerous cocktail.

17      Dr. King told you he reviewed Mr. Miller's PMP report,

18  the prescription history, and confirmed that Mr. Miller was on

19  Suboxone, the drug that treats opioid addiction, and had been

20  since December of 2019, a few years after Dr. Romano's practice

21  was shut down.

22      Counts 21 and 22 involve prescriptions the defendant

23  wrote to Kent Crigger who testified yesterday.

24      Kent Crigger started the defendant's practice after an

25  unsuccessful attempt at using opioids to treat his pain.  And

17

1   the defendant kept him on them.

2          Mr. Crigger had added risks associated with his health

3   because of his chronic bronchitis, obesity, and his other

4   co-morbid conditions.  And just like Eric Webb, Kent Crigger

5   started with an inconsistent drug screen.

6          Apparently, Mr. Crigger wasn't taking the morphine he

7   had been prescribed.  That means either he finished it early

8   and was abusing it, a cause for concern, or he didn't take it

9   and didn't need it, or that he was giving it to somebody else

10  or otherwise diverting it.  Either way, acceptable with no

11  follow-up.

12         When Dr. Romano testified about this he was, quote,

13  mistaken about how soon before Mr. Crigger's first office visit

14  he had last been prescribed methadone.  He didn't want you to

15  know that his patient file showed that Mr. Crigger didn't have

16  the methadone in his urine that he was supposed to, that he had

17  been prescribed.  Dr. Romano knew and continued prescribing it

18  anyway.

19         Now, staying on the urine drug screens for a second.

20  You heard that they cost the defendant a couple of bucks to buy

21  but that he charged his patients $225 each.  Carol Vargo told

22  you that.  $225 that the patients couldn't use insurance on.

23         More than just the $225 for the urine tests and $725 for

24  the first visit.  Dr. Romano's no insurance policy is further

25  evidence that he knew his prescribing was outside the usual

18

1    course of professional practice. He didn't want insurance

2    companies reviewing his practices. He scoffed when they had

3    the audacity to send him letters about the dangerous drugs he

4    was prescribing. He was more willing to let personal injury

5    lawyers be involved in his practice than insurance providers.

6         Now back to Mr. Crigger. Shortly after the drug screen

7    where Mr. Crigger wasn't taking the prescribed morphine. In

8    Count 21, the defendant of course gives Mr. Crigger a massive

9    cocktail of dangerous controlled drugs: Morphine, oxycodone,

10   Soma, and Klonopin. And on top of that, Mr. Crigger was also

11   on Adderall, an amphetamine.

12        Count 22 is more than six months later. The defendant

13   is still giving Mr. Crigger the same dangerous cocktail at the

14   same high strength. Dr. King told you both of these

15   prescriptions were outside the usual course of professional

16   practice, not for a legitimate medical purpose.

17        On cross-examination, Mr. Shamansky attacked Dr. Belcik

18   for letting Arrieal Butler drive her nonexistent car after

19   receiving the defendant's cocktail. But it's crickets on the

20   strongest, more potent, more sedating drug for Mr. Crigger who

21   told you he was a charge nurse treating sick and ill patients

22   at the hospital; drugs that made him fall asleep at work

23   tranquilized by the drugs that Dr. Romano gave him.

24        And since Dr. Romano, no other doctor has given these

25   pills, these drugs to Mr. Crigger. Probably because they

19

1    harmed more than they helped.

2        Now, Mr. Neilan.  You might not recognize him from this

3    picture but he testified on Friday.  He looks a lot better now.

4    Free from the defendant's practice.

5        Count 9 charges the incredibly high MME prescription to

6    Mr. Neilan on October 4th of 2014.  975 MME.  More than ten

7    times what the CDC guidelines caution against exceeding.  And

8    of course along with that prescription was the benzo Xanax.

9        A few months later in Count 10, the defendant remarkably

10   increases the MME for Mr. Neilan up to 981 daily MME.  Again,

11   along with Xanax.

12       In Count 11, more than a year later, the defendant is

13   still giving Mr. Neilan almost 900 daily MME.

14       The defendant claimed to be tapering Mr. Neilan.  But

15   remember what Dr. King told us about a taper.  A taper is

16   supposed to last weeks, maybe a few months.  And Dr. Le

17   testified similarly.  She said that a ten percent weekly taper

18   was slowish.

