IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION - COLUMBUS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| Plaintiff | Case No. 2:19-cr-202 |
| vs. | Judge Michael H. Watson |
| THOMAS ROMANO, | |
| Defendant | |

## UNITED STATES' SENTENCING MEMORANDUM

On September 20, 2023, a jury found defendant Thomas Romano, M.D., guilty of 24 counts of unlawful distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1). On January 29, 2024, the U.S. Probation Office issued its Final Presentence Report ("PSR"). (ECF 198.) The PSR calculates Defendant's Offense Level as 30 and Criminal History Category as I. PSR ¶¶ 35 & 39.

For the reasons articulated below, the government respectfully requests that the Court adopt the findings of the PSR. Based upon the above Offense Level and Criminal History Category, Defendant's guideline range is 97-121 months. The government submits that a sentence at the low-end of the guidelines, 97 months of imprisonment, followed by three years of supervised release, is sufficient, but not greater than necessary, to provide just punishment in this case, promote respect for the law, and both general and specific deterrence.[1] In addition, the government requests that the Court order permanent forfeiture of Defendant's DEA registration to protect the community,

---

[1] A three-year term of supervised release is required following any term of incarceration for this offense. *See* 21 U.S.C. § 841(b)(1)(C).

in light of the evidence presented at trial as to Defendant's prescribing practices and the risks to which he repeatedly exposed his patients.

## I.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND

### A.  Procedural History

Defendant was charged by indictment on September 12, 2019, with twenty counts of unlawfully distributing and dispensing controlled substances in violation of 21 U.S.C. § 841. On June 18, 2020, the grand jury returned a superseding indictment, which added an additional fourteen counts to the original twenty, for a total of thirty-four counts of unlawfully distributing and dispensing controlled substances in violation of 21 U.S.C. § 841. Defendant proceeded to trial, initially on August 1, 2022, on the superseding indictment. Following convictions on twenty-four of the thirty-four counts, the Court granted Defendant a new trial pursuant to Federal Rule of Criminal Procedure 33(a).  Evidence in the retrial commenced on September 11, 2023. On September 20, 2023, the jury returned a verdict of guilty on all counts. Sentencing is scheduled for May 2, 2024.

### B.  Offense Conduct

Defendant, a licensed medical doctor in the State of Ohio since 1982, operated a solo rheumatology practice in Martin's Ferry, Ohio, where he prescribed controlled drugs, including opioids (oxycodone, oxymorphone, oxycontin, morphine, methadone, hydromorphone); benzodiazepines (clonazepam, alprazolam, diazepam); and muscle relaxers (carisoprodol). A majority of the patients named in the superseding indictment drove long distances to see Defendant on a monthly basis for years at a time, bypassing pain management specialists to do so. Defendant prescribed opioids in high doses to his patients and in combination with benzodiazepines and muscle relaxants. Numerous witnesses at trial testified that opioids in combination with

benzodiazepines and/or muscle relaxants form a dangerous and addictive drug cocktail that can cause fatal respiratory depression. Defendant repeatedly prescribed such combinations and continued to do so even when patients failed to improve or respond to the drugs. Evidence at trial established that Defendant, through his prescribing, facilitated addiction and ignored warnings, including from a pharmacist and another doctor, as to the danger posed by his prescribing.

### C.  Defendant's Objections to the PSR are Without Merit

Defendant makes several objections to the PSR. The majority of Defendant's objections have no bearing on the total offense level, with the exception of the Abuse of Trust enhancement. All of Defendant's objections are without merit.

