# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  July 23, 2025

Mr. Jeremy Raymond Sanders
U.S. Department of Justice
Criminal Division
1400 New York Avenue, N.W.
Washington, DC 20005

Mr. Samuel Harry Shamansky
Law Office of Samuel H. Shamansky
523 S. Third Street
Columbus, OH 43215

Re:  Case No. 24-3463, *USA v. Thomas Romano*
Originating Case No. : 2:19-cr-00202-1

Dear Counsel,

The Court issued the enclosed opinion today in this case.

Enclosed are the court's unpublished opinion and judgment, entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Sincerely yours,

s/Cathryn Lovely
Opinions Deputy

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue

NOT RECOMMENDED FOR PUBLICATION
File Name:  25a0365n.06

No. 24-3463

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| Plaintiff-Appellee, | ) | Jul 23, 2025 |
|  | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTH-ERN DISTRICT OF OHIO |
| THOMAS J. ROMANO | ) |  |
| Defendant-Appellant. | ) | OPINION |
|  | ) |  |

Before:  BOGGS, McKEAGUE, and MATHIS, Circuit Judges.

BOGGS, Circuit Judge. Defendant-Appellant Dr. Thomas Romano most recently practiced as a rheumatologist at a clinic he owned and operated in Martins Ferry, Ohio. Romano's practice focused on treating pain, and he prescribed a high dosage of controlled substances to many of his patients.

Following a jury trial, Romano was convicted of twenty-four counts of unlawful distribution of controlled substances. On appeal, Romano challenges the sufficiency of the evidence supporting the jury's verdict and the adequacy of the government's pretrial expert-witness disclosures. For the reasons that follow, we affirm.

**BACKGROUND**

In June 2020, a federal grand jury charged Romano with thirty-four counts of knowingly distributing a controlled substance without a legitimate medical purpose and outside the course of professional practice, in violation of 21 U.S.C. § 841(a)(1).

No. 24-3463, *United States v. Romano*

Following his first trial in 2022, the jury convicted Romano on twenty-four counts and acquitted him on ten counts. In a post-trial order, the district court granted Romano a new trial for two independent reasons: first, the court found that the government failed to disclose material evidence; and second, the court found that prosecutors engaged in prejudicial misconduct throughout the first trial by, among other things, repeatedly violating the court's evidentiary rulings.

Following Romano's second trial in September 2023, the jury convicted Romano on the remaining twenty-four counts, those that had not resulted in an acquittal at the first trial. Romano timely appealed.

In the second trial, the jury heard the following evidence. Romano worked as a rheumatologist for over thirty years. Due to a change in Ohio licensing requirements, Romano applied in 2011 to have his office licensed as a pain clinic so that he could continue to prescribe controlled substances. In 2012, Romano's clinic was granted the license by the State Medical Board of Ohio.

By all accounts, Romano used his license aggressively; indeed, Romano testified that he recognized he "might get in trouble" for his prescribing practices "given the climate now," and Romano's practice was described by one expert witness as "opiate-centric."

Romano did not accept insurance payments because "he didn't want somebody else making decisions for him about . . . how he could treat the patients." Likewise, Romano seldom worked with other physicians—he claimed that he did not believe that other doctors could treat chronic pain as well as he did.

Romano charged $750 for first-time appointments and around $120 per visit after that. His typical appointments were between fifteen and thirty minutes long. Many of Romano's patients traveled long distances—sometimes more than two hours each way—to visit his clinic. Romano had so many patients who traveled long distances to see him that his introductory letter to patients

No. 24-3463, *United States v. Romano*

stated, "if you are driving a long distance, you may want to consider making arrangements to stay in the area overnight."