19       This is more than a year later from the previous count

20   and Dr. Romano still has him on almost 900 MME.

21       What did Mr. Neilan and the other patients tell you

22   helped?  It was the HGH they received from Dr. Nolan.

23   Dr. Nolan's prescribing is not the subject of this Indictment.

24       Next is Mr. Saker, Counts 12, 13 and 14.  Dr. Romano

25   prescribed him ever-increasing dosages of opioids OxyContin,

20

1   oxycodone, along with the benzo Klonopin.

2          Here we start at 630 in Count 12.  Sorry, that was

3   earlier.  Count 12 is 705.  And I think there's a mistake here.

4   That should be Count 13 on November 6th of 2015 at 705 and then

5   Count 14 increases to 750.

6          Like Mr. Neilan before him, Mr. Saker was angry at the

7   government.  Angry for the government taking away his pills,

8   taking away Dr. Romano.

9          We're not trying to say that Mr. Saker and Mr. Neilan

10  were junkies trying to get high.  We're not trying to say that

11  no matter what Mr. Shamansky tells you, what he crossed these

12  witnesses on.  Because the defense, during their cross of

13  witnesses and their presentation of evidence, has suggested to

14  you a false perception of the government's case against

15  Dr. Romano.

16         We're not saying that his patients were trying to get

17  high or that he was operating a, quote, pill mill.  We're

18  asking you to convict him because the prescriptions that he was

19  issuing to these patients were so potent, so dangerous that

20  they were outside the course of professional practice and

21  without a legitimate medical purpose.

22         Don't be distracted by this idea that the government is

23  suggesting that these patients were out galavanting on joy

24  rides trying to get high.  That's not the case.

25         But remember what else Mr. Saker angrily told

1    Ms. Sakowski on Friday.  That no matter what, he would always

2    say that he was in more pain because he was afraid of losing

3    his pills.  Not because he was trying to get high but because

4    the pills controlled him.  And Dr. Romano, as the keeper of

5    those pills, had that control over Mr. Saker and the other

6    patients.

7        Faced with a patient like Mr. Saker saying that the

8    drugs don't help, what does Dr. Romano do?  Keep them flowing.

9    Maintain that control.

10       And since the government took away Dr. Romano from

11   Mr. Saker, what did he tell you he's on?  No other doctor has

12   prescribed him oxycodone.  No other doctor has prescribed him

13   OxyContin.  And you know why that is?  Again, because the drugs

14   were harming more than they were helping.

15       Mark Robinson presented a heartbreaking story of years'

16   long pain, addiction, and a host of co-morbid health

17   conditions.  When he first went to Dr. Romano, Mark Robinson

18   brought his medical records.  Records that clearly showed a

19   history of substance abuse and addiction.

20       He reported he had been addicted to pain meds.  Pain

21   meds he had received from other providers and pain meds he was

22   trying to get from Dr. Romano.  Did Dr. Romano ever refer

23   Mr. Robinson to an addiction specialist?  Never.

24       Someone else did.  In the fall of 2015, when

25   Mr. Robinson was on a break from Dr. Romano, his doctor tried

1    to treat his addiction with Suboxone.  Remember, Suboxone is

2    the drug that John Tittle is using successfully to treat his

3    opioid addiction.

4         For seven months, Mr. Robinson was away from the

5    defendant and on much lower strengths and dosages.  First it

6    was the Suboxone and then he was transitioned onto low dosages

7    of other painkillers.  First, 7.5 daily MME, then down to 5

8    daily MME.

9         But wham, back to the defendant in May of 2016 and

10   immediately up to 165 MME.  From 5 to 165.  That's more than a

11   3,000 percent increase for Mark Robinson.  A man with a history

12   of addiction and a failing heart.  And that's Count 23 of the

13   Indictment.

14        And remember when the defendant testified.  What did he

15   slip up and tell you about Mark Robinson during this visit?  He

16   said that Mr. Robinson was doing, quote, much better.  Much

17   better after seven months away from the defendant's

18   prescribing.  Much better before the prescription in Count 23

19   when the defendant again doped him up with 165 daily MME of

20   opioids.

21        Two months later in Count 24, the defendant adds the

22   tranquilizer Soma.