Consistent with the calculation set forth in the PSR, the government submits that the total offense level for Defendant should be calculated as Level 30 pursuant to U.S.S.G. §2D1.1(c)(5). This calculation is based on Defendant's convictions for unlawfully prescribing 3,046 pills of oxycodone (30 mg), 570 pills of oxycodone (80 mg), 570 pills of oxycodone (15 mg), 255 pills of oxycodone (10 mg), 60 pills of oxycodone (40 mg), 504 pills of oxymorphone (40 mg), 360 pills of oxymorphone (15 mg), 60 pills of morphine (60 mg), 360 pills of methadone (10 mg), and 120 pills of hydromorphone (8 mg) to the patients named in the superseding indictment.[2]

The PSR contemplated the weight of all the charged prescriptions in calculating the Base Level Offense, including those prescriptions on which the original jury (August 2022) acquitted. Defendant objects to the inclusion of the acquitted drug weight both as a general matter of inclusion and also as part of the calculation, but acknowledges that its exclusion would not change the Base Level Offense. PSR Addendum p. 28, 32.

---

[2] The numbers reflected in this section are limited to the pills Defendant prescribed in the counts of conviction.  As a result, the totals do not include the pills on which the first jury acquitted, or the 120 oxycodone (80m mg) pills on which the second jury did not convict as to Patient D.N. in Count 11.

Acquitted conduct is relevant under the guidelines and a preponderance of the evidence supports the inclusion of the acquitted prescriptions and their respective drug weights, based on the medical standards and guidelines presented at trial. *See United States v. Milton*, 27 F.3d 203, 208–09 (6th Cir. 1994) ("This circuit clearly allows district courts to consider acquitted conduct at sentencing. We consider acquitted conduct under the theory that a determination of guilt requires proof beyond a reasonable doubt while sentencing considerations only require proof by a preponderance of the evidence."). However, because the weight of the drugs in the acquitted counts does not ultimately impact the calculation of the Base Level Offense, the government defers to the Court in terms of considering that conduct.

Defendant lodges several additional objections to the PSR that have no impact on Defendant's Offense Level. Defendant's objection that the DEA did not participate in the underlying investigation is without merit. PSR Addendum at p. 29. DEA was part of a multi-agency investigation into Defendant and participated in the execution of the search warrant at Defendant's practice and Defendant's arrest. While the government ultimately did not call him at trial, DEA Diversion Investigator William D. Crawford was listed on the government's trial witness list. (ECF 160 at 4.)

Defendant also objects to the assertion in the PSR that Defendant's prescription practices violated federal and state regulations. PSR Addendum at p. 30. As a threshold matter, a jury convicted Defendant of twenty-four counts of violating the Controlled Substance Act ("CSA"). The Code of Federal Regulations explains the application of the CSA to prescribers: "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04. "An order purporting to be a prescription issued not in the usual course of

professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of [the CSA] and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances." *Id.* Defendant's convictions, standing alone, establish that his prescription practices violated federal regulations. Additionally, the government's expert, Dr. Timothy King, who testified that each of the charged prescriptions was issued without "a legitimate medical purpose … [outside] the usual course of … professional practice", testified that he "reviewed the Ohio state guidelines for the use opioids and the treatment of chronic pain" going back to 2013. Day IV Tr. 64: 5-7; Day III Tr. 50: 15-17.[3] Dr. King also testified regarding guidelines from the Centers for Disease Control and Prevention regarding prescribing doses over 90 morphine milligram equivalents and a black box warning from the Federal Drug Administration regarding the risks of prescribing opioid pain medications in combination with benzodiazepines, which informed his opinion. Day III Tr. 83: 7-11; Day III Tr. 75: 5-10.

Defendant also objects to the inclusion of the Abuse of Trust enhancement, pursuant to U.S.S.G. § 3B1.3, on the basis that Defendant was supervised by various boards and programs including the State Medical Board of Ohio (the "Board").  *See* PSR Addendum at p. 34. This objection is both contrary to the case law and common sense. In *United States v. McCollister*, the Sixth Circuit upheld the district court's application of the two-level enhancement for abuse of a position of trust for a physician who pleaded guilty to conspiring to distribute oxycodone in violation of 21 U.S.C. § 841. 96 Fed. App'x. 974 (6th Cir. 2004). The Court held that:

> The touchstone for a finding that the defendant occupies a position
> of trust is not necessarily the amount of supervision the person

---

[3] Throughout this memorandum, the government cites pages in the trial transcript by day, page, and line number (*e.g.*, Day I Tr. : ).