The potency of opioids like oxycodone and fentanyl can be measured using a morphine milligram equivalent (MME), which denotes the equivalent daily amount of morphine a patient is receiving. The jury heard testimony that CDC guidelines warn doctors that prescribing a dosage greater than 90 MME has serious risks. Similarly, the jury heard that State Medical Board of Ohio guidelines indicate that 80 MME is considered a "pause point," where a doctor should carefully reevaluate their patient to ensure that the doctor has justification for exposing the patient to a high risk of adverse effects. The jury was also apprised of the CDC guideline that doctors should rarely prescribe opioids for a continuous period of more than seven days. While these guidelines do not establish bright-line prohibitions, they are designed to protect patients against the well-known risks associated with prescribing opioids, "including misuse and abuse, addiction, overdose, and death."

The jury heard extensive testimony describing Romano's prescribing practices for nine of his patients—the patients who had been issued the prescriptions listed in Romano's indictment. Before seeing Romano, all nine patients had taken opioids but did not report improvements in their pain levels, according to an expert's review of the patients' records. Because of his patients' lack of improvement from past opioid use, "there was no foundation to justify the continued use of opiates," the expert explained at trial.

Despite this lack of foundation, Romano prescribed each of the nine patients high doses of opioids for extended periods, in some cases for several years. Many of Romano's patients were prescribed more than 300 MME for many years; "time and again," Romano's "patients remained in a very high-risk category," according to expert testimony.

No. 24-3463, *United States v. Romano*

The government also offered evidence that Romano's patients were not meaningfully warned about the risks of the medications they were prescribed. The introductory pain contract that Romano provided to patients stated that opioids have a "low risk of psychologic dependence," a claim that an expert recognized as plainly false. One patient testified that she expressed concern about the cost associated with seeing Romano, and his response was to underscore that the patient needs the drugs and needs his services, so she should "[d]o whatever [she] gotta do" to pay.

The jury also heard testimony that Romano's patient evaluations were mostly perfunctory and "cloned," meaning his evaluations were not distinct from patient to patient—most of the patients "had the same diagnosis" of fibromyalgia and "regional pain." These diagnoses, the justifications for the patients' high-volume opioid prescriptions, were largely based on incomplete medical histories and lacked supportive diagnostic testing such as a comprehensive physical exam or an MRI. As one expert witness at trial stated, "Romano prescribed controlled substances without establishing a medical condition that justified the use of controlled substances."

Across the nine patients at issue, Romano continued to prescribe opioids with "no indication of improvement in pain, function, or quality of life." To the contrary, an expert who reviewed the patients' files testified that many of Romano's patients experienced a "degradation" of quality of life. The jury heard that Romano ignored patients' comorbidities—anxiety, depression, and obesity, among others—which increased the patients' risk of addiction or other negative effects such as labored breathing.

Romano's prescribing practices fell yet further from the standard of care insofar as he prescribed dangerous combinations of benzodiazepines, along with the opioids, to each of the nine patients whose details were presented to the jury. Romano regularly prescribed the opioid-and-benzodiazepine combination for long periods of time, several months to years. In one extreme

- 4 -

No. 24-3463, *United States v. Romano*

case, Romano wrote overlapping opioid and benzodiazepine prescriptions for a patient for nearly five years. The jury heard about the risks involved in such a drug combination. Indeed, the FDA issued a "black box" warning—the FDA's strongest warning—against combining opioids and benzodiazepines.

Finally, the jury heard evidence indicating that Romano knew the risks he was imposing on his patients. He ignored problematic drug screens and other "red flags," continuing to prescribe controlled substances despite indications that patients were abusing or diverting their pills. For instance, one patient reported a history of substance abuse on his first visit to Romano; Romano prescribed him opioids anyway. Another patient told Romano about his history of drug abuse and reported "borrowing" other people's drugs, but that did not stop Romano from prescribing him high dosages of controlled substances.

Some of Romano's patients displayed signs of addiction such as falling asleep at work and getting into car accidents—one patient reported to Romano that he was involved in at least sixteen car accidents—but, again, Romano continued them on high dosages of opioids. The jury also heard testimony from Dr. Benedict Belcik, a doctor who treated one of Romano's patients. Belcik testified that Romano's patient came into Belcik's practice appearing heavily sedated—wearing sunglasses inside, having trouble walking down the hallway, and exhibiting slurred speech. Belcik learned that Romano had prescribed the patient an "extremely dangerous" combination of oxycodone and two benzodiazepines. He also learned that the patient was never warned about the alarming combination of drugs that Romano prescribed her, a combination that "a medical student would have identified" as dangerous.