23        On to Count 25.  Now two years later and Dr. Romano has

24   completed the cocktail.  The cocktail, that John Tittle

25   compared to heroin, for Mark Robinson who was addicted to

23

1  painkillers and who you all saw on the stand on Friday has to

2  take nitroglycerin to stave off heart attacks.

3      Just like with Mr. Saker and Mr. Crigger, no other

4  doctor will give Mr. Robinson the same cocktail of drugs that

5  he was receiving from Dr. Romano.  He's not on oxycodone.  He's

6  not on hydromorphone.  He's not on Klonopin.  And of course

7  he's not on Soma.  Only Dr. Romano would give him all those.

8      But when you're addicted to these drugs, you have to

9  have them.  Which is why Eric Webb was willing to drive almost

10  four hours; why Kent Crigger was willing to drive even further;

11  Mr. Saker and Mr. Neilan drove more than an hour and a half;

12  and roughly an hour for Patricia and John Tittle.

13      Driving for hours, driving past countless other pain

14  clinics in search of the one that will give him these pills.

15  In search of Dr. Thomas Romano.

16      Kent Crigger, the registered nurse who spends his day

17  surrounded by doctors in the critical care unit.  Surrounded by

18  doctors, none of whom would be willing to give him these pills

19  he got from Dr. Romano.  That's why he was willing to drive

20  more than four hours to get his prescription.

21      All the doctors Kent Crigger passed along the way.  All

22  the doctors that are closer to these other patients.  But they

23  chose to drive for hours to get the pills because Dr. Romano

24  had them hooked.

25      They drove for hours to end up here in Martins Ferry.

24

1          Now, Counts 15 and 16 relate to John Tittle.  John

2    Tittle testified last Tuesday morning.  He told you that the

3    drugs Dr. Romano gave him turned him into a zombie.  He said

4    because once you're on them, you can't get off them without

5    help.  And the defendant didn't offer him that help.

6          John Tittle showed up to the defendant's practice with a

7    history of dirty drug tests and a history of other -- of taking

8    other people's medication.  He said he, quote, borrowed

9    medication from his mom and his girlfriend.

10         You saw John Tittle, ladies and gentlemen.  A little

11   rough around the edges.  He might be a good welder.  He is

12   definitely not a doctor.  But Dr. Romano gave him essentially

13   what he self-prescribed himself from his mom's and his

14   girlfriend's medicine cabinets:  The added Klonopin and Soma.

15         But more than that.  Again staring Dr. Romano in the

16   face were notes from prior prescribers who had refused to give

17   John Tittle dangerous high-dose opioids and addictive

18   combinations.

19         Right before John came to Dr. Romano, a Dr. Michael

20   Stanish wrote that the oxycodone was excessive and that John

21   needs to be weaned.  In November of 2007, Dr. Megan Cortazzo

22   said that John is taking drugs that he wasn't being prescribed.

23   She said he'll, quote, need to find another physician to

24   prescribe opioids.

25         John explained to you that he tried to find another

25

1   physician.  No one would give them to him.  He got kicked out

2   of pharmacies.  He said Rite Aid stopped filling his

3   prescriptions.  You know why?  Because they weren't working and

4   they were harming him.

5       No one else would but Dr. Romano.  Dr. Romano put him on

6   the three-drug cocktail.

7       In Count 15 he gave John 510 daily MME in January of

8   2015 plus the benzo Klonopin, and Soma.

9       He kept John Tittle on that cocktail for years.  Count 6

10  (sic) is from July of 2016.  Same drug combination, same high

11  drug MME.  And this didn't help John.

12      He told you what it did to him.  It turned him into a

13  zombie.  He told you no one wanted to be around him.  He

14  couldn't work and he certainly wasn't getting any better.

15      And then Dr. Romano kicked him to the curb.

16  Unsurprisingly, no other doctor would give him the same pills

17  Dr. Romano was giving him.  So John turned to heroin.

18      Rather than referring John to an addiction specialist,

19  Dr. Romano abandoned him.  This letter terminating John from

20  the practice is effectively a prescription for street heroin.

21  The cocktail Romano was giving John Tittle was already

22  comparable to heroin.  And taking that away without a referral

23  to an addiction specialist, of course he turned to heroin.

24      Then John got a wake-up call.  What did he tell you?  My

25  son walked in and I was barely breathing with my head slumped

1   over.  He grabbed me by the hair and slapped me in the face.