> receives, although that is an important factor to consider, but rather the amount of discretion the person has in his or her position of employment. A practicing physician enjoys perhaps the highest level of discretion afforded any professional. [Defendant] abused a position of trust because his professional role as practicing physician made it possible for him to write prescriptions for oxycodone and thus contributed significantly to his ability to commit the offense.

*Id*. at 976; *see also United States v. Fata*, 650 Fed. App'x. 260, 263 (6th Cir. 2016) ("That a doctor works with little supervision and exercises substantial discretionary judgment that is ordinarily given considerable deference is axiomatic.") (internal quotations omitted); *United States v. Brogan*, 238 F.3d 780, 783 (6th Cir. 2001) (noting that the enhancement "is akin to punishment for violating a fiduciary duty, a higher duty than the ordinary one placed on all employees […] where the enhancement is appropriate correspond[s] to the types of relationships where fiduciary duties are often implied: physician-patient, lawyer-client, officer-organization").  Here, Defendant enjoyed a high level of discretion as a physician that enabled him to unlawfully distribute controlled substances to patients.

At trial, Defendant testified that in 2011, he applied for status as a pain management clinic which involved him submitting patient files and sitting for an interview with a staff member from the Board. Day V Tr. 20: 4-9; Day V Tr. 21: 2-17. Following that process, Defendant testified that no one from the Board alerted to him to any concerns regarding his prescribing. Day V Tr. 23: 2-8. In 2017, Defendant received an additional records request from the Board which included five patients named in the superseding indictment. Day V Tr. 27: 1-5. Following this request, the Board did not take action on Defendant's license or make any findings related to his prescribing. Day V Tr. 27:6-12.  Defendant also testified that his medical license and DEA registration were renewed throughout his career. Day V Tr. 23: 9-23.

That Defendant received some oversight from the Board and periodic renewal of his

medical license and DEA registration does not amount to carte blanche to prescribe controlled

drugs in violation of federal law. Nothing presented at trial established that the Board (or any

entity) was investigating or reviewing Defendant's patient records and prescriptions for violations

of federal law. The Board employee who reviewed the pain clinic application had unknown

qualifications. Day IV Tr. 152: 13-16. During the 2017 review, a Board staff member found that

Defendant's high MME counts and abnormal recommendations for Naloxone warranted an expert

review. Day IV tr. 158-59: 23-1. In general, state medical boards often have limited authority and

limited investigative tools as compared to federal criminal investigators, and when they do

investigate, those investigations are often limited in scope.[4] Defendant alone used his degrees,

training, and position of trust to facilitate addiction among his patients. When other medical

professionals, like a pharmacist and fellow physician, voiced concerns about dosages and

combinations prescribed by Defendant, Defendant disregarded those concerns and continued

patients on a course of dangerous prescribing. The Board (and other state bodies) did not review

the same evidence as the jury, nor was any evidence presented that they ever interviewed patients

or other medical professionals who treated and interacted with those patients.

That the DEA continued renewing Defendant's registration is also not grounds to abandon

the Abuse of Trust enhancement. The registration process is not an in-depth review of patient files,

prescription data, or other information sources reviewed by the investigative team in this case. The

DEA is responsible for registration renewal for hundreds of thousands of prescribers across the

---

[4] Medical boards from across the country have been criticized for failing to meaningfully discipline licensees. For example, in 2022, Boston Globe Spotlight reporters published a series of articles related to a medical doctor licensed by the State of New Hampshire Board of Medicine. In their reporting, the Boston Globe cited a study published by the Public Citizen's Health Research Group, *Ranking of the Rate of State Medical Board's Serious Disciplinary Actions, 2017-2019* (March 31, 2021). The study concluded: "[I]t is clear that many, if not most, state medical boards are doing a dangerously lax job in enforcing their states' medical practice acts. Low rates of serious disciplinary actions suggests that medical boards are not adequately taking actions to discipline physicians responsible for negligent medical care or whose behavior is unacceptably dangerous to patients." *Id*. at p. 11.

country, and the re-registration process checks to make sure certain licenses and paperwork are in order. That Defendant's registration was renewed does not equate to DEA blessing his illegal prescribing practices, it merely acknowledged that at the time he applied for renewal he had the requisite license and paperwork in order.