Likewise, Romano ignored verbal or written warnings from other doctors, pharmacists, and insurance companies. For instance, the jury heard testimony that pharmacists would regularly

- 5 -

No. 24-3463, *United States v. Romano*

call Romano's practice with concerns about the dosages of drugs he prescribed, but Romano made clear that he "didn't want to hear about" it. When pharmacists would call the office and refuse to fill a prescription, Romano's response was to instruct the pharmacist to "[g]ive the patient back the prescription" so that the patient "can fill it someplace else."

The State Medical Board of Ohio investigated Romano in 2017 and subpoenaed patient files from his practice. Although the investigation resulted in Romano keeping his license, Romano testified that a letter from the Board listed some problems with his prescribing practices, including a failure to sufficiently review patients' reports in the Ohio Automated Rx Reporting System (OARRS), a database containing "any controlled substances that [have been] prescribed to a patient." Ultimately, Romano testified that he "kn[e]w the dangers" involved with prescribing high daily doses of opioids.

## ANALYSIS

### A. Sufficiency of the Evidence

We review de novo Romano's sufficiency-of-the-evidence claim. *United States v. Pritchett*, 749 F.3d 417, 430 (6th Cir. 2014). A conviction rests on sufficient evidence if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In evaluating a sufficiency-of-the-evidence challenge, we neither judge the credibility of testifying witnesses nor independently weigh the evidence. *United States v. Gooding*, 351 F.3d 738, 741 (6th Cir. 2003). At bottom, a defendant "bears a very heavy burden" on a sufficiency-of-the-evidence challenge, *United States v. Hills*, 27 F.4th 1155, 1172 (6th Cir. 2022), because "[a]ll reasonable inferences must be made to support the jury verdict," *United States v. LaVictor*, 848 F.3d 428, 456 (6th Cir. 2017).

No. 24-3463, *United States v. Romano*

As stated above, the jury convicted Romano of twenty-four counts of unlawful distribution of controlled substances, 21 U.S.C. § 841(a)(1). "In order to obtain a conviction under 21 U.S.C. § 841(a)(1) against a licensed physician . . . the government must show: (1) [t]hat defendant distributed a controlled substance; (2) [t]hat he acted intentionally or knowingly; and (3) [t]hat defendant prescribed the drug without a legitimate medical purpose and outside the course of professional practice." *United States v. Anderson*, 67 F.4th 755, 769 (6th Cir. 2023) (per curiam) (internal quotation marks and citation omitted).

Romano challenges the sufficiency of the evidence presented to prove the second and third elements of unlawful distribution. Romano first contends that the government did not prove that he, in fact, prescribed controlled substances without a legitimate medical purpose and outside the course of professional practice. Romano points out that his expert witness testified that each of the prescriptions listed in the indictment "were appropriate, within the usual course of medical treatment, and for a legitimate medical purpose."

This argument is unpersuasive. There was sufficient evidence from which a rational juror could have concluded that Romano operated far outside professional norms. *See ibid.* (rejecting a sufficiency-of-the-evidence challenge because expert testimony established that the defendant's prescribing practices "fell far short of professional practice"). While Romano's expert witness presented his favorable view of Romano's prescribing practices, the jury heard voluminous countervailing evidence from several government witnesses. That evidence, as described above, revealed that Romano prescribed high doses of opioids over several years—together with benzodiazepines—to patients with comorbidities and signs of addiction, while failing both to adequately warn his patients about the serious risks of the drugs and to consider his patients' medical histories and physical conditions. *See United States v. Bauer*, 82 F.4th 522, 529 (6th Cir. 2023) (rejecting a

No. 24-3463, *United States v. Romano*

sufficiency-of-the-evidence challenge where a doctor, among other things, "prescribed dangerous combinations of controlled substances" and "vastly exceeded [MME] dosage thresholds established by federal and state agencies even though there was no indication that the named patients' functioning or pain levels were improving").