2   The next day, I went to a Suboxone clinic.

3       While Romano was John's doctor, he never mentioned

4   Suboxone.  The one drug that could have saved John.  John told

5   you he would have gladly turned to Suboxone rather than street

6   heroin.  And with Suboxone, John told you, I feel like I got my

7   life back.  A life stolen for seven years by Dr. Romano's

8   prescribing.

9       Much hay has been made over the fact that the medical

10  board requested patient files for John Tittle and a few of

11  these other patients.  Dr. Romano suggested that somehow he

12  thought the medical board blessed his prescribing practices.

13  But that's a story concocted to fool you and distract you from

14  the issues that are truly before you.

15      The medical board did no such thing and the defendant

16  never believed they did.  He is the doctor.  By his own

17  admission, he knows the dangers of these drugs and the way that

18  a doctor is acting within the usual course of professional

19  practice prescribes these drugs.

20      The medical board isn't a baby-sitting service and it

21  isn't in the business of enforcing drug laws.  But that's

22  exactly what we're doing here; what you're being asked to do.

23      The medical board didn't hold him accountable but you

24  can.  And do you really think that Dr. Romano, the

25  self-professed giant among men who didn't listen to his peers

1    or everyone else that was questioning his practices, who felt

2    everyone else was beneath him, do you really think he would

3    have listened to the State Medical Board?

4          When he was interviewed by the medical board in 2012, he

5    told the inspector a different story from the practice he was

6    actually running.  He swore he always got medical records.

7    Look at Eric Webb.  He told the inspector it was a deal breaker

8    when somebody had a dirty urine.  Look at Eric Webb again, John

9    Saker, Mark Robinson, Kent Crigger, John Tittle.

10         Finally we have Patricia Tittle, John's mom.  Her

11   prescriptions are charged in Counts 17, 18, 19, and 20.

12         When Patricia Tittle came to Dr. Romano, she came

13   looking for a doctor, not a drug dealer.  But over the course

14   of nine years, Dr. Romano pumped her full of a cocktail of

15   drugs that knocked her out.  Caused problems at her job and

16   stole years of her life.

17         Just like John, Patricia Tittle came to Dr. Romano's

18   practice alongside warnings from another doctor that continuing

19   the high-dose opioids and combinations would be bad for her.

20   They wanted to wean her off, not continue oxycodone

21   prescribing.

22         But Dr. Romano does just that.  He gave her high-dose

23   opioids and gave her dangerous combinations that weren't

24   working.  These are quotes from Ms. Tittle's patient file:

25   September 2011, increased neck pain; keep prescribing.

28

1   August 2013, hurts all over with increased fatigue and

2   decreased energy; keep prescribing.  January 2015, in more

3   widespread pain lately; keep prescribing.  July 2016, increased

4   hip pain and increased neck pain; keep prescribing.

5   April 2019, increased pain overall, especially left hip pain;

6   keep prescribing.

7       Repeatedly, Ms. Tittle told Dr. Romano she was getting

8   worse.  Repeatedly, he kept her on the same course.

9       What do they say about doing the same thing over and

10  over again and expecting a different result?  Certainly not the

11  practice of medicine.

12      And what was the result of Dr. Romano's prescribing?

13  Ms. Tittle told you, well, I changed.  My family kept telling

14  me I was a different person.  I was grouchy and I slept a lot.

15  I wasn't able to do what I normally do.  I mean, you can't play

16  with your grandkids when you're asleep.  I had trouble at work.

17  I was falling asleep at work.

18      She told Dr. Romano what the drugs were doing to her,

19  that they were knocking her out, causing her fatigue.  She even

20  fainted in 2016, but he kept on prescribing.

21      Count 17 is from December of 2014.  He wrote her three

22  different opioid prescriptions plus the tranquilizer Soma, plus

23  the benzo Valium.

24      Again, Count 18 in November of 2015.  Same combination

25  that is making her worse.

29

1      Again, Count 19, June of 2016.  Same combination that is

2  making her worse.

3      And finally, Count 20, January 2017.  Shortly after she

4  reported fainting.  Same combination that isn't working.  Same

5  combination that's making her worse.