Now that a jury has rendered its verdict, Defendant wants to continue avoiding responsibility for his crimes by blaming various licensing and regulatory bodies. Defendant abused the position of trust he occupied as the sole prescriber issuing the prescriptions that the jury found violated 21 U.S.C. §841(a) and the enhancement under U.S.S.G. § 3B1.3 is appropriately applied.

Finally, Defendant objects to the PSR's assertion that pharmacies refused to fill prescriptions issued by him. Addendum at p. 30. John Tittle testified in reference to Joint Exhibits 239-248, that "several pharmacies questioned [the prescriptions] and I was refused by quite a few pharmacies also… they would not fill them due to the high milligram of the opioid medication." Day II Tr. 36: 2-6.

## II.    ANALYSIS OF THE SECTION 3553(a) FACTORS

The federal statute governing sentencing requires district courts to take the applicable Sentencing Guidelines range into consideration when sentencing, along with other sentencing factors enumerated by Congress. *See* 18 U.S.C. § 3553; *United States v. Booker*, 543 U.S. 220, 264 (2005) ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). When the Court determines a sentence, "the Guidelines are the starting point and the initial benchmark." *United States v. Peebles*, 624 F.3d 344, 347 (6th Cir. 2010).

Once the Court calculates the defendant's Sentencing Guidelines range, it must then consider the factors set forth in 18 U.S.C. § 3553(a) to decide if they support the sentence recommended by Probation and the parties. *Peebles*, 624 F.3d at 347. These factors include, among

others: (a) the nature and circumstances of a defendant's offense and his history and characteristics; and (b) the need for the sentence contemplated to, among other things: (i) reflect the seriousness of the offense; (ii) promote respect for the law and provide just punishment for the offense; (iii) afford adequate deterrence to criminal conduct; and (iv) protect the public from further crimes of defendant.

The Section 3553(a) factors support a sentence of 97 months in custody for Defendant. Such a sentence would be "sufficient, but not greater than necessary" to comply with the purposes enumerated in 18 U.S.C. § 3553 (a), discussed further below.

### A. Nature and Circumstance of the Offenses

Defendant's decision to prescribe in a manner that ignored national prescribing guidelines, provided addictive and dangerous drugs to patients for whom the drugs were not working, and which facilitated addiction is a serious offense. As a medical practitioner in Ohio – a state in which between 2014 and 2019, according to the Ohio Department of Health, 18,853 Ohioans died from unintentional drug overdoses – Defendant was well aware of the risks of prescribing dangerous drugs outside the usual course of professional practice and without a legitimate medical purpose.

Here, Defendant's prescribing had real-world, lasting negative effects on his patients. Patricia Tittle testified that, "These types of drugs control you, your mind. You feel like you're going to die without them. And in your mind, you have to have them no matter what." Day I Tr. 52: 17-19. Dr. Stephanie Le, who treated Patricia Tittle, following years of Defendant prescribing Mrs. Tittle a combination of high MME opioids, benzodiazepines, and carisoprodol, did not continue Mrs. Tittle's opioid prescription from Defendant because she felt the dose was "a rather excessive amount." Day I Tr. 103: 10. Dr. Le's "main focus for Ms. Tittle was not so much figuring out how am I going to manage her pain at the moment, but rather how do I mitigate some of the

risks that she is having by having such high doses of pain medicine." Day I Tr. 108: 4-7. Dr. Le also testified that she does not prescribe the combination of an opioid, benzodiazepine, and muscle relaxer (Soma) because "it's dangerous." Day I Tr. 112:7. The same risk is posed by a combination of opioids and benzodiazepines because "they're both centrally acting" and can cause "sedation, central nervous depressant, [and] respiratory depression." Day I Tr. 112: 22, 25. Ultimately, Dr. Le testified that she believed the prescriptions Defendant had Mrs. Tittle on were "too high, too dangerous, and that's why I suggested the weaning process." Day I Tr. 122:9-10.