Sufficiency-of-the-evidence review "bars courts from intrud[ing] on the jury's role to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *United States v. Sykes*, 65 F.4th 867, 880–81 (6th Cir. 2023) (alteration in original) (citation omitted). Thus, Romano "cannot override the jury's decision by claiming that his favored evidence should have been entitled to more weight than conflicting evidence." *United States v. Suetholz*, No. 23-5613, 2024 WL 4182903, at *4 (6th Cir. Sept. 13, 2024).

Romano also attacks the sufficiency of the government's evidence showing that he acted intentionally or knowingly. He contends that he "reasonably and subjectively believed that his methods were authorized," and points to evidence that, he claims, shows that he "conducted extremely thorough examinations, performed monthly patient evaluations, verified symptoms and diagnoses, sought outside opinions for alternative treatments, rejected patients who violated their pain contract, and lowered opioid dosages in a careful, considered manner when appropriate." Romano adds that the State Medical Board of Ohio renewed his license after reviewing some of his patient records, which he interpreted to mean "that what [he] was doing was acceptable and that [he] should continue taking care of [his] patients in the manner in which [he] was doing."

However, the jury heard sufficient evidence to infer that Romano had "the required subjective knowledge of unauthorized distribution." *Bauer*, 82 F.4th at 529. Recall that Romano testified that he recognized he "might get in trouble" for his prescribing practices "given the climate now." The jury also heard testimony, as described above, that Romano "cloned" patient examinations,

- 8 -

No. 24-3463, *United States v. Romano*

ignored signs of addiction, and balked at warnings from other doctors, insurance companies, and pharmacists. *See ibid.* ("[E]vidence that [a doctor] failed to adequately examine the patients, establish diagnoses, consider red flags, or attempt more conservative treatment options" supported an inference that the doctor knew his prescriptions were without authorization.); *Anderson*, 67 F.4th at 769 (sustaining a § 841(a) conviction where a doctor ignored patients' obvious signs of addiction). For instance, patients traveled long distances, sometimes more than two hours each way, to see Romano, as the doctor acknowledged in the letter he supplied to his patients. *See United States v. Stanton*, 103 F.4th 1204, 1210 (6th Cir. 2024) (explaining that "patients traveling long distances from out of state" to visit a clinic is a red flag that the clinic operated as a "pill mill"); *United States v. Elliott*, 876 F.3d 855, 864 (6th Cir. 2017) (holding that the defendant's "knowledge of the distances [patients] traveled to obtain prescriptions at the clinic" supported the conviction).

Romano's argument that the State Medical Board of Ohio "objectively authorized" his prescribing practices by renewing his license fares no better. While the renewal of Romano's license following the Board's review of some of his patient files might be some evidence in his favor, again, it is the jury's role, not ours, to weigh the evidence. In any event, Romano's argument that his prescribing practices were "directly and unequivocally" approved by the Board is specious. While the Board did not withdraw Romano's license following a review of some of his patient files, it did alert him to several problems with his prescribing practices, among them Romano's insufficient review of patients' OARRS reports. *See Bauer*, 82 F.4th at 528 ("'[T]he more unreasonable' a defendant's 'asserted beliefs or misunderstandings are,' especially as measured against objective criteria, 'the more likely the jury . . . will find that the Government has carried its burden of proving knowledge.'" (citation omitted)).

No. 24-3463, *United States v. Romano*

At bottom, the large amount of circumstantial evidence '"especially as measured against objective criteria' allows an inference that [Romano] had subjective knowledge" that he was operating without a legitimate medical purpose and outside the course of professional practice, satisfying the government's burden. *Id.* at 529 (citation omitted).

## B. Expert-Witness Challenges

Romano contends that the district court erred in permitting the expert testimony of Dr. Stephanie Le, Dr. Benedict Belcik, and Jeffrey McCloud, a registered pharmacist, on the basis that the government's expert disclosures were inadequate under Federal Rule of Criminal Procedure 16(a)(1)(G). We reject Romano's contention and hold that the district court acted within its discretion when it permitted Dr. Le, Dr. Belcik, and McCloud to testify as experts.