6      After she left Dr. Romano's practice in 2019, she went

7  to see Dr. Le.  Rather than leading Ms. Tittle further down the

8  path of addiction that Dr. Romano had paved, Dr. Le warned

9  Ms. Tittle about Dr. Romano's dangerous drug cocktail.  Told

10  Ms. Tittle if she kept down this path, she'd be dead in five

11  years.

12      Just like John's slap in the face was a wake-up call,

13  Dr. Le was a wake-up call for Patricia Tittle.  She told you

14  she felt like she hit the end of the road.  That her family

15  told her was a different person, that they didn't like her like

16  that.  She said, I'll try to get off it.  And if not, then I'll

17  die.

18      Dr. Le told you on Monday that the most concerning thing

19  about Patricia Tittle, given all of her health issues, was the

20  combination of drugs that she was on from Dr. Romano.  The

21  first thing Dr. Le had to do was wean Ms. Tittle off those

22  drugs.  And only then could she start treating Ms. Tittle for

23  her pain.

24      Dr. Le spent almost an hour talking with Ms. Tittle

25  about the dangers associated with mixing opioids and benzos.

30

 1   In one visit, Dr. Le spent more time counseling Ms. Tittle than

 2   Dr. Romano did in nine years of prescribing to her.

 3        Ms. Gregorian asked Ms. Tittle about what she's doing

 4   now.  Are you taking any opioids?  No.  Are you taking any

 5   benzos?  No.  Are you taking any Soma?  No.  Are you taking any

 6   controlled substances?  No.

 7        She told you, I'm still in pain but at least I can

 8   think.

 9        You heard repeatedly that the drugs Dr. Romano was

10   prescribing harmed more than they helped.  They turned his

11   patients into zombies.  Improving only after the pills stopped.

12        You've seen and heard the evidence that shows beyond a

13   reasonable doubt that Dr. Romano's prescribing was outside the

14   usual course of professional practice and without a legitimate

15   medical purpose.

16        But he thinks as a giant among men that he's above such

17   lowly requirements.  But he's not above the law.  We ask that

18   you hold him responsible, find him guilty on all counts.  Thank

19   you, ladies and gentlemen.

20                          – – –

21                        * * * * *

22                          – – –

23        THE COURT:  Rebuttal.

24        MR. HELFMEYER:  Yes, Your Honor.

25        Dangerous but how dangerous?  We're not talking about

31

1  dollars in a bankruptcy case.  We're talking about human lives.
2  One is too many.

3     Eric Webb's addiction is one too many.  Each year that
4  John Tittle and Patricia Tittle lost to the defendant's
5  prescribing is one too many.

6     Those are the dangers.  That's dangerous enough.

7     I don't mind being attacked.  That's part of my job as a
8  prosecutor.  I get attacked by defense attorneys.  That's fine.
9  But I don't want you to be swayed by the attacks on the
10  government because what I say, what Mr. Shamansky says, no
11  matter how indignant he or I get is not evidence.

12     The evidence that you get to consider is based on the
13  testimony that came from that witness stand and the exhibits
14  that you've seen in front of you during this trial.  Evidence
15  that we have brought to you that shows beyond a reasonable
16  doubt that the defendant's prescribing was without a legitimate
17  medical purpose outside of the usual course of professional
18  practice.

19     No, this is not a malpractice case.  The defendant
20  didn't commit malpractice.  He unlawfully distributed
21  controlled substances when he gave them to the heroin addict
22  Eric Webb; when he sent John and Patricia Tittle down the
23  spiral of addiction; when he gave Arrieal Butler drugs that
24  weren't working; when he sent a charge nurse off to the
25  critical care floor sedated; when he didn't help Kent Crigger,

32

1    Donald Neilan, Mark Robinson.

2        That's not medical malpractice.  That's unlawful

3    distribution of a controlled substance.

4        Dr. Le.  Dr. Le told you why she was concerned about

5    cross-examination.  She'd been cross-examined by him before.

6    She told you it was demeaning.  She didn't want to be demeaned

7    again when she took the stand.

8        But why?  Why would Dr. Le say anything other to you

9    than exactly what she saw, what she observed, what she knows

10   based on her many years of treating patients in pain?  Why?

11   She wouldn't.  There's no reason.  There's no reason for her to

12   do that.