Mrs. Tittle's son, John Tittle, also saw Defendant for a number of years and was prescribed the same combination of opioid, benzodiazepine, and carisoprodol. Mr. Tittle testified that the drug combination made him feel, "like [he] was high". Day II Tr. 15:21. Following Mr. Tittle's termination from Defendant's practice, Mr. Tittle could not find another doctor who would prescribe the same drugs. Day II Tr. 29: 3. Without the prescriptions from Defendant, and without another doctor willing to prescribe them, Mr. Tittle turned to heroin. Day II Tr. 37: 13.

In addition to the Tittles, Defendant treated E.W. who died of a drug overdose (fentanyl and oxycodone) in May of 2017, a few weeks after receiving prescriptions for oxymorphone, carisoprodol, and clonazepam from Defendant. Joint Exhibit 146. E.W.'s widow, Krishna Wright, testified at trial that E.W. was in the throes of drug addiction when he began seeing Defendant in the early spring of 2016. Day III Tr. 21: 4, 8. While being treated by Defendant, E.W. used heroin and marijuana and was having trouble at work. Day III Tr.23: 12, 14, 18-19. The government did not accuse Defendant of causing E.W.'s death and does not do so now – but the circumstances of E.W.'s life and death are relevant to Defendant's sentencing. Defendant's repeated prescribing of a dangerous combination of drugs (opioid, benzodiazepine, and carisoprodol) helped facilitate the ongoing addiction of E.W., who continued using street drugs while under Defendant's care, drove

six-hours roundtrip once per month to get his prescriptions, showed outward signs of addiction (*e.g.*, dental issues), and would have failed pill counts or urine drug testing had Defendant initiated them. Day III Tr. 23; 24; 26; 27:7-14; 17-20; 3-25; 1-8. This background, which should have been evident to a prudent and careful physician, reenforces that the prescriptions issued by Defendant to E.W. were outside the usual course of professional practice and without a legitimate medical purpose – this relationship was drug dealing, not the practice of medicine.

That Defendant's prescribing practices were outside the usual course of professional practice and without a legitimate medical purpose should not have come as a surprise to him. Numerous witnesses testified at trial as to the feedback Defendant received from other medical professionals on his prescribing. Defendant's medical receptionist, Carol Vargo, testified that pharmacists would call with concerns about "the amount of medication that was being prescribed." Day II Tr. 83: 16-17. Defendant would tell Ms. Vargo that, "he wrote the prescriptions and he wasn't changing anything. He wasn't concerned," and that "pharmacists were people that couldn't make it through medical school." Day II Tr. 84: 10-11; 17-18. Ms. Vargo also testified that pharmacists would call daily with concerns about Defendant's prescribing. Day II Tr. 85: 9. E.W.'s pharmacist, Jeffrey McCloud, also testified that when he called Defendant with concerns about E.W.'s dosage and combination of prescriptions, Defendant "was indignant" and "didn't like to be questioned." Day II Tr. 198: 24; Day II Tr. 199: 2.

Dr. Benedict Belcik also testified that he treated patient A.B. while she was still receiving treatment and prescriptions from Defendant. When Dr. Belcik saw the medications (benzodiazepines and an opioid) that Defendant had prescribed A.B., Dr. Belcik testified that he was concerned because, "they're both sedating medications. They're both – depress respiration, so in combination you could risk stopping breathing, dying." Day II Tr. 110: 1-3. Following Dr.