By way of background, before Romano's second trial, the government provided expert-witness disclosures to Romano summarizing the anticipated testimony from Dr. Le, Dr. Belcik, and McCloud. The disclosures also stated that each witness would give testimony "regarding largely the same topics as" they did in the first trial, and each disclosure included page numbers keyed to the transcript of the experts' testimony in the first trial.

Romano moved to exclude the three experts from testifying on the basis that the government's disclosures violated Federal Rule of Criminal Procedure 16(a)(1)(G) by failing to state the experts' "specific opinion[s]." *See* Fed. R. Crim. P. 16(a)(1)(G) ("At the defendant's request, the government must disclose to the defendant, in writing," among other things, "a complete statement of all opinions that the government will elicit" from expert witnesses during its case-in-chief). Romano added an additional challenge to Dr. Le's disclosure because her disclosure did not have her signature on it. *See* Fed. R. Crim P. 16(a)(1)(G)(v) ("The witness must approve and sign the disclosure, unless the government[] states in the disclosure why it could not obtain the witness's

No. 24-3463, *United States v. Romano*

signature through reasonable efforts."). The government explained in a separate communication to the court and Romano's counsel—sent alongside its Rule 16 disclosures—that it could not reach Dr. Le to obtain her signature after calling and emailing her multiple times.

The district court denied Romano's motion, determining that "even if the Government failed to comply with Rule 16's disclosure requirements, suppression would not be appropriate" because Romano "cannot show any prejudice." The court underscored that the three "witnesses all testified in the first trial, and [Romano] will be free to cross-examine these witnesses at length."

At the second trial, Dr. Le, Dr. Belcik, and McCloud testified, and Romano cross-examined each of them. Dr. Le testified that she did not sign her disclosure because she was travelling in Alaska with inconsistent cell service.

We review for abuse of discretion the district court's rulings on issues raised under Federal Rule of Criminal Procedure 16(a)(1)(G). *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007). "We reverse only where the district court's erroneous admission of evidence affects a substantial right of the party." *Ibid.* (citing Fed. R. Evid. 103(a)). "An error affects a defendant's substantial rights if it is likely to have had any substantial effect on his conviction." *Id.* at 404 (citation omitted).

Even assuming arguendo that the government's disclosures violated Rule 16(a)(1)(G), Romano's argument fails because he does not meaningfully articulate "how the outcome of the case would have been different" had he been provided with a more detailed summary of the experts' testimony or a signature from Dr. Le. *Id.* at 407 (citation omitted). Indeed, as the government argues, Romano had the benefit of reviewing the three experts' testimony from his first trial before cross-examining them at his second trial, meaning that he "did not suffer any surprise" from the purported insufficiency of the disclosures. *See United States v. Ham*, 628 F.3d 801, 806 (6th Cir.

No. 24-3463, *United States v. Romano*

2011) (citation omitted); *White*, 492 F.3d at 406 ("In 1993, the drafters amended Rule 16 to require such disclosure to minimize surprise that often results from unexpected expert testimony . . . and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." (alteration in original) (internal quotation marks omitted)); *United States v. Wells*, 211 F.3d 988, 997 (6th Cir. 2000) (rejecting an argument that the government supplied an insufficient expert-witness disclosure and explaining that the defendant "should not have been surprised by [the expert's] testimony" because the testimony "was the subject of a substantial amount of pretrial discourse"). On this record, we hold that Romano's substantial rights were unaffected by any Rule 16 error.

## CONCLUSION

For the reasons above, we AFFIRM.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-3463

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

    v.

THOMAS J. ROMANO,

    Defendant - Appellant.

**FILED**
Jul 23, 2025
KELLY L. STEPHENS, Clerk

Before:  BOGGS, McKEAGUE, and MATHIS, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

    THIS CAUSE was heard on the record from the district court and was submitted on the briefs without oral argument.

    IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Kelly L. Stephens, Clerk