13       You saw her.  You judged her credibility just as you saw

14   Dr. Belcik.  Same position.  Why?  Why would he give you

15   anything other than exactly what Ms. Butler told him?  Exactly

16   what he saw, what he knew as a physician.  There's no reason.

17       If we could go, Ms. Balde, to 145 at page 7 and zoom in

18   to the top.

19       It was just suggested to you that I made up that Eric

20   Webb had 16 motor vehicle accidents.  I quit counting after 16

21   MVA, motor vehicle accidents.

22       It's not concocted.  It's not made up by the government.

23   This is right here, what Eric Webb wrote down, what he gave to

24   the defendant before the defendant continued prescribing to the

25   heroin addict.

1   The medical board.  Says who that the defendant wouldn't
2   listen to the medical board?  Every single witness that
3   testified about their interactions with the defendant talked to
4   you about the way that he disregarded other things that people
5   told him that he didn't want to hear.  Anybody who disagreed
6   with him was beneath him.
7        You really think he would have listened to the medical
8   board?  But what did he know from the medical board?
9        Back in 2012, he was allowed to operate a pain clinic
10  and then he got a subpoena.  That's it.  That's all he knew.
11  He never saw the results of the 2017 review of patient records.
12  He never saw that report written by Nurse Holdford that the
13  defense showed you.
14       It's Defense Exhibit 7, if we could go to that at page
15  1, Ms. Balde.  And if we could zoom in to the top.  Thank you.
16       This is what the defendant didn't know but this is part
17  of what the medical board was doing behind the scenes.  Some of
18  the patient files were reviewed by a nurse, Mr. Holdford.
19       And what's part of the conclusion?  Pull more patient
20  files due to regular prescriptions of the drug abuse cocktail
21  of a benzo, opioid, and a sleep aid.
22       It's not a buzzword, ladies and gentlemen, cocktail.
23  That's the word used by Dr. Le when she testified.  That's the
24  word used by the medical board.  It doesn't sound good to
25  Dr. Romano, but it's not our buzzword.

34

1          If we could go to page 6 of this exhibit at the bottom,

2     and to the recommendations.

3          Again, this is not what Dr. Romano saw.  He had no idea

4     what the medical board was doing.  But the medical board

5     reviewer found that he was complying with many of the

6     guidelines.  But his use of Naloxone and other parts of the

7     review indicates that he is aware, he being Dr. Romano, is

8     aware that he may be overprescribing.  Overprescribing these

9     dangerous opioids and benzodiazepines and Soma to his addicted

10    patients.

11         And the medical board recommends a review by an expert.

12    That's what the medical board did.  Not blessing him.  Telling

13    him go forth and continue throwing pills at these people.

14         Thank you, Ms. Balde.

15         The medical board allowed him to have a pain practice in

16    2012.  The prescriptions at issue in this case issued to John

17    Tittle, Patricia Tittle, and the other patients, those are all

18    after 2012.  2014 to 2019.

19         Don't believe that the medical board blessed this.

20    There's no evidence to support that.

21         On Mr. Crigger.  Why else would he drive eight hours

22    round trip?  Yes, it's in evidence that he was working at a

23    hospital surrounded by doctors.  Nobody else was giving him the

24    medications the defendant was giving him.  That is the evidence

25    from that witness stand and from the exhibits that you've seen.

35

1       When you go back to deliberate, think about Patricia

2   Tittle, think about John Tittle, Arrieal Butler, Eric Webb, the

3   other patients in this case, the years lost by these pills, the

4   addiction and suffering that it has caused to them and their

5   family.

6       Dangerous.  How dangerous?  One is too many.  The 24

7   counts in the Indictment that you're to consider, he's guilty

8   of.  Convict him.  Thank you.

9                                   - - -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

36

1        C E R T I F I C A T E

2

3        I, Lahana DuFour, do hereby certify that the foregoing

4   is a true and correct transcript of the proceedings before the

5   Honorable Michael H. Watson, Judge, in the United States

6   District Court, Southern District of Ohio, Eastern Division, on

7   the date indicated, reported by me in shorthand and transcribed

8   by me or under my supervision.

9

10

11                    s/Lahana DuFour
                     Lahana DuFour, RMR, CRR
12                   Official Federal Court Reporter
                     December 21, 2023
13

14

15

16

17

18

19

20

21

22

23

24

25