Belcik's encounter with A.B., he was so concerned by the combination of drugs Defendant was

prescribing, that he referred this information to the Board of Pharmacy. Day II Tr. 117: 21-22. He

also sent the progress note to Defendant because he wanted Defendant to read about the encounter

and perhaps start to wean A.B. off this dangerous combination of medications. Day II Tr. 118: 15-

17. Such a wean did not occur.

Defendant's prescribing was dangerous and had real world consequences for his patients,

namely addiction and heightened risk of drug overdose. When other medical professionals

attempted to warn Defendant about these dangerous prescribing patterns, Defendant ignored and

rebuffed them at his patients' peril.

### B.      History and Characteristics of Defendant

Defendant has been afforded every opportunity to succeed in life. According to the

information in the PSR, Defendant's upbringing was devoid of any abuse of neglect. He

maintained close relationships with his family members, including his now adult children.

Defendant obtained a medical degree in addition to a doctorate and master's degrees. Despite his

training and privilege, Defendant repeatedly chose to break the law. Accordingly, Defendant's

history and characteristics favor the imposition of a significant custodial sentence. As discussed

throughout this memorandum and as presented at trial, Defendant repeatedly rebuffed the concerns

and notices of other professionals, ignored signs of addiction in his patients, failed to stop the use

of dangerous drugs when they were not working, and disregarded medical guidance that warned

practitioners of the dangers associated with the drugs and combinations that Defendant repeatedly

prescribed over the course of years to multiple patients. Defendant had adequate education and

training, and was aware that his prescribing was not appropriate. Yet he still made a conscious and

knowing choice to ignore the relevant medical standards.

C. **Deterrence, Promoting Respect for the Law, and Punishing Defendant for His Crimes**

A guideline sentence of 97 months is appropriate for the seriousness of Defendant's criminal conduct and justly punishes him for that conduct. *See* 18 U.S.C. § 3553(a)(2)(A). It will also deter others from engaging in similar illegal conduct. 18 U.S.C. § 3553(a)(2)(B) (requiring district court judges to impose a sentence that affords adequate deterrence, both specific and general). In sentencing crimes which are more "rational, cool, and calculated" rather than "sudden crimes of passion or opportunity" a central consideration is the need for general deterrence. *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014).[5] As discussed above, the State of Ohio has been ravaged by the opioid epidemic over the last several years. Accordingly, general deterrence should be considered here. The requested sentence will serve to cause individuals, especially those in a position of power, to see that deliberately ignoring guidelines regarding prescribing controlled substances is not worth the risk of incarceration. *See United States v. Barbara*, 683 F.2d 164, 167 (6th Cir. 1982) (holding it was well within the district court judge's discretion to consider societal retribution and the general deterrence factors as the most important in sentencing the defendant).

The requested sentence is also sufficient to promote respect for the law. As stated above, Defendant completely disregarded known prescribing warnings, state and federal standards, and the warnings of his colleagues in prescribing controlled substances. Defendant was aware of the problems with his prescribing, but continued on the same course unabated. His conviction and sentence should serve to show him that his belief in his own medical superiority does not trump the applicable guidelines and law.

---

[5] As stated by the drafters of 18 U.S.C. § 3553(a), general deterrence is particularly important for white collar criminals to dissuade actors that small fines or low sentences can be dismissed as simply a "cost of doing business."

**D.      Avoiding Unwarranted Sentencing Disparities**

One of the central reasons for creating the sentencing guidelines was "to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." *Musgrave*, 761 F.3d 602, 609. Recognizing the ongoing opioid crisis, defendants in a similar position to this Defendant need to be deterred from harming their patients and their communities at large. To avoid unwarranted sentencing disparities among defendants, as contemplated in 18 U.S.C. § 3553(a)(6), Defendant should be sentenced to a period of incarceration. "Subsection 3553(a)(6) is concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *See United States v. Poynter*, 495 F.3d 349, 351-56 (6th Cir. 2007); *United States v. LaSalle*, 948 F.2d 215, 218 (6th Cir. 1991); *United States v. Parker*, 912 F.2d 156, 158 (6th Cir. 1990). Other medical professionals, who have distributed controlled drugs outside the scope of their professional practice and not for legitimate medical purposes, have been sentenced to periods of incarceration:

- In *United States v. Crystal Compton* and *United States v. Kayla Lambert*, 7:22-CR-0007 (EDKY), the defendant physician and nurse were convicted of conspiracy to illegally prescribe controlled substances outside the scope of professional practice and were sentenced to 100 months and 60 months incarceration, respectively.

- In *United States v. George Griffin*, 1:19-CR-112 (SDOH), the defendant physician pleaded guilty and was convicted of unlawful distribution of controlled substances outside the scope of professional practice and was sentenced to 40 months incarceration.

- In *United States v. Morris Brown*, 3:19-CR-92 (SDOH), the defendant physician pleaded guilty and was convicted of unlawful distribution of controlled substances

outside the scope of professional practice and was sentenced to 48 months incarceration.

- In *United States v. Larry Boatwright*, Cr. No. 06-20099 (WDTN), the 57-year-old defendant, a pharmacist, was convicted of distributing controlled substances outside the scope of professional practice and was sentenced to a period of 188 months (which was later reduced to 151 months).

- In *United States v. Rosaire Michael Dubrule*, 2:07-CR-20246-01 (WDTN), the 62-year-old defendant, a physician, was convicted of conspiracy and unlawful distribution of controlled substances outside the scope of professional practice and was sentenced to a period of 150 months with the recommendation that the defendant be designated to a Federal Medical Facility.

- In *United States v. Michael Patterson*, 2:11-CR-20262 (WDTN), the defendant physician was convicted of unlawful distribution of controlled substances outside the scope of professional practice and sentenced to 192 months.

The government acknowledges that every case is different and the specific facts and circumstances of each case and each defendant should be evaluated in reaching a sentencing decision. The government includes these comparison sentences, however, to demonstrate that other defendants with similar training and convictions to this Defendant have been sentenced to periods of incarceration. Accordingly, based upon all of the above, a sentence of 97 months incarceration would be appropriate based on the Sentencing Guidelines and the factors articulated in 18 U.S.C. § 3553(a).

### III.  SUPERVISION CONDITIONS

The government is requesting a three-year term of supervised release pursuant to the

15

Controlled Substances Act requirement that such a term follow any period of incarceration for this offense. *See* 21 U.S.C. § 841(b)(1)(C). The government respectfully requests that Defendant be barred from the practice of medicine, and any attempt to retain or re-apply for a license to do so, and that he be barred from prescribing controlled substances during this term. The government further respectfully requests that Defendant be prohibited from working in any medical setting during the term of supervision.

## IV. CONCLUSION

For the foregoing reasons, the government respectfully submits that a Guidelines sentence would satisfy the directives in 18 U.S.C. § 3553(a). The government respectfully recommends that this Court sentence Defendant to a term of imprisonment of 97 months, followed by three years of supervised release, and order a special assessment of $2,400, as well as permanent forfeiture of Defendant's DEA registration.

<div style="margin-left: 50%;">

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

GLEN LENNON
Chief, Fraud Section
Criminal Division
United States Department of Justice

</div>

By:                                    /s/*Danielle H. Sakowski*
                                       DANIELLE H. SAKOWSKI
                                       ALEXIS GREGORIAN
                                       DEVON HELFMEYER
                                       Trial Attorneys
                                       United States Department of Justice
                                       1400 New York Avenue NW
                                       Washington, DC 20002

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 25th day of April, 2024, I filed the foregoing United States' Sentencing Memorandum with the Clerk of Court, and provided an electronic copy to Defendant's counsel of record.

/s/*Danielle H. Sakowski*
DANIELLE H. SAKOWSKI
Trial Attorney
United States Department of Justice
1400 New York Avenue NW
Washington, DC 